1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dennis J. Stewart, CA Bar No. 99152
**GUSTAFSON GLUEK PLLC**
600 B Street, Suite 1700
San Diego, CA 92024QW
Tel.: (612) 333-8844
Fax: (612) 339-6622
dstewart@gustafsongluek.com
[Additional Counsel on Signature Page]
Attorneys for Plaintiffs and Others Similarly Situated

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **ELRETHA PERKINS and LARONICA JOHNSON**, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>**WELLS FARGO, N.A.**, a Delaware Corporation; **WELLS FARGO HOME MORTGAGE, INC.**, a Delaware Corporation,<br><br>Defendants. | **Case No. 3:22-cv-3455**<br><br>**CLASS ACTION COMPLAINT**<br><br>**(1) Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq.**<br>**(2) Violation of the Fair Housing Act, 42 U.S.C. § 3601, et seq.**<br>**(3) Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, et seq.**<br>**(4) Violation of the California Unfair Competition Law, Cal. Bus. & Pro. Code §17200, et seq.**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT - 1

Plaintiffs Elretha Perkins and Laronica Johnson, on behalf of themselves and all others similarly situated, bring this action against Defendants Wells Fargo, N.A. and Wells Fargo Home Mortgage (The "Defendants" or "Wells Fargo") to address the substantial injuries they and all others similarly situated sustained arising from Wells Fargo's illegal discrimination, in violation of the Equal Credit Opportunity Act, the Fair Housing Act, the Civil Rights Act of 1866, and the California Unfair Competition Law.

## I.  NATURE OF THE ACTION

1.      Homeownership in the United States of America is a central tenet of the American Dream.  For millions of Americans, homeownership is the foundation of family, community, and human dignity.

2.      By design, however, federal agencies and financial institutions in charge of making homeownership a reality have long placed African Americans and other racial minorities at a structural disadvantage.

3.      Soon after Congress passed the National Housing Act of 1934 (NHA) into law, federal agencies, and financial institutions responsible for fulfilling the NHA's promise drew maps across the United States, placing "greenlines" around neighborhoods that were predominantly white Anglo-Saxon and Northern European, and "redlines" around neighborhoods that were predominantly African American and other racial minority populations.

4.      This discriminatory practice of "redlining" caused African American home loan applicants to be denied more often than their similarly situated white counterparts, to receive less favorable terms than their similarly situated white counterparts, and to receive inferior treatment as part of the home loan application process than their similarly situated white counterparts.

5.      In 1968, Congress enacted the Fair Housing Act, seeking to, among other things, end the discriminatory practice of redlining.

6.      Despite decades of efforts since the Fair Housing Act, recent data from federal housing agencies indicate that African Americans and other racial minorities, of worthy credit, continue to face discrimination in access to, and quality of, home loans when compared to their similarly situated white counterparts.  Among those who continue to contribute to this injustice is Wells Fargo.

7.      Indeed, data reviewed reveals that in 2020, Wells Fargo rejected a majority of completed home loan applications submitted by African American homeowners as compared to similarly situated white applicants.[1] Moreover, the application process designed by Wells Fargo is more difficult for African American applicants to complete, resulting in 27% of all African American applicants to withdraw their application before completing it.[2]

8.      Wells Fargo has a long history of discrimination against African Americans and other racial minorities in the home loan arena.  For example, in 2011, a jury found Wells Fargo guilty of systematically discriminating against minority home buyers by using a computer software in part to identify minority homeowners which resulted in them paying more for their home loans than white borrowers.  *See Opal Jones, et. al v. Wells Fargo Bank, N.A., et al.*, Case No. BC337821 (Los Angeles Superior Court. 2011), *rev'd on other grounds*, Case No. B243333, 2015 WL 662081.  The following year, a United States Department of Justice (DOJ) Civil Rights Division investigation found that in more than 34,000 cases, Wells Fargo charged Black and Hispanic customers higher fees and interest rates than white customers with similar credit profiles.[3]  Despite

---

[1]  https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing
[2] *Id.*
[3] *See Justice Department Reaches Settlement with Wells Fargo Resulting in More Than $175 Million in Relief for Homeowners to Resolve Fair Lending Claims* (DOJ Release) July 12, 2012, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief (accessed April 10, 2022).

having to be held accountable for its discriminatory conduct many times before, Wells Fargo continues its pattern and practice of discrimination against non-white borrowers.

9.      Starting in at least 2018, and continuing to the present, Wells Fargo has discriminated against African Americans, and other racial minorities, by deploying a modern home loan scheme that is tantamount to 21st century redlining.

10.     Wells Fargo deploys this discriminatory scheme in two critical ways.  First, Wells Fargo uses a computer system which deploys automated algorithms and artificial intelligence-like machine learning as part of its home loan decisions.  These algorithms and artificial intelligence machine learning technologies—like the redlining maps of the 1930's—select geographic areas that are predominantly African American (and other racial minorities) and subject those geographies and persons within those geographies to adverse treatment as part of home loan decisions.

11.     For example, Wells Fargo's algorithm labels certain neighborhoods that are predominantly Black as neighborhoods ineligible for rapid loan processing, a service provided to similarly situated white applicants.  As a result, Wells Fargo loan personnel have told African American loan applicants who live in predominantly Black neighborhoods that they would not receive the same rapid application process as their white counterparts.[4]

12.     Second, Wells Fargo applies several pretextual actions in the home loan application process which are specifically targeted at non-white borrowers.  These actions include, but are not limited to, (i) providing African American applicants with an inferior and slower valuation process for homes in predominantly Black neighborhoods, (ii) placing loan officers who were able to process applications significantly farther away from Black applicants than their white

---

[4]   *See* Wells Fargo Rejected Half Its Black Applicants in Mortgage Refinancing Boom (bloomberg.com), www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/, (accessed March 28, 2022).

counterparts, and (iii) delaying processing of applications from African Americans, when compared to their similarly situated white counterparts.

13.     Based on the data, the disparate impact of Wells Fargo's discriminatory scheme is quite clear.  A white applicant seeking to refinance their home loan, who earned between $0 and $63,000 per year were more likely to have their home loan financing application approved by Wells Fargo than a Black applicant seeking to refinance their home loan, who earned between $120,000 and $168,000 per year.[5]  As a result of Wells Fargo's barrage of pretextual actions aimed at deterring Black applicants, more than one-quarter of all Black homeowners who began an application to finance their home loan through Wells Fargo did not finish their application.[6]

14.     Wells Fargo was the only major lender in the United States of America that approved a smaller share of refinancing applications from Black Americans in 2020 than it had in 2010.[7]

15.     Notably, Wells Fargo was the *only* major lending institution in the United States to reject the majority of Black applicants seeking to refinance their homes.  Wells Fargo's conduct is especially pernicious with regards to refinancing—as opposed to a new loan application—because with a refinance, the applicant has already established an ability to pay a mortgage with a *higher* interest rate than would be secured with a refinanced loan.

16.     Wells Fargo's discrimination is even more stark when its treatment of Black home loan applicants is compared to other financial institutions.

17.     By way of example, during the same time period, JP Morgan Chase & Co. approved 81% of Black applicants seeking to refinance their home loan.  Bank of America Corp. approved

---

[5]     *Id.*
[6]     *Id.*
[7]     *Id.*

over two-thirds of Black applicants; and Rocket Mortgage approved nearly 8-in-10 Black applicants.[8]  Overall, other comparable lenders approved 71% of Black applicants seeking to refinance their home loans.[9]  Meanwhile, Wells Fargo approved only 47% of Black applicants.

18.     One of those many Americans impacted by Wells Fargo's discriminatory scheme is Plaintiff Elretha Perkins.  Ms. Perkins is a successful small business owner with a 40+ year career in North Carolina's childcare and transportation industries.  Ms. Perkins is a business leader, a graduate of North Carolina A&T State University, a prominent Historically Black College and University ("HBCU"), and leader within her local African American community.  In addition to her personal successes, she has raised extremely successful children who are active in Georgia's film and entertainment industry.

19.     Ms. Perkins has consistently made payments on her home loan, originally financed by Wells Fargo.  Ms. Perkins' creditworthiness is evidenced by her 720-credit score.  Yet, despite her successful 40+ career and clear creditworthiness, when Ms. Perkins sought to refinance an equity line of credit, Wells Fargo subjected her to delay tactics and overt acts of discrimination.

20.     Ms. Perkins faced a multitude of pretextual obstacles and actions by Wells Fargo, including mandating that in order for her to refinance her equity line of credit she would have to apply for a modification under a "hardship" program, as if the loan was in distress, despite Ms. Perkins not facing any financial hardship or need to modify the loan under a loss mitigation program. Wells Fargo also required her to speak with third-party entities to simply make payments on her equity line of credit.  Ms. Perkins was given the runaround to such an extent that she has

---

[8]     *See Wells Fargo refinancing loan approvals lower for Blacks (Philadelphia Tribune)*, www.phillytrib.com/news/business/wells-fargo-refinancing-loan-approvals-lower-for-blacks/article_379b95bd-d8a7-5402-abb9-d569c68bbbc6.html, (accessed March 26, 2022).
[9]     *See Wells Fargo Rejected Half Its Black Applicants in Mortgage Refinancing Boom (bloomberg.com)*, *www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/, (accessed March 28, 2022)*

had to submit the same tax and income documents multiple times only to face more delays from Wells Fargo in processing her refinancing request.

21.     Another American impacted by Wells Fargo's discriminatory scheme is Plaintiff Laronica Johnson.  Ms. Johnson is a caring and committed educator.  Ms. Johnson received her bachelor's degree from Texas Southern University and her master's degree from Prairie View A&M University, both HBCU's.  Today, Ms. Johnson works to ensure that all children receive equal treatment and access to education as a special education teacher.

22.     Ms. Johnson has consistently made payments on her home loan.  Ms. Johnson has never been late on her current home mortgage payment.  Her creditworthiness is evidenced by her 680-credit score.

23.     Despite her creditworthiness, Wells Fargo provided a series of pretextual reasons in discriminating against Ms. Johnson.  For example, contrary to the purpose of borrowers refinancing their home mortgage loans, Wells Fargo personnel told Ms. Johnson that refinancing did not make sense in her case and would result in her mortgage and/or interest rate increasing.  In addition, despite approving many other similarly situated white applicants, Wells Fargo personnel told Ms. Johnson that refinancing was "just not worth it."  Between 2019 and 2022, Ms. Johnson has applied three times to refinance her home mortgage loan with Wells Fargo.  Wells Fargo denied Ms. Johnson each time.

24.     The experiences of Ms. Perkins and Ms. Johnson mirror the experiences of so many Black and Brown Americans who have been damaged by Wells Fargo's systemic discrimination. Wells Fargo's discriminatory conduct violates the commercial and civil rights of Class members and has caused hundreds of millions of dollars in damages to the Class.  Individually, and as Class Representatives, Ms. Perkins and Ms. Johnson bring this action against Wells Fargo to restore the

Class any amounts which they otherwise would have been entitled to under law, together with any other equitable and remedial relief as the Court may deem appropriate.

## II.  JURISDICTION AND VENUE

25.     Plaintiffs bring this action under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*, the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981, to secure declaratory and  injunctive relief, statutory damages, costs of suit, and reasonable attorneys' fees for the injuries that Plaintiffs and members of the Class sustained as a result of Defendants' violations.

26.     This Court has federal question jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1343, regarding Plaintiffs' claims arising under the Equal Credit Opportunity Act, 15 U.S.C. §  1691 *et seq*, the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

27.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a), regarding Plaintiffs' claims arising under California's Unfair Competition Law, Cal. Bus. And Pro. Code § 17200 *et seq.*, because this claim is so related to the federal Equal Credit Opportunity Act, the Fair Housing Act of 1968, and the Civil Rights Act of 1866 claims that they form part of the same case or controversy under Article III of the United States Constitution.

28.     This Court has personal jurisdiction over Defendants because, among other things, they: (a) transacted business throughout the United States, including in this District; (b) the illegal discrimination alleged took place in this District; (c) had maintained substantial aggregate contacts with the United States as a whole, including in this District; (d) had substantial contact in various states in the United States, including in this District; and (e) directed its illegal discrimination and had direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons

residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

29.     This District is the appropriate venue under 28 U.S.C. §1391(c), because during the Class Period, Defendants transacted business in this District, and a substantial part of the events giving rise to the Plaintiffs' claims took place in this District.

## III.  PARTIES

**A.  Plaintiffs**

*Elretha Perkins*

30.     Plaintiff Elretha Perkins is a Black female homeowner with a 720-credit score, and is a natural person and citizen of Eden, North Carolina.  Ms. Perkins owns homes in both Eden, North Carolina and Dacula, Georgia.  Ms. Perkins' Dacula, Georgia home was financed through Wells Fargo.  Ms. Perkins has been a Wells Fargo customer for nearly 20 years.

*Laronica Johnson*

31.     Plaintiff Laronica Johnson is a Black female homeowner with a 680-credit score, and is a natural person and citizen of Houston, Texas.  Ms. Johnson owns a home in Houston, Texas.  Ms. Johnson unsuccessfully sought to refinance her home mortgage loan through Wells Fargo on three separate occasions between 2019 and 2022.

**B.  Defendants**

*Wells Fargo, N.A.*

32.     Defendant Wells Fargo, N.A. a publicly traded, global financial services firm and a Fortune 500 corporation incorporated in the State of Delaware, with its principal place of

business in the State of California.   As of 2020, Defendant Wells Fargo N.A. has assets of approximately $1.9 trillion.   Among other things, Wells Fargo, N.A. is a mortgage lender.

*Wells Fargo Home Mortgage*

33.   Defendant Wells Fargo Home Mortgage is a home lending company that is one of Wells Fargo's various corporate entities.   Defendant Wells Fargo Home Mortgage originates and services approximately $300 billion worth of loans per year.   Wells Fargo Home Mortgage is incorporated in the State of Delaware and has its principal place of business in the State of Iowa.

## IV.  FACTUAL ALLEGATIONS

**A.   Access to Home Loan Refinancing Hits Record Highs**

34.   Refinancing a home loan provides homeowners the ability to reduce the interest on their home loan payments, to "cash out" and capture the additional equity their homes have gained since the previous financing and may permit home loan borrowers to save money on the principal of their loan.

35.   Because of historically low interest rates, millions of Americans have applied to refinance their homes over the last few years.   These homeowners have refinanced over $5 trillion in mortgage value.

**B.   Wells Fargo's Discriminatory Scheme**

36.   Wells Fargo executes its discriminatory scheme in two key ways.   First, Wells Fargo utilizes a computer system with a discriminatory automated algorithm and artificial intelligence machine learning program to make home loan decisions.   These discriminatory algorithms and artificial intelligence machine learning technologies—like the redlining maps of the 1930's—select geographic areas that are predominantly Black, and then either deny home loan

opportunities to Black applicants or provide inferior terms and processing than the terms and processing received by similarly situated white applicants.  For example, Wells Fargo's algorithms and artificial intelligence machine identified geographic neighborhoods eligible for quick evaluations of refinancing applicants.  This algorithm consistently labeled predominantly Black neighborhoods *ineligible* for rapid processing.

37.     Second, Wells Fargo employed a series of pretextual actions that are instrumental to further its discriminatory scheme.

38.     One pretextual action was that Wells Fargo placed its loan officers significantly farther away from Black applicants to reduce the amount and frequency of home loan applications from Black applicants.

39.     Another pretextual action was Wells Fargo delaying the home loan valuation process for Black applicants as well as delaying the valuation process of homes located in predominantly Black neighborhoods.  The valuation process is critical to any home loan and home sale transaction.  By deploying this pretextual action, Wells Fargo treated Black applicants differently than their similarly situated white counterparts.

40.     A third pretextual action was the intentional delay in the processing of applications from African Americans, when compared to their similarly situated white counterparts.  Wells Fargo regularly approved refinancing applications of non-Black homeowners in just weeks but took significantly longer to approve the applications of Black homeowners, sometimes taking months.

**C.      Data Shows Wells Fargo Disparately Treated Its Black Home Loan Applicants.**

41.     The impact of Wells Fargo's discriminatory scheme is also evident from the data.

42.     In 2020, Wells Fargo approved Black homeowner refinancing applications at a rate far lower than that of *any* other major lender in the United States of America.

43.     For instance, JP Morgan Chase & Co. approved 81% of Black applicants seeking to refinance their home loans.  Bank of America Corp. approved over two-thirds of Black applicants; and Rocket Mortgage approved nearly 8-in-10 Black applicants.

44.     Overall, other comparable lenders approved 71% of Black applicants seeking to refinance their home loans, whereas Wells Fargo approved only 47%.

**D.     Plaintiffs Elretha Perkins and Laronica Johnson Were Harmed by Wells Fargo's Race-Based Discrimination.**

45.     Plaintiff Elretha Perkins purchased her home in Dacula, Georgia in 2006, through a Wells Fargo home loan for $470,000 ("Home Loan").  Today, Ms. Perkin's Dacula home is worth approximately $630,000.  As part of this home loan approval, but without Ms. Perkins knowledge, Wells Fargo added a second home equity loan ("Home Equity Loan") to Ms. Perkins lending package.  Ms. Perkins consistently made payments to Wells Fargo from 2006 through 2018.

46.     In 2018, Ms. Perkins' Home Loan contract was moved to a third-party mortgage servicer, Specialized Loan Services.  Ms. Perkins' Home Equity Loan, however, continued to be serviced by Wells Fargo.  Ms. Perkins began making home loan payments to Specialized Loan Services, and Home Equity Loan payments to Wells Fargo.

47.     In 2021, Ms. Perkins sought to refinance her Home Equity Loan through Wells Fargo.  Because of her high credit score and history with Wells Fargo, Ms. Perkins believed refinancing her Home Equity Loan would be easy.  She was sadly mistaken.

48.     For example, upon initially seeking to refinance her Home Equity Loan, Wells Fargo repeatedly asked Ms. Perkins to resubmit paperwork because Wells Fargo personnel claimed that the information she had submitted was either not received, missing, or somehow lost.  Wells Fargo personnel also took weeks or months to respond to Ms. Perkins' inquiries about the status of her Home Equity Loan refinance request.

49.     During this time, Wells Fargo mandated that for Ms. Perkins to refinance her Home Equity Loan she would have to apply for a loan modification classifying the loan with "Hardship" status, despite Ms. Perkins facing no financial hardship or requesting any hardship status.  Wells Fargo then advised Ms. Perkins that the only way for her to be considered for a Home Equity Loan refinance would be for her to fill out paperwork seeking mortgage assistance through loss mitigation.

50.     Although Ms. Perkins was not under any financial hardship, she very much desired to refinance her Home Equity Loan so she acquiesced to Wells Fargo's request and filled out hardship paperwork.  Despite following Wells Fargo's directions for nearly 12 months, including submitting paperwork for mortgage assistance and "hardship" status that Ms. Perkins did not need, Wells Fargo has constructively denied her home loan refinance request.

51.     Plaintiff Laronica Johnson purchased her home in Houston, Texas in 2016, for approximately $163,000.  Her home is currently worth approximately $261,000.  In 2018, Wells Fargo notified Ms. Johnson that it would take over servicing her mortgage, which was originated with a third-party, TexMex Mortgage Company.

52.     In July 2019, Ms. Johnson first applied to refinance her home mortgage loan through Wells Fargo.  Contrary to the entire purpose of refinancing a home mortgage, Wells Fargo personnel told Ms. Johnson that refinance would cost her *more* money than her initial mortgage

agreement.  Following this illogical explanation, Wells Fargo personnel told Ms. Johnson that it "just did not make sense" for Ms. Johnson to obtain a home loan refinance at this time.

53.     In October 2020, Ms. Johnson again applied to refinance her home mortgage loan through Wells Fargo.  This time, Wells Fargo gave Ms. Johnson the runaround, farcically explaining that it just would not be "worth it" for her to refinance her home mortgage loan and that based upon the application she submitted, it did not look like refinancing would result in a lower interest rate.  When Ms. Johnson inquired into why, especially in light of her 680-credit score, Wells Fargo personnel relied on a nonsensical excuse that refinancing was simply not in Ms. Johnson's best interest.

54.     In February 2022, Ms. Johnson applied to refinance her home mortgage loan through Wells Fargo for a third time.  During this attempt, Wells Fargo personnel told Ms. Johnson that refinancing her home mortgage loan, which is typically sought for the purpose of reducing monthly payments for a borrower, would result in Ms. Johnson paying an additional $10,000 on her mortgage.  When Ms. Johnson explained to Wells Fargo that such an increase does not make sense in light of her knowing others who had been approved for refinancing, Wells Fargo continued the denial.

55.     In causing injury to the Plaintiffs and the members of the Class, Defendants have acted intentionally, maliciously, and with willful, callous, wanton, and reckless disregard for the Plaintiffs' and Class members' rights.

## V.  CLASS ACTION ALLEGATIONS

56.     Plaintiffs Elretha Perkins and Laronica Johnson bring this action on behalf of themselves and all others similarly situated as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Class:

All Black persons, as well as other racial minorities, in the United States of America, who from January 1, 2018 through the Present (the "Class Period"), submitted, or attempted to submit, an application to finance or refinance their home mortgage through the Defendants that was (i) processed at a rate slower than that of the average processing time of applications made by non-Black or other non-racial minority applicants; or (ii) whose application was denied; or (iii) whose resulting refinanced loans were made at higher interest rates as compared to similarly situated non-Black applicants.

57.     Plaintiffs and Class members reserve the right to amend the Class definitions as discovery proceeds and to conform to the evidence.  Excluded from the Class are Defendants and their employees, affiliates, parent entities, subsidiaries, and co-conspirators, whether or not named in this complaint, and the United States Government.

58.     The exact size of the Class is unknown at this time because the information is in the exclusive control of Defendants.  However, upon information and belief and due to the nature of commerce involved, there are thousands of Class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

59.     The Class is readily ascertainable by business records and other data from Defendants.

60.     Plaintiffs' claim is typical of the claims of the members of the Plaintiff Class because Plaintiffs and members of the Class all submitted applications for home loan refinancing to Defendants, and therefore Plaintiffs' claim arises from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

61.     Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs' interests are aligned with, and not antagonistic to, the Class.

62.     Plaintiffs has retained counsel competent and experienced in class action litigation.

63.     Numerous questions of law and fact common to each Class member exist that predominate over questions affecting only individual members, including, but not limited to:

**A.** Whether Defendants discriminated against Plaintiffs and the Class;

**B.** Whether such discrimination is a violation of the Equal Credit Opportunity Act; the Fair Housing Act; the Civil Rights Act of 1866; and California's Unfair Competition Law;

**C.** Whether Defendants' acts, policies, and practices have a disparate impact on the basis of race, color, and/or national origin with respect to credit transactions, as described herein, on the basis of race;

**D.** Whether Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges on the basis of race, color, and/or national origin in connection with the making of residential real estate-related transactions;

**E.** The natural persons involved in the alleged discrimination, and their acts in furtherance of the illegal practice;

**F.** The period of time the alleged discrimination existed;

**G.** Whether and the extent to which Defendants' discrimination resulted in increased interest and/or principal amounts incurred by Plaintiffs and Class Members above natural market levels;

**H.** The nature and scope of the injunctive relief required to remedy continuous illegal discrimination;

**I.** The measure of damages suffered by Plaintiffs and the Class Members.

64. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical. Prosecution as a class action will eliminate the possibility of repetitious litigation.

The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation.  Absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system.  Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.  The Class is readily definable and is one for which records likely exist in the files of Defendants.

65.     Defendants' actions are ongoing and without Court intervention, will continue unabated.  Accordingly, Plaintiffs seek to represent the Class under Rule 23(b)(2) for an award of declaratory and injunctive relief finding the Defendants' discriminatory actions improper and enjoining the Defendants from continuing their acts of discrimination as described herein.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT
### 15 U.S.C. § 1691, *et seq.*

66.     Plaintiffs incorporate by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

67.     The Equal Credit Opportunity Act makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

68.     The Equal Credit Opportunity Act applies to all applications for financing, including applications for refinancing like those the Plaintiffs, and all others similarly situated, sought.  Plaintiffs applied for credit by seeking to refinance their home loans.

69.     Defendants are creditors because they regularly extend, renew, and continue the issuance of credit.

70.     Defendants' denial of home loan refinance applications based on race, and Defendants' perpetual delays, roadblocks, and other pretextual actions, constitute race-based discrimination and are unlawful under the Equal Credit Opportunity Act.

71.     Defendants' acts, policies, and practices are intentionally discriminatory on the basis of race, color, and/or national origin with respect to aspects of credit transactions, constitute redlining, and violate 15 U.S.C. § 1691(a)(1).

72.     Defendants' acts, policies, and practices have a disparate impact on the basis of race, color, and/or national origin with respect to aspects of credit transactions in violation of 15 U.S.C. § 1691(a)(1).

73.     Defendants have maintained these acts, policies, and practices continuously and without material change since at least 2018, and they constitute a continuing violation of the Equal Credit Opportunity Act.

74.     Plaintiffs and all other similarly situated were harmed by Defendants' conduct, including, but not limited to, harm in the form of higher interest rates paid while applications were pending, higher interest rates paid upon a delayed approval, an inability to secure a "cash out" refinance loan, an inability to reduce the principal on a home loan payment, or from a denied application.

75.     On behalf of themselves, and all others similar situated, Plaintiffs requests the relief set forth below.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE FAIR HOUSING ACT OF 1968**
**42 U.S.C. § 3601, *et seq.***

76.    Plaintiffs incorporate by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

77.    The Fair Housing Act makes it illegal to discriminate against any designated class of individuals in a residential real estate transaction.

78.    Plaintiffs and all others similarly situated sought to engage in a residential real estate transaction with the Defendants.

79.    Plaintiffs and all others similarly situated are African Americans, or other racial minorities, and therefore members of a protected class under the Fair Housing Act.

80.    Defendants refused to transact business with Plaintiffs and all others similarly situated by (i) denying Black (or other racial minority) home loan applicants, of worthy credit, while approving home loan applications from their similarly situated white counterparts; (ii) approving Black (or other racial minority) home loan applicants, but with inferior terms than terms offered to similarly situated white home loan applicants; (iii) refusing to approve refinancing applications on the same window of time as applications made by other parties with similar qualifications that were not members of the protected class, or by (iv) constructively causing applicants to withdraw applications due to roadblocks and pretextual actions.

81.    Defendants refused to transact business with Plaintiffs and all others similarly situated during the Class Period and at the same time transacted business with non-Black homeowners with similar qualifications.

82.    Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges on the basis of race, color, and/or national origin in

connection with the making of residential real estate-related transactions, in violation of 42 U.S.C. § 3605

83.    Plaintiffs and all others similarly situated were disparately impacted by Defendants' refusal to transact business with them on equal terms because, among other things, they: (i) paid application fees for refinancing applications that were delayed or denied;  (ii) continued to pay higher interest rates while their delayed applications were pending;  (iii)  were provided with higher interest rates than other similarly situated Non-Black applicants; or (iv) were unable to "cash out" of their mortgage and capture increased home value since a previous financing.

84.    Defendants have maintained these acts, policies, and practices continuously and without material change since at least 2018, and they constitute a continuing violation of the Fair Housing Act.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF THE CIVIL RIGHTS ACT OF 1866
### 42 U.S.C. § 1981, *et seq.*

85.    Plaintiffs incorporate by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

86.    Racial discrimination in contracting is prohibited by 42 U.S.C. § 1981, which ensures that all people have the same right to make and enforce contracts "as is enjoyed by white citizens." Section 1981 was enacted to eradicate racial discrimination in contracting as is derived from the Civil Rights Act of 1866 and applies with full force and effect today.

87.    Defendants have engaged in, and is engaging in, pernicious, intentional racial discrimination in contracting, which is illegal under § 1981.  Section 1981 is broad, covering "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

88.   African Americans and other racial minorities are a protected class under § 1981. Plaintiffs and the Class Members are members of that class as they are African American or other racial minorities.

89.   As alleged herein, Plaintiffs and the Class Members attempted to contract with the Defendants for home loans and loan refinancing, but the Defendants refused, engaging in a series of pretextual acts meant to discriminate, including but not limited to, (i) denying Black (or other racial minority) home loan applicants, of worthy credit; (ii) approving Black (or other racial minority) home loan applicants, but with inferior terms than terms offered to similarly situated white home loan applicants; (iii) refusing to approve refinancing applications on the same window of time as applications made by other parties with similar qualifications that were not members of the protected class, or by (iv) constructively causing applicants to withdraw applications due to roadblocks and pretextual actions.   Yet, Defendants have continued to contract with and make themselves available to contract with similarly situated white home loan applicants.

90.   Defendants have refused to contract with Plaintiffs and the Class Members for home loan financing.  Defendants have a pattern and practice of refusing to do business, or offering unequal contracting terms to, African Americans and other racial minorities.

91.   Plaintiffs and all other similarly situated were harmed by Defendants' conduct, including, but not limited to, harm in the form of higher interest rates paid while applications were pending, higher interest rates paid upon a delayed approval, an inability to secure a "cash out" refinance loan, an inability to reduce the principal on a home loan payment, or from a denied application.

92.   Accordingly, Defendants' unlawful discrimination has caused Plaintiffs and those similarly situated harm for Defendants' refusal to contract with Plaintiffs.

1
2
3

### FOURTH CLAIM FOR RELIEF
### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Pro. Code §17200, *et seq*.

4
5

93.     Plaintiffs incorporates by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

6
7
8

94.     The California Unfair Competition Law ("UCL") forbids "unlawful, unfair or fraudulent" conduct in connection with business activity.

9
10

95.     Defendants' business offering of financing loans and refinancing of existing loans is a business activity under the UCL.

11
12

96.     Plaintiffs and others similarly situated are "persons" under the UCL.

13
14
15
16

97.     Defendants' conduct described herein constitutes unlawful competition, as in the course of engaging in the business acts described above, it engaged in conduct that constituted a predicate violation of the laws identified herein, namely the Equal Credit Opportunity Act and the Fair Housing Act, 42 U.S.C. § 1981.

17
18
19
20
21
22
23
24
25
26

98.     Defendants' conduct described herein constitutes unfair competition under the UCL, as Defendants deploy hidden business practices designed to deny, delay and refuse the financing and/or refinancing of loans of Black Americans, and subjecting those that are approved, to less favorable terms than white borrowers.  Defendants' acts and practices offended an established public policy, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers. As there is no legitimate justification for these practices, which have a disproportionately negative impact on the public, in comparison to any fair business, purpose Defendants' practices are unfair as defined under the UCL.

27
28

99.     A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

100.    Defendants' acts and practices alleged above constitute unlawful business acts or practices as they have violated federal law as described herein.

101.    Defendants' conduct described herein constitutes fraudulent competition under the UCL, as they claim they will fairly and quickly process the financing and refinancing applications of all applicants, but instead use hidden business practices designed to deny, delay and refuse the refinancing of loans of Black Americans, and subjecting those that are approved to less favorable terms.  These business practices are likely to deceive the public, and thus are fraudulent.

102.    Plaintiffs and those similarly situated were injured by Defendants' refusal to transact business with them because they paid application fees for financing and refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar qualifications, because they were offered less favorable terms than white borrowers, and/or because their applications were denied.

## VII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class of similarly situated persons, respectfully seek the following relief:

A.    An order certifying this action as a class action under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), defining the Class as requested herein, finding that Plaintiffs are proper representatives of the Class requested herein, and appointing Plaintiffs' counsel as Class Counsel;

B.    Designate Plaintiffs as Class Representatives and designate the undersigned counsel as lead Class Counsel;

**C.** Find that Defendants' acts described herein violate the Equal Credit Opportunity Act, the Fair Housing Act, the Civil Rights Act of 1866, and the California Unfair Competition Law;

**D.** Enter a declaratory judgment that the forgoing acts, policies, and practices of Defendants violate 15 U.S.C. § 1691; and 42 U.S.C. § 3605;

**E.** Enter a permanent injunction enjoining Defendants from continuing to implement and enforce the illegal conduct described herein and directing Defendants to take all affirmative steps necessary to remedy the effects of that conduct and to prevent additional instances of such conduct or similar conduct from occurring in the future;

**F.** Find that Defendants have engaged in a pattern and practice of racial discrimination resulting in the harm to Plaintiffs and class members described above;

**G.** Award Plaintiffs and the members of the Class damages in an amount to be determined by the Court;

**H.** Award Plaintiffs and the members of the Class pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

**I.** Award Plaintiffs and the members of the Class the costs of suit, including reasonable attorneys' fees, as provided by law; and

**J.** Award Plaintiffs and the members of the Class any other and further relief as the case may require and the Court may deem just and proper.

### VIII.    JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated:        June 10, 2022                    Respectfully submitted,

                                               **GUSTAFSON GLUEK, PLLC**

                                               By: */s/ Dennis J. Stewart*
                                               Dennis J. Stewart, CA Bar No. 99152
                                               600 B Street, Suite 1700
                                               San Diego, CA 92024
                                               Tel.: (612) 333-8844
                                               Fax: (612) 339-6622
                                               dstewart@gustafsongluek.com

                                               Daniel E. Gustafson (Pro Hac Vice to be filed)
                                               David A. Goodwin (Pro Hac Vice to be filed)
                                               Amanda M. Williams (Pro Hac Vice to be filed)
                                               Abou B. Amara, Jr. (Pro Hac Vice to be filed)
                                               **GUSTAFSON GLUEK PLLC**
                                               Canadian Pacific Plaza
                                               120 South Sixth Street, Suite 2600
                                               Minneapolis, MN 55402
                                               Telephone: (612) 333-8844
                                               dgustafson@gustafsongluek.com
                                               dgoodwin@gustafsongluek.com
                                               awilliams@gustafsongluek.com
                                               aamara@gustafsongluek.com

                                               Scott D. Hirsch (*Pro Hac Vice to be filed*)
                                               **SCOTT HIRSCH LAW GROUP, PLLC**
                                               6810 N. State Road 7
                                               Coconut Creek, FL 33073
                                               Tel.: (561) 569-7062
                                               scott@scotthirschlawgroup.com

                                               Vildan A. Teske (*Pro Hac Vice to be filed*)
                                               Marisa C. Katz *(Pro Hac Vice to be filed)*
                                               **TESKE KATZ PLLP**
                                               222 South Ninth Street, Suite 1600
                                               Minneapolis, MN 55402
                                               Telephone: (612) 746-1558
                                               teske@teskekatz.com

                                               *Attorneys for Plaintiffs and Others Similarly Situated*