# EXHIBIT A

1  Amanda L. Groves (SBN: 187216)
   agroves@winston.com
2  Kobi K. Brinson (*Admitted pro hac vice*)
   kbrinson@winston.com
3  Winston & Strawn LLP
   333 S. Grand Avenue, 38th Floor
4  Los Angeles, CA 90071
   Telephone: (213) 615-1700
5  Facsimile: (213) 615-1750

6  Ava E. Lias-Booker (*Admitted pro hac vice*)
   alias-booker@mcguirewoods.com
7  Alicia A. Baiardo (SBN: (SBN 254228)
   abaiardo@mcguirewoods.com
8  McGuire Woods LLP
   Two Embarcadero Center
9  Suite 1300
   San Francisco, CA  94111-3821
10 Telephone: (415) 844-9944
   Facsimile: (415) 844-9922
11

12 *(Additional Counsel on Signature Page)*

13 Attorneys for Defendants
   WELLS FARGO BANK, N.A.,
14 and WELLS FARGO & COMPANY

15                    **UNITED STATES DISTRICT COURT**

16                    **NORTHERN DISTRICT OF CALIFORNIA**

17

18 CHRISTOPHER WILLIAMS, SAM            Case No. 3:22-cv-00990-JD
   ALBURY, and SHAIA BECKWITH
19 SIMMONS, individually and on behalf of   **DEFENDANTS' NOTICE OF MOTION AND**
   all others similarly situated,            **MOTION TO CONSOLIDATE;**
20                                           **MEMORANDUM OF POINTS AND**
            Plaintiffs,                       **AUTHORITIES IN SUPPORT**
21
         v.                                  Date:       November 10, 2022
22                                           Time:       10:00 a.m.
   WELLS FARGO BANK, N.A. and WELLS         Location:   Courtroom 11
23 FARGO & CO.,                                          Phillip Burton Federal Building &
                                                         United States Courthouse
24          Defendants.                                  450 Golden Gate Avenue
                                                         San Francisco, CA 94102
25

26

27

28

1                 **NOTICE OF MOTION AND MOTION TO CONSOLIDATE**

2       PLEASE TAKE NOTICE that on November 10, 2022[1] at 10:00 a.m. in Courtroom 11,

3 Phillip Burton Federal Building & United States Courthouse, 450 Golden Gate Avenue, San

4 Francisco, CA 94102, Defendants Wells Fargo Bank, N.A. and Wells Fargo & Company will and do

5 hereby move to consolidate the above-captioned case with *Braxton v. Wells Fargo Bank, N.A., et al.*,

6 Case No. 3:22-cv-01748-JD; *Ebo v. Wells Fargo Bank, N.A.*, No. 3:22-cv-02535-JD; and *Perkins v.*

7 *Wells Fargo Bank, N.A., et al.*, Case No. 3:22-cv-3455-JD.

8       This motion is based on this Notice of Motion and Motion, the accompanying Memorandum

9 of Points and Authorities, the Declaration of Amanda L. Groves and the exhibits thereto, the record

10 in this action, and any other written or oral submission that may be presented at or before the hearing

11 on this Motion.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   [1] Wells Fargo has selected this date in an effort to accommodate the schedules of all counsel.

1

Dated: August 5, 2022

2

**WINSTON & STRAWN LLP**

3

By:     */s/ Amanda L. Groves*
        Amanda L. Groves

4       agroves@winston.com
        333 S. Grand Avenue, 38th Floor

5       Los Angeles, CA 90071
        Telephone: (213) 615-1700

6       Facsimile: (213) 615-1750

7

8       Kobi K. Brinson *(admitted pro hac vice)*
        kbrinson@winston.com

9       Stacie C. Knight *(admitted pro hac vice)*
        sknight@winston.com

10      300 South Tryon Street, 16th Floor
        Charlotte, NC 28202

11      Telephone: (704) 350-7700
        Facsimile: (704) 350-7800

12

13      **MCGUIREWOODS LLP**

14      By:     */s/ Alicia A. Baiardo*
                Ava E. Lias-Booker (*admitted pro hac vice*)

15              alias-booker@mcguirewoods.com
                Alicia A. Baiardo

16              abaiardo@mcguirewoods.com
                Jasmine K. Gardner (*admitted pro hac vice*)

17              jgardner@mcguirewoods.com
                Two Embarcadero Center, Suite 1300

18              San Francisco, CA  94111-3821
                Telephone: (415) 844.9944

19              Facsimile: (415) 844.9922

20

21              Attorneys for Defendants
                WELLS FARGO BANK, N.A. and WELLS FARGO &

22              COMPANY

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    FACTUAL BACKGROUND ...................................................................................... 2

      A.    The *Williams* Action ................................................................................. 2

      B.    The *Braxton* Action.................................................................................... 3

      C.    The *Ebo* Action .......................................................................................... 3

      D.    The *Perkins* Action .................................................................................... 4

      E.    *Williams*, *Braxton*, *Pope*, *Ebo*, and *Perkins* Have Been Related Pursuant to
            Local Rule 3-12.......................................................................................... 5

II.   LEGAL ANALYSIS ............................................................................................... 5

      A.    Class Actions Like These Are Ideally Suited For Consolidation. ................. 5

      B.    These Cases Share Common Questions of Law and Fact For Purposes of
            Consolidation. ........................................................................................... 6

      C.    Consolidation Will Save Time and Effort and Will Not Cause Inconvenience,
            Delay, or Expense. ..................................................................................... 9

      D.    The Court Should Order Plaintiffs to File a Consolidated, Master Pleading or
            Alternatively, At Least Consolidate Discovery. ......................................... 10

III.  CONCLUSION ..................................................................................................... 12

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

*Amador v. Logistics Express, Inc.*,
   2010 WL 3489038 (C.D. Cal. Aug. 27, 2010)......................................................................5, 7

*BizCloud, Inc. v. Comput. Scis. Corp.*,
   2014 WL 1724762 (N.D. Cal. Apr. 29, 2014).....................................................................5, 9

*Brown v. Accellion, Inc*,
   2022 WL 767279 (N.D. Cal. Mar. 14, 2022)......................................................................9, 10

*Diaz v. First Am. Home Buyers Protection Co.*,
   2014 WL 12696519 (S.D. Cal. Sept. 25, 2014)...............................................................6, 9, 10

*In re Equity Funding Corp. of Am. Sec. Litig.*,
   416 F. Supp. 161 (C.D. Cal. 1976) ...........................................................................................6

*Huene v. United States*,
   743 F.2d 703 (9th Cir. 1984) ....................................................................................................6

*Huynh v. Quora, Inc.*,
   2019 WL 11502874 (N.D. Cal. Apr. 11, 2019) ......................................................................10

*Imran v. Vital Pharms., Inc.*,
   2019 WL 12340204 (N.D. Cal. Oct. 17, 2019)..................................................................6, 10

*Melgoza v. Aegis Senior Communities LLC*,
   2022 WL 1693706 (N.D. Cal. May 26, 2022)..........................................................5, 7, 8, 10

*In re Oreck Corp. Halo Vacuum and Air Purifiers Marketing and Sales Practices
   Litig.*,
   282 F.R.D. 486 (C.D. Cal. 2012) ..............................................................................5, 8, 10

*Taylor v. Schneider National Carriers, Inc.*,
   2010 WL 11515254 (C.D. Cal. Oct. 27, 2010).........................................................................5

**Other Authorities**

Fed. R. Civ. P. 4(m) .........................................................................................................................1

Fed. R. Civ. P. 42(a) ................................................................................................................1, 2, 5, 10

Fed. R. Civ. P. 42(a)(2) ..................................................................................................................11

L.R. 3-12(a)......................................................................................................................................5

*Manual for Complex Litigation* § 21.15 (4th ed.) ............................................................................6

DEFENDANTS' MOTION TO CONSOLIDATE
CASE NO. 3:22-cv-00990

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiffs across six putative class actions raise similar allegations and claims that Wells Fargo discriminates against Black and African American home loan applicants. *See Williams v. Wells Fargo Bank, N.A., et al.*, Case No. 3:22-cv-00990-JD (filed Feb. 17, 2022); *Braxton v. Wells Fargo Bank, N.A., et al.*, Case No. 3:22-cv-01748-JD (filed Mar. 18, 2022); *Pope v. Wells Fargo Bank, N.A. et al.*, No. 4:22-cv-01793-JD (filed Mar. 21, 2022); *Thomas et al. v. Wells Fargo Bank, N.A. et* al., No. 3:22-cv-01931-CRB (filed Mar. 26, 2022); *Ebo v. Wells Fargo Bank, N.A.*, No. 3:22-cv-02535-JD (filed Apr. 26, 2022); and *Perkins v. Wells Fargo Bank, N.A., et al.*, Case No. 3:22-cv-3455-JD (filed June 10, 2022).  Five of the cases (*Williams*, *Braxton*, *Pope*, *Ebo*, and *Perkins*) have been related and are before the Honorable James Donato.

The Court should consolidate *Williams*, *Braxton*, *Ebo*, and *Perkins*—the four cases in which Wells Fargo has been served[2]—because they are all predicated on the same basic common questions of law and fact: namely, whether plaintiffs can prove disparate treatment (intentional discrimination) or disparate impact (by identifying a facially neutral policy that results in a disparate impact), and if they can, whether that conduct violates federal or California law.  Based on common underlying allegations, the plaintiffs in all four cases bring many of the same causes of action and seek to represent similar classes.  Accordingly, the cases necessarily involve a common question of law or fact under Fed. R. Civ. P. 42(a).  Moreover, consolidation would conserve both the parties' and the Court's resources by preventing the waste of time and money that necessarily would be involved by duplicative discovery and proceedings on the same factual and legal questions.  Litigating the cases separately would be inefficient, wasteful, and raise the risk of inconsistent adjudication.  The *Braxton* plaintiffs' recently-filed Motion for Appointment of Interim Counsel for a Putative Refinancing Class further underscores the need for consolidation as it seeks to divide the cases in ways that are not supported by the pleadings or the underlying facts.

---

[2] *Pope* was related to this action and assigned to Judge Donato after the *Ebo* plaintiff filed a motion to relate her case to *Pope*.  However, Wells Fargo has not been served in *Pope* or *Thomas*, and the 90-day period for plaintiffs to effect service in those cases has expired.  *See* Fed. R. Civ. P. 4(m).  If *Pope* and *Thomas* are not dismissed for failure to timely serve the summons and complaint pursuant to Rule 4(m), those cases should be consolidated with the others, and Wells Fargo will move for consolidation of those cases at the appropriate time.

1    Accordingly, pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, the Court

2    should consolidate this case with *Braxton*, *Ebo*, and *Perkins* for all purposes, including the filing of a

3    single, consolidated complaint or alternatively, for discovery and motion practice.

4    **I.     FACTUAL BACKGROUND**

5        **A.     The *Williams* Action**

6        On February 17, 2022, Christopher Williams filed a putative class action against Wells Fargo

7    Bank, N.A. and Wells Fargo & Company.  Williams alleged that Wells Fargo discriminated against

8    him on the basis of race when he applied for a home mortgage loan, and that Wells Fargo's home

9    mortgage origination and underwriting practices intentionally and disproportionately discriminate

10   against Black home loan applicants.  Dkt. 1, ¶¶ 6-18.  Based on those allegations, Williams brought

11   claims under (1) the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* ("ECOA"); (2) 42

12   U.S.C. § 1981 ("Section 1981"); (3) 42 U.S.C. § 1982 ("Section 1982"); and (4) the Fair Housing

13   Act of 1968, 42 U.S.C § 3601 *et seq.* ("FHA").  *See id.*  Williams sought to represent "a class of

14   African Americans who applied for credit related to residential real estate and who were subjected to

15   discrimination by Defendants due to their race," and sought declaratory and injunctive relief,

16   compensatory damages, punitive damages, prejudgment interest, costs, and attorneys' fees.  *Id.*, ¶ 19

17   and Prayer for Relief.  Wells Fargo waived service in *Williams* on March 17, 2022.

18       On April 14, 2022, Williams filed an amended complaint that added two proposed named

19   plaintiffs, one of whom alleges that Wells Fargo discriminated against her on the basis of race when

20   she tried to modify her existing home loan (Plaintiff Aaron Braxton in the *Braxton* case also tried to

21   modify his existing home loan).  The amended complaint asserts the same causes of action and seeks

22   the same relief as the original complaint but redefines the putative class as "Black and/or African

23   American applicants or borrowers who applied for, received, or maintained credit from Defendants

24   related to residential real estate and who were subjected to discrimination by Defendants due to their

25   race."  Dkt. 22, ¶ 44.

26       Wells Fargo answered the *Williams* amended complaint on June 10, 2022.

27

28

**B.      The *Braxton* Action**

On March 18, 2022, Plaintiff Aaron Braxton filed this putative class action against Wells Fargo Bank, N.A. and Wells Fargo Home Mortgage, Inc., alleging that Wells Fargo discriminated against him on the basis of race when he applied to refinance his mortgage loan,[3] and that Wells Fargo's residential mortgage policies and practices discriminate against African American applicants.  Declaration of Amanda L. Groves, Ex. A, ¶¶ 4-16.  Braxton alleged that Wells Fargo's actions violated the ECOA, Section 1981, the FHA, the California Unruh Civil Rights Act, and the California Unfair Competition Law ("UCL").  *Id.*, ¶¶ 72-104.  Braxton sought injunctive relief, compensatory damages, punitive damages, prejudgment interest, costs, and attorneys' fees, and defined his putative class as Black homeowners who submitted an application to refinance their home mortgage through Wells Fargo "that was (i) processed at a rate slower than that of the average processing time of applications made by non-Black applicants; or (ii) whose applications were denied; or (iii) whose resulting refinance loans were made at higher interest rates as compared to similarly situated non-Black applicants."  *Id.*, ¶¶ 53, 152-54 and Prayer for Relief.

On April 18, 2022, Braxton filed an amended complaint, adding three putative named plaintiffs and Wells Fargo & Company as a defendant.  *Id.*, Ex. B.  The causes of action, putative classes and subclasses, and relief sought are unchanged from the original *Braxton* complaint.  *See id.*

**C.      The *Ebo* Action**

Ifeoma Ebo filed a putative class action complaint against Wells Fargo Bank, N.A. on April 26, 2022.  Ebo alleges that Wells Fargo discriminated against her on the basis of race when she applied for a home mortgage loan, and that its home mortgage origination and underwriting practices intentionally and disproportionately discriminate against African American home loan applicants.  Groves Decl., Ex. C, ¶¶ 13–32. Based on those allegations, Ebo brings claims under the ECOA, Section 1981, and the FHA.  *Id.*, ¶¶ 55–84.  Ebo seeks to represent "All Black Americans (1) who submitted applications to obtain or refinance a mortgage loan with respect to residential real property, (2) who were qualified to receive mortgage loans from Wells Fargo, and (3) whose

---

[3] Braxton did not actually apply to refinance his loan but instead sought a modification of his existing mortgage loan.

1   applications were either (a) denied by Wells Fargo, (b) never completed, due to Wells Fargo's

2   demands for documentation or information that would not have been imposed by Wells Fargo in

3   connection with a similarly situated White applicant, or (c) granted by Wells Fargo, but on less

4   favorable terms than a similarly situated White borrower would have received." *Id.*, ¶ 50.  She seeks

5   compensatory damages, punitive damages, statutory damages, prejudgment interest, costs, and

6   attorneys' fees.  *Id.*, Prayer for Relief.

7          Wells Fargo agreed to waive service in *Ebo* in April 2022.  Her counsel sent the waiver form

8   to Wells Fargo's counsel on July 29, 2022.  Wells Fargo's answer to the *Ebo* complaint is due on

9   September 27, 2022.

10         **D.**     **The *Perkins* Action**

11          On June 10, 2022, Elretha Perkins and Laronica Johnson filed a putative class action against

12   Wells Fargo Bank, N.A. and Wells Fargo Home Mortgage, Inc., alleging that Wells Fargo

13   discriminated against them on the basis of race when they applied to refinance their home mortgage

14   loans, and that Wells Fargo's home mortgage origination and underwriting practices intentionally

15   and disproportionately discriminate against African American and minority home loan applicants.

16   Groves Decl., Ex. D, ¶¶ 18-24.  Based on those allegations, the *Perkins* plaintiffs bring claims under

17   (1) the ECOA; (2) the FHA; (3) Section 1981; (4) and the UCL.  *See id.*, ¶¶ 66-102.  Perkins and

18   Johnson seek to represent a proposed class of "[a]ll Black persons, as well as other racial minorities"

19   that "submitted, or attempted to submit, an application to finance or refinance their home mortgage

20   through the Defendants that was (i) processed at a rate slower than that of the average processing

21   time of applications made by non-Black or other nonracial minority applicants; or (ii) whose

22   application was denied; or (iii) whose resulting refinanced loans were made at higher interest rates as

23   compared to similarly situated non-Black applicants."  *Id.*, ¶ 56.  Like the plaintiffs in the other

24   cases, the *Perkins* plaintiffs seek injunctive relief, compensatory damages, punitive damages,

25   prejudgment interest, costs, and attorneys' fees.  *Id.*, Prayer for Relief.

26          Wells Fargo's answer to the *Perkins* complaint is due on August 15, 2022.

27

28

E.  ***Williams*, *Braxton*, *Pope*, *Ebo*, and *Perkins* Have Been Related Pursuant to Local Rule 3-12.**

On June 9, 2022, the Court granted Wells Fargo's administrative motion to relate this action and *Braxton*.  On June 29, 2022, the Court also related *Ebo* and *Pope* to *Williams*.  With both motions, the Court thus found that the cases "concern substantially the same parties, property, transaction, or event," and "[i]t appears likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different Judges."  L.R. 3-12(a).  All five cases are now assigned to Judge James Donato, but Wells Fargo has never been served in *Pope* (or *Thomas*, which is assigned to Judge Breyer).

Wells Fargo answered the *Braxton* amended complaint on June 13, 2022, and also filed a motion to dismiss or stay under the first-to-file rule, arguing that Braxton's allegations and proposed class and subclasses are wholly encompassed by the first-filed *Williams* case.  *Braxton* Dkt. 39.  The court denied that motion on July 19, 2022, holding that "[t]he cases are sufficiently similar for purposes of relation under the District's local rules, but not so similar that *Braxton* is subsumed in *Williams*."  *Braxton* Dkt. 44.[4]

## II.  LEGAL ANALYSIS

### A.  **Class Actions Like These Are Ideally Suited For Consolidation.**

Rule 42 provides that the court may consolidate actions involving "a common question of law or fact."  Fed. R. Civ. P. 42(a).  Because a single, common question of law or fact is all the rule requires, a court "may consolidate … actions even if there is not a strict identity of claims or parties."  *Amador v. Logistics Express, Inc*., 2010 WL 3489038, at *1 (C.D. Cal. Aug. 27, 2010) (citations omitted); *see also Taylor v. Schneider National Carriers, Inc*., 2010 WL 11515254, at *1 (C.D. Cal. Oct. 27, 2010) ("we may consolidate two actions even if there is not a strict overlap of claims or parties") (collecting cases).  Furthermore, "[w]hile a district court does have broad discretion in determining whether consolidation is appropriate, typically, consolidation is favored."

---

[4] Because consolidation only requires one common issue of law or fact, the denial of the first-to-file motion does not impact the Court's decision on consolidation.  *See Melgoza v. Aegis Senior Communities LLC*, 2022 WL 1693706 (N.D. Cal. May 26, 2022) (denying motion to dismiss second-filed putative class action under first-to-file rule and consolidating cases under Rule 42(a)).

5

*In re Oreck Corp. Halo Vacuum and Air Purifiers Marketing and Sales Practices Litig.*, 282 F.R.D. 486, 490 (C.D. Cal. 2012) (quotations and citation omitted).

   To decide whether consolidation is appropriate, the court should weigh "'the saving of time and effort consolidation would produce against any inconvenience, delay, or expense that it would cause.'" *BizCloud, Inc. v. Comput. Scis. Corp.*, 2014 WL 1724762, at *2 (N.D. Cal. Apr. 29, 2014) (quoting *Huene v. United States*, 743 F.2d 703, 704 (9th Cir. 1984)).  To that end, "[c]ourts recognize that class action suits are ideally suited to consolidation because their unification expedites proceedings, reduces duplication, and minimizes the expenditure of time and money by all concerned." *Diaz v. First Am. Home Buyers Protection Co.*, 2014 WL 12696519, at *2 (S.D. Cal. Sept. 25, 2014) (citing *In re Equity Funding Corp. of Am. Sec. Litig.*, 416 F. Supp. 161, 176 (C.D. Cal. 1976).  "Consolidation further facilitates discovery, conserves judicial resources, and reduces the confusion and delay that result from prosecuting related class action cases separately." *Id.* (citing *In re Equity*, 416 F. Supp. At 176).  Finally, "'[a] common practice in consolidated multiple cases, including class actions, is to encourage use of a master pleading.'" *Imran v. Vital Pharms., Inc.*, 2019 WL 12340204, at *2 (N.D. Cal. Oct. 17, 2019) (quoting *Manual for Complex Litigation* § 21.15 (4th ed.)).

   **B.    These Cases Share Common Questions of Law and Fact For Purposes of Consolidation.**

   These cases are not only sufficiently similar for purposes of relation, they also share common questions of law and fact for the Court to order consolidation.  And those common questions are not tangential.  They are at the core of each case.

   First, the cases involve not one, but many common issues of fact.  At bottom, the key factual issues in each case are whether plaintiffs can prove (1) disparate treatment (intentional discrimination) or disparate impact (by identifying a facially neutral policy that results in a disparate impact); and (2) that Wells Fargo intentionally and purposefully discriminated against plaintiffs because of race in violation of state and federal law when they applied for home mortgage loans and loan modifications.  *Dkt.* 22, ¶ 49; Groves Decl., Ex. B, ¶ 58; Groves Decl., Ex. C, ¶ 52; Groves Decl., Ex. D, ¶ 63.  Thus, in each case, the trier of fact will have to determine, whether, as Plaintiffs

allege, Wells Fargo, *inter alia*, (1) labeled predominantly Black neighborhoods as ineligible for rapid loan processing,[5] (2) placed undue, heightened scrutiny on the applications of Black and African American applicants,[6] (3) unduly delayed the applications of Black and African American applicants,[7] and (4) used scoring models, algorithms, and artificial intelligence that discriminated against Black and African American applicants.[8]

Second, the cases raise common claims.  Indeed, all four cases purport to bring class wide claims under the ECOA, the FHA, and Section 1981, and *Braxton* and *Perkins* purport to bring class wide UCL claims.  Moreover, Plaintiffs seek to represent similar classes.  Indeed, the putative class definitions are similar as they encompass every aspect of mortgage lending.  Finally, the cases seek similar relief, including compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief.

Differing class definitions do not prevent consolidation.  *Amador*, 2010 WL 3489038, at *1. Indeed, because the putative classes in *Williams* and *Ebo* include all Black and African American home loan applicants, the narrower refinancing classes in *Braxton* and *Perkins* are included within the *Williams* and *Ebo* putative classes.  Thus, "if the Rule 23 requirements are satisfied [in *Williams* or *Ebo*], the putative class in [*Braxton* and *Perkins*] may be certified as a subclass of the [*Williams* or *Ebo*] putative class." *Amador*, 2010 WL 3489038, at *1.  Similarly, *Williams'* and *Ebo's* allegations regarding Wells Fargo's home lending business as a whole, as opposed *Braxton's* and *Perkins'* focus on refinancing does not change the result.  First, *Williams* and *Ebo* include Black and African American refinancing applicants, who—like *Braxton* and *Perkins*—allege that Wells Fargo unreasonably delayed and placed undue scrutiny on their applications, and charged them higher interest rates, because of their race.  Dkt. 22, ¶¶ 18-21, 25-26; Groves Decl., Ex. B, ¶¶ 102, 115, 158; Groves Decl., Ex. C, ¶¶ 19-20, 31; Groves Decl., Ex. D, ¶¶ 12, 19-20, 23, 56.  Moreover, as courts repeatedly recognize, strict identity of claims is not required for consolidation.  *See, e.g., Amador*, 2010 WL 3489038, at *1.

---

[5] Groves Decl., Ex. B, ¶ 11; Groves Decl., Ex. D, ¶ 11.
[6] Dkt. 22, ¶ 34; Groves Decl., Ex. B, ¶ 133; Groves Decl., Ex. C, ¶ 48.
[7] Dkt. 22, ¶¶ 34-35; Groves Decl., Ex. B, ¶ 138; Groves Decl., Ex. C, ¶¶ 30-31.
[8] Dkt. 22, ¶ 24; Groves Decl., Ex. B, ¶¶ 13, 16; Groves Decl., Ex. D, ¶ 10.

1    For example, in *Melgoza*, 2022 WL 1693706, at *1, this Court consolidated two putative

2  wage and hour class actions, *Salonga* and *Melgoza*, even though the complaints did not assert

3  identical causes of action.  In particular, although both cases brought claims under the same six

4  California statutes, *Salgona* brought an additional California claim for failure to reimburse business

5  expenses, while *Melgoza* brought a federal Fair Labor Standards Act and an additional California

6  claim for failure to pay hours worked.  *Id.*  In consolidating the cases, this Court noted that "[d]espite

7  the differences, both cases are pending in this court and the state-law claims … overlap," and "the

8  putative class in *Melgoza* action is subsumed within the putative class in *Salgora*."  *Id.* at *2.

9  Moreover, "[t]he actions (1) involve similar questions of law and fact (namely whether the defendant

10  has violated California wage and-hour laws and (2) are at a similar stage."  *Id.*

11    The same is true here.  Although there is not complete overlap of claims in the four cases,

12  there is indeed overlap.  And, the putative classes in *Braxton* and *Perkins*, which include refinancing

13  applicants, are included within the larger *Williams* and *Ebo* putative classes, which include all Black

14  and African American home loan applicants.  Finally, the cases are at similar stages.  Accordingly,

15  just as in *Melgoza*, consolidation is warranted here.

16    Similarly, in *In re Oreck*, 282 F.R.D. 486, the court consolidated six consumer fraud putative

17  class actions against the defendant, even though some of the cases arose out of the plaintiffs'

18  purchase of vacuum cleaners, while the others arose out of the purchase of air filters.  The plaintiffs

19  in one of the cases opposed consolidation and argued that the vacuum cleaners and air purifiers were

20  "separate products" that were separately marked.  *Id.* at 489.  The court rejected that argument,

21  finding that despite their differences, the actions presented common questions of law and fact.  *Id.* at

22  490.  As the court explained, "[a]lthough the technology underlying the … vacuums and air purifiers

23  is different," "the gravamen of each action is that [defendant] misled consumers into purchasing

24  products that did not perform as advertised.  As such, the actions involve common questions of law

25  and fact."  *Id.* at 491.  Here too, even if refinancing were not at issue in all four cases (and it is), they

26  nonetheless share common questions of law and fact: again, whether the plaintiffs can prove (1)

27  disparate treatment or disparate impact; or (2) that Wells Fargo intentionally and purposefully

28  discriminated against them because of race when they applied for home mortgage loans.

1   Consolidation is appropriate.

2   **C.      Consolidation Will Save Time and Effort and Will Not Cause Inconvenience,**
    **Delay, or Expense.**
3
    Because the cases involve a common issue of law or fact, the Court must "weigh the saving
4
    of time and effort consolidation would produce against any inconvenience, delay, or expense that it
5
    would cause." *BizCloud*, 2014 WL 1724762, at *2 (quotations and citation omitted).
6
    Here, consolidation would save the parties' and the Court's resources by preventing
7
    duplicative discovery, motions practice, and class certification proceedings on the same factual and
8
    legal questions.  First, because "the claims for each case arise from the same or similar set of
9
    circumstances, discovery issues relating to each case will be parallel."  *Brown v. Accellion, Inc*.,
10
    2022 WL 767279, at *3 (N.D. Cal. Mar. 24, 2022).  While the *Braxton* and *Perkins* plaintiffs may
11
    argue that their focus on refinancing renders the necessary discovery in their cases unique, that is
12
    simply not true.  As demonstrated above, *Williams* and *Ebo **do*** include refinancing.  *See* page __,
13
    *supra*.  In any event, the application process for refinancing applicants is not any different because
14
    the applicant already received the underlying loan.  The refinance applicant is not automatically
15
    exempt from any application, underwriting, or appraisal requirements by virtue of seeking a
16
    refinance, as opposed to a purchase money loan.  To the contrary, regardless of whether a potential
17
    loan is a purchase money mortgage or a refinancing transaction, the application is, *inter alia*, (1)
18
    processed in CORE (which is not, as the *Braxton* plaintiffs claim, an underwriting tool or an
19
    algorithm); (2) evaluated by Fannie Mae and Freddie Mac's automated underwriting systems, where
20
    applicable; and (3) subjected to applicable underwriting guidelines.  Thus, there can be no doubt that
21
    the cases will involve overlapping, duplicative discovery, including "many of the same …
22
    documents and witnesses … ."  *Diaz*, 2014 WL 12696519, at *3; *see also Brown*, 2022 WL 767279,
23
    at *3 (recognizing that not consolidating overlapping class actions "could create duplicative and
24
    overlapping discovery efforts").
25
    Second, because the cases bring similar claims and seek to represent shared classes, they will
26
    also involve duplicative motions practice and class certification issues.  Accordingly, consolidation
27
    will undoubtedly save time and effort. *See Diaz*, 2014 WL 12696519, at *3 (consolidating putative
28

1   class actions that "share[d] certain remaining claims" and thus "would involve many of the same

2   arguments, documents and witnesses in any motion or trial" and because the "complaints in both

3   actions … purport[ed] to represent an overlapping putative class"); *Brown*, 2022 WL 767279, at *3

4   (consolidating putative class actions that "could create duplicative and overlapping discovery efforts,

5   pretrial motions, class certification filings relating to similar or the same classes, and other case

6   management issues, which would result in what Rule 42(a) is aimed at avoiding: inefficiency").

7           Finally, consolidation will not cause inconvenience, delay, or expense.  For starters, the cases

8   are at a similar stage.  Wells Fargo has filed answers in *Williams* and *Braxton*, but no scheduling

9   orders have been entered, and discovery has not commenced in any case.  Accordingly, instead of

10   causing inconvenience, delay, or additional expense, "consolidating all the identified cases will

11   allow the cases to proceed at the same pace, promote judicial economy by lessening the Court's

12   burden of managing [the cases], and streamline the parties' discovery and briefing efforts … ."

13   *Brown*, 2022 WL 767279, at *3; *see also Melgoza*, 2022 WL 1693706, at *1 (consolidating putative

14   class actions that were "at a similar stage" when "no party … identified any inconvenience, delay, or

15   expense that could result from consolidation"); *see also In re Oreck*, 282 F.R.D. at 490 ("factors that

16   counsel against consolidation, such as differing trial dates or stages of discovery, are not present

17   here").

18           Consolidation is warranted.

19       **D.**     **The Court Should Order Plaintiffs to File a Consolidated, Master Pleading or**
             **Alternatively, At Least Consolidate Discovery.**
20

21   Because these cases meet all the requirements under Rule 42(a), the court should order the

22   plaintiffs to file a consolidated, "master pleading," which will necessarily result in consolidated

23   discovery, motions, and class certification proceedings.  *See Imran*, 2019 WL 12340204, at *2 ("[a]

     common practice in consolidated multiple cases, including class actions, is to encourage use of a
24
     master pleading"); *Huynh v. v. Quora, Inc.*, 2019 WL 11502874, at *1 (N.D. Cal. Apr. 11, 2019)
25
     (ordering plaintiffs to file a consolidated complaint); *Diaz*, 2014 WL 12696519, at *5 (same).
26
             The need for a single, consolidated complaint is aptly demonstrated by the *Braxton* plaintiffs'
27

28

1   Motion for Appointment of Interim Counsel for a Putative Refinancing Class.[9]  Notably, the *Braxton*

2   plaintiffs filed their motion pursuant to Rules 42(a)(2) *and* 23(g)(3) under the auspices that a

3   separate putative refinancing class is warranted because there are these six separate lawsuits.  The

4   *Braxton* motion seeks to carve out a separate class in line with their theory that a refinance is

5   somehow meaningfully different from a purchase money loan application.  Braxton Dkt. 45 at 7

6   (arguing their proposed "Putative Refinancing Class" is "differently situated than purchase money

7   loan customers" because "all members of the Putative Refinancing Class were already deemed

8   sufficiently creditworthy to obtain a home loan, and thus [are] unlike classes including prospective

9   homeowners seeking a purchase money loan").  Their proposal is not workable because the

10  discovery in all cases will involve processes common to both purchase money and refinance

11  applications.  There is no distinction that would require separate discovery sufficient to warrant a

12  separate "Putative Refinancing Class."  Indeed, the *Braxton* suggestion that a refinancing applicant

13  is imminently more creditworthy than a purchase money loan applicant is not accurate.  A borrower

14  who was "deemed sufficiently creditworthy to obtain [the original] home loan" may not be

15  "sufficiently creditworthy" to refinance that loan if, for example, that borrower has missed payments

16  on the original loan, filed for bankruptcy, lost income, and the like.  Refinancing applicants, like

17  purchase money loan applicants, must still apply, meet credit and income requirements, and qualify

18  for their particular loan program.  The *Braxton* plaintiffs' attempt to differentiate their putative class

19  on this basis fails.

20          So too does the Braxton plaintiffs' claim that *Pope*, *Thomas*, and *Perkins* involve "non-Black

21  applicants."  The named plaintiffs in those cases are African American home loan applicants, and

22  those complaints make no substantive allegations regarding any "non-Black applicants."  Thus, those

23  complaints' passing, factually unsupported references to "female applicants" (two references in the

24  *Pope* and *Thomas* complaints) and "Hispanic customers" (one reference in the *Perkins* complaint)

25  does not make them "differently situated" than the *Braxton* case.  At bottom, all cases allege that

26

27  [9] Wells Fargo will address the appointment of interim lead counsel in its response to that motion, but
    it takes no position on which firm should be appointed interim lead counsel if the Court is inclined to
28  appoint interim lead counsel.

Wells Fargo's practices have a discriminatory impact on Black and African American borrowers, and the *Braxton* plaintiffs' attempt to artificially divide the cases as they suggest makes no practical sense.

Given the similarities among the cases, a single, consolidated complaint will expedite pretrial proceedings, reduce case duplication, avoid the need to contact parties and witnesses for multiple proceedings, and minimize the expenditure of time and money for all parties involved.  On the other hand, if the cases proceed separately, there will be four different scheduling orders, multiple sets of discovery and depositions directed at the same issues, four motions for summary judgment, four class certification motions, and potentially, four trials.  For these reasons, a consolidated amended complaint will benefit all parties and the Court, and no prejudice will result.

In the alternative, the Court could order the cases consolidated for purposes of discovery and allow the parties to revisit consolidation for additional purposes as the cases proceed.  Consolidation for discovery purposes will avoid the waste of time and resources that will occur if discovery proceeds separately in each case.  Indeed, without consolidated discovery, the plaintiffs in each case could be permitted to (1) serve up to 25 interrogatories (a total of least 100 interrogatories would be the result without consolidation); (2) serve unlimited requests for production prepared by four sets of lawyers in four cases, each with differing meet-and-confer and discovery disputes; and (3) depose the same individuals for each case, thus subjecting witnesses to potentially four different depositions.  Consolidation for discovery purposes would avoid this wasteful and burdensome result.

## III.    CONCLUSION

For the foregoing reasons, Defendants Wells Fargo Bank, N.A. and Wells Fargo & Company respectfully request that the Court consolidate this action with *Braxton*, *Ebo*, and *Perkins* for all purposes.

1  Dated:  August 5, 2022

2                                                    **WINSTON & STRAWN LLP**

3
                                        By:      */s/ Amanda L. Groves*
4                                                Amanda L. Groves
                                                 agroves@winston.com
5                                                333 S. Grand Avenue, 38th Floor
                                                 Los Angeles, CA 90071
6                                                Telephone: (213) 615-1700
                                                 Facsimile: (213) 615-1750
7

8                                                Kobi K. Brinson *(admitted pro hac vice)*
                                                 kbrinson@winston.com
9                                                Stacie C. Knight *(admitted pro hac vice)*
                                                 sknight@winston.com
10                                               300 South Tryon Street, 16th Floor
                                                 Charlotte, NC 28202
11                                               Telephone: (704) 350-7700
                                                 Facsimile: (704) 350-7800
12

13                                                   **MCGUIREWOODS LLP**

14
                                        By:      */s/ Alicia A. Baiardo*
15                                               Ava E. Lias-Booker (*admitted pro hac vice*)
                                                 alias-booker@mcguirewoods.com
16                                               Alicia A. Baiardo
                                                 abaiardo@mcguirewoods.com
17                                               Jasmine K. Gardner (*admitted pro hac vice*)
                                                 jgardner@mcguirewoods.com
18                                               Two Embarcadero Center, Suite 1300
                                                 San Francisco, CA  94111-3821
19                                               Telephone: (415) 844-9944
                                                 Facsimile: (415) 844-9922
20

21                                               Attorneys for Defendants
                                                 WELLS FARGO BANK, N.A. and WELLS FARGO &
22                                               COMPANY

23

24

25

26

27

28

DEFENDANTS' MOTION TO CONSOLIDATE
CASE NO. 3:22-cv-00990

1   Amanda L. Groves (SBN: 187216)
    agroves@winston.com
2   Kobi K. Brinson (*Admitted pro hac vice*)
    kbrinson@winston.com
3   Winston & Strawn LLP
    333 S. Grand Avenue, 38th Floor
4   Los Angeles, CA 90071
    Telephone: (213) 615-1700
5   Facsimile: (213) 615-1750

6   Ava E. Lias-Booker (*Admitted pro hac vice*)
    alias-booker@mcguirewoods.com
7   Alicia A. Baiardo (SBN: (SBN 254228)
    abaiardo@mcguirewoods.com
8   McGuire Woods LLP
    Two Embarcadero Center
9   Suite 1300
    San Francisco, CA  94111-3821
10  Telephone: (415) 844-9944
    Facsimile: (415) 844-9922
11

12  (*Additional Counsel on Signature Page*)

13  Attorneys for Defendants
    WELLS FARGO BANK, N.A.,
14  And WELLS FARGO & COMPANY

15                  **UNITED STATES DISTRICT COURT**

16                  **NORTHERN DISTRICT OF CALIFORNIA**

17

18  CHRISTOPHER WILLIAMS, SAM          Case No. 3:22-cv-00990-JD
    ALBURY, and SHAIA BECKWITH
19  SIMMONS, individually and on behalf of   Hon. James Donato
    all others similarly situated,
20                                          **DECLARATION OF AMANDA L. GROVES IN**
                    Plaintiffs,             **SUPPORT OF MOTION TO CONSOLIDATE**
21
            v.
22
    WELLS FARGO BANK, N.A. and WELLS
23  FARGO & CO.,

24                  Defendants.

25

26

27

28
                                    1

I, Amanda L. Groves, declare:

1.      I am an attorney duly authorized to practice before this Court and am an attorney at the law firm of Winston & Strawn LLP, counsel for Defendants Wells Fargo Bank, N.A. and Wells Fargo & Company ("Wells Fargo") in this matter.  I have personal knowledge of the facts herein and if called as a witness, could and would competently testify thereto.

2.      On March 18, 2022, Aaron Braxton filed a putative class action complaint against Wells Fargo Bank, N.A and Wells Fargo Home Mortgage, Inc., Case No. 3:22-cv-01748.  A true and correct copy of the complaint is attached as Exhibit A.  On April 18, 2022, Braxton filed an amended complaint.  A true and correct copy of the amended complaint is attached as Exhibit B.

3.      On April 26, 2022, Ifeoma Ebo filed a putative class action complaint against Wells Fargo Bank, N.A., Case No. 3:22-cv-02535.  A true and correct copy of the complaint is attached hereto as Exhibit C.

4.      On June 10, 2022, Elretha Perkins and Laronica Johnson filed a putative class action against Wells Fargo Bank, N.A.  and Wells Fargo Home Mortgage, Inc., Case No. 3:22-cv-03455.  A true and correct copy of the complaint is attached hereto as Exhibit D.

I declare under the penalty of perjury of the laws the United States of America that the foregoing is true and correct.

This 5th day of August 2022.


                                        _/s/ Amanda L. Groves_____
                                        Amanda L. Groves

# EXHIBIT A

1  ELLIS GEORGE CIPOLLONE
   O'BRIEN ANNAGUEY LLP
2  Dennis S. Ellis (State Bar No. 178196)
     dellis@egcfirm.com
3  Noah S. Helpern (State Bar No. 254023)
     nhelpern@egcfirm.com
4  Ryan Q. Keech (State Bar No. 280306)
     rkeech@egcfirm.com
5  Stefan Bogdanovich (State Bar No. 324525)
     sbogdanovich@egcfirm.com
6  2121 Avenue of the Stars, Suite 2800
   Los Angeles, California 90067
7  Telephone: (310) 274-7100
   Facsimile: (310) 275-5697
8
   Joseph Kiefer (*pro hac vice* forthcoming)
9    jkiefer@egcfirm.com
   152 West 57th St., 28th Fl.
10 New York, New York 10019
   Telephone: (212) 413-2600
11 Facsimile: (212) 413-2629_

12 FRANK SIMS & STOLPER LLP
   Jason Frank (State Bar No. 190957)
13   jfrank@lawfss.com
   Scott H. Sims (State Bar No. 234148)
14   ssims@lawfss.com
   Andrew D. Stolper (State Bar No. 205462)
15   astopler@lawfss.com
   19800 MacArthur Blvd., Suite 855
16 Irvine, California 92612
   Telephone: (949) 210-2400
17 Facsimile: (949) 201-2405

18 Attorneys for Plaintiff Aaron Braxton, on
   behalf of himself and all others similarly
19 situated

20                    UNITED STATES DISTRICT COURT

21                  NORTHERN DISTRICT OF CALIFORNIA

22

23

24 AARON BRAXTON, on behalf of          Case No.
   himself and all others similarly situated,
25                                       **CLASS ACTION COMPLAINT
              Plaintiff,                 FOR:**
26
          vs.                            **1. VIOLATION OF THE EQUAL
27                                        CREDIT OPPORTUNITY ACT,
   WELLS FARGO BANK, N.A., a             15 U.S.C. § 1691, *ET SEQ.***
   Delaware corporation; WELLS FARGO     **2. RACE DISCRIMINATION IN
28 HOME MORTGAGE, INC., a                VIOLATION OF THE FAIR**

                                                              Case No.

2013830.1

1   Delaware corporation,

2            Defendants.

**HOUSING ACT OF 1968, 42
U.S.C. § 3601, *ET SEQ.*
3. RACE DISCRIMINATION IN
VIOLATION OF 42 U.S.C. § 1981
4. VIOLATION OF THE UNRUH
CIVIL RIGHTS ACT,
CALIFORNIA CIVIL CODE § 51
5. VIOLATION OF THE
CALIFORNIA UNFAIR
COMPETITION LAW**

**DEMAND FOR JURY TRIAL**

    Plaintiff Aaron Braxton, individually and as a representative of a nationwide class of Black applicants for home mortgage refinancing through Wells Fargo and its related entities (collectively "Plaintiffs" or the "Class"), alleges as follows:

## I.    NATURE OF ACTION

    1.    Homeownership has long been considered the cornerstone of the American Dream—allowing citizens to accumulate wealth through access to credit, generating equity, and reducing housing costs.[1]  For a decade, historically low interest rates have provided more and more Americans with access to this dream and, by way of refinanced lower home mortgages, the ability to pass their properties on to their next generation.

    2.    But careful students of American history know that homeownership has for far too long been unattainable for a disproportionate number of Black Americans, and even worse, more difficult for Black Americans to maintain once achieved.  Indeed, prior to the passage of the Civil Rights Act (and sometimes even afterwards), Black American homeowners were systematically denied access to the financial benefits of this particular American Dream through the use of pernicious

_____

[1] https://www.forbes.com/sites/forbesrealestatecouncil/2021/09/28/homeownership-and-the-american-dream/?sh=1c78499623b5

2013830.1

and pervasive race-based exclusions.  These included, for example, the Federal
Housing Administration's refusal to insure mortgages in and near Black
neighborhoods—a practice now referred to as "redlining"—at the same time that the
FHA subsidized builders who mass-produced entire subdivisions made for White
Americans.  These also included restrictive covenants in deeds that prohibited or
restricted the sale of American homes to Black Americans.

3.     The passage of the Civil Rights Act in 1965—and the judicial
interventions that followed—were supposed to fix that historical injustice, eliminate
race-based gatekeeping practices like redlining and restrictive covenants while
righting this long-standing American wrong.  For many homeowners seeking a first
or refinanced mortgage with some banks, it did.

4.     However, despite publicly touting their commitment to "help[] ensure
that all people across our workforce, our communities, and our supply chain feel
valued and respected and have equal access to resources, services, products, and
opportunities to succeed,"[2] Defendants in this case—Wells Fargo Bank, N.A. and
Wells Fargo Home Mortgage (collectively "Defendants" or "Wells Fargo")—have
continued to discriminate against Black American home loan applicants.  Federal
data shows that over the last several years thousands of Black homeowners have
been unable to maintain the dream of home ownership because of Wells Fargo's
ongoing and discriminatory modern day "redlining" practices.  These practices
delayed, obstructed and denied Black homeowners the benefit of lower interest rates
obtained through refinancing, forcing them to pay more for their loans than was
required of non-Black applicants, and in many cases sending them into foreclosure.[3]

---

[2] https://www.wellsfargo.com/about/diversity/diversity-and-inclusion/

[3] https://www.nclc.org/images/pdf/special_projects/covid-19/IB_Covid_Black_Forbearance_Foreclosure.pdf

2013830.1

Case 3:22-cv-01908-JD   Document 63-2   Filed 08/05/22   Page 4 of 23

5.      Bloomberg reported that the data released under the federal Home Mortgage Disclosure Act shows unequivocally that Wells Fargo rejects a disproportionate number of Black homeowners' refinancing applications.[4]  Wells Fargo also makes the refinancing application process purposely more difficult and less attractive for Black applicants than others—on a consistently national scale—demanding higher interest rates for loans secured by homes located in neighborhoods with greater proportions of Black residents by placing its loan officers much farther away from those same neighborhoods.[5]  And Wells Fargo customers report that loan officers state that certain "areas" with large Black populations are ineligible for rapid valuations.[6]  Black applicants are further subjected to delays, feigned mistakes, and other obstacles, leading many Black Americans to withdraw their requests for refinancing, and leading others to wait indefinitely while Wells Fargo refuses to act upon their applications.

6.      Wells Fargo also uses automated algorithms and machine learning to make underwriting decisions.  But these, too, are infected with Wells Fargo's pervasive race-based discrimination.  Wells Fargo's algorithms and machine learning select "areas" and other characteristics for greater or lesser scrutiny of credit applications, which, over time, only exacerbates the wealth disparities between people living in those areas or among groups which tend to have certain characteristics analyzed by the algorithms and machine learning.

7.      Numbers do not lie and, here, the numbers tell a shameful story, without any legitimate explanation.  Data from eight million refinancing

---

[4] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/

[5] *Id*.

[6] *Id*.

Case 3:22-cv-01998-JCS Document 63-2 Filed 08/05/22 Page 5 of 23

1   applications from 2020 reveal that "the highest-income Black applicants [had] an

2   approval rate about the same as White borrowers in the lowest-income bracket."[7]

3   White refinancing applicants earning between $0 and $63,000 a year were ***more***

4   ***likely*** to have their refinancing application approved by Wells Fargo than Black

5   refinancing applicants earning between $120,000 and $168,000 a year.[8]  Overall, in

6   2020, Wells Fargo rejected a ***majority*** of all the completed applications submitted

7   by Black homeowners.[9]  And because Wells Fargo designed an application process

8   that is disproportionately difficult for Black homeowners to complete, 27% of all

9   Black homeowners who began a refinance application with Wells Fargo withdrew

10  it.[10]

11      8.     As a result of its discriminatory practices, Wells Fargo was the only

12  major lender in the United States that approved a smaller share of refinancing

13  applications from Black homeowners in 2020 than it had in 2010.[11]  And its

14  disproportionally low approval rates for Black applicants are well below the national

15  average.

16      9.     In 2020—at the height of the refinancing boom, when millions of

17  Americans benefitted from the historically low interest rate environment—Wells

18  Fargo approved 47% of all applications by Black homeowners (meaning that Wells

19  Fargo rejected the majority of applications from Black homeowners), whereas all

20

21

22  _____

23  [7] *Id.*

24  [8] *Id.*

25  [9] *Id.*

26  [10] *Id.*

27  [11] *Id.*

28

1   other lenders approved 71% of all applications by Black homeowners.[12]

2       10.     No other lending institution rejected a majority of Black homeowners'

3   applications for refinancing.[13]

4       11.     Wells Fargo also systematically and discriminatorily applied to Black

5   refinance applicants some of the tightest lending standards in the industry, which

6   disproportionately affect minority applicants.[14]  A study done by the Board of

7   Governors of the Federal Reserve System analyzing federal mortgage data stated

8   that they "do not have any evidence [a]s to whether these tighter standards reduce

9   loan risk to justify the disparate impact on minority denials they are associated

10  with."[15]  And after controlling for relevant underwriting factors (debt-to-income

11  ratios, loan-to-value ratios, credit scores, etc.) the study found that "[l]enders who

12  impose the strictest standards on their white applicants [like Wells Fargo] tend to

13  have the largest unexplained excess denials of minority applicants."[16]

14      12.     Plaintiff Aaron Braxton is one victim of Wells Fargo's discriminatory

15  policies.  Mr. Braxton is a financially successful and eminently creditworthy Black

16  playwright, performer, and a math and science teacher with a Masters degree from

17  the University of Southern California.[17]  He has authored several award winning

18  _____

19  [12] *Id.*

20  [13] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-
    refinancing/

21

22  [14] *Id.*

23  [15] *How Much Does Racial Bias Affect Mortgage Lending? Evidence from Human
    and Algorithmic Credit Decisions*, Neil Bhutta, Aurel Hizmo, and Daniel Ringo
    (July 2021), at 12, n.20. Available at:

24

25  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887663

26  [16] *Id.* at 12.

27  [17] https://www.imdb.com/name/nm1347914/bio?ref_=nm_ov_bio_sm

28

Case No.

2013830.1

1   plays, including *DID YOU DO YOUR HOMEWORK?*, which broke the Beverly

2   Hills Playhouse's record for longest running play (9 months).[18]  He has also written

3   several films and television pilots, and acted in several film, television, and theatre

4   projects.[19]

5        13.    In addition, for two decades, Mr. Braxton was a loyal Wells Fargo

6   mortgage customer.  He purchased his home in 2000, in a historically Black

7   neighborhood located in South Los Angeles near the campus of the University of

8   Southern California and secured his property with a Wells Fargo home mortgage

9   insured by the Federal Housing Administration.  Mr. Braxton always made his

10   mortgage payments and bills on time, and he had a good credit score.

11        14.    Yet despite his successful career and his creditworthiness, when Mr.

12   Braxton sought to refinance his home mortgage loans in August of 2019, Wells

13   Fargo consistently obstructed his ability to refinance his loan.  Despite favorable

14   loan-to-value metrics and his personal history with the institution, Wells Fargo was

15   focused more on his race and the location of his home within a historically Black

16   Los Angeles neighborhood, and used the fact of his race and the location of his

17   home to delay, obstruct and deny him the full benefits of historically low home

18   mortgage interest rates.  Wells Fargo did this even though, having paid his loan for

19   more than 18 years, Mr. Braxton had equity in his home far greater than the amount

20   remaining, on his Federal Housing Administration (FHA) secured loan.

21        15.    Mr. Braxton was given the runaround to such an extent that it took him

22   over nine months to refinance his federally backed mortgage loan (and 12 months to

23   refinance his home equity loan) at an above-market interest rate of around 4%.  This

24   was after various Wells Fargo representatives kept telling him they lost his

25   paperwork, made incomplete inquiries and needed to request more information,

26

[18] *Id.*

27

[19] *Id.*

28

1  delayed its responses, and even placed him into an unsolicited debt-trap deferred

2  payment program without his permission.  It was only after Mr. Braxton notified the

3  Department of Housing and Urban Development ("HUD") that Wells Fargo

4  approved the refinancing of his federally backed FHA loan (indeed, Wells Fargo

5  approved the application the very next day).  Of course, for the prolonged period

6  that Mr. Braxton was waiting for Wells Fargo to refinance his loans, he was paying

7  the higher rates associated with his original loans.

8       16.    Mr. Braxton's experience is unfortunately consistent with the

9  experiences of thousands of Black Americans who have been victimized by Wells

10  Fargo's intentional, knowing and systematic race discrimination, violating the

11  contractual, commercial and civil rights of Class members and causing millions (and

12  perhaps even billions) of dollars in damages to the Nationwide Class.  Individually

13  and as a representative of the Class, Mr. Braxton brings this action to make good to

14  the Class all damages resulting from Defendants' violations of the federal civil

15  rights laws and to restore to the Class any amounts to which they otherwise would

16  have been entitled, together with other equitable and remedial relief as the Court

17  may deem appropriate.

18                **II.    JURISDICTION AND VENUE**

19       17.    This Court has federal question jurisdiction over this matter pursuant to

20  28 U.S.C. §§ 1331, 1332(d), and 1343, because the Plaintiff asserts federal causes of

21  action, because Plaintiff asserts civil rights causes of action, and because at least one

22  member of the Class is a citizen of a different state than all Defendants, and because

23  the amount in controversy exceeds $5,000,000.

24       18.    Personal jurisdiction is appropriate over Defendants because Wells

25  Fargo Bank, N.A. transacts business in the State of California and has its principal

26  place of business in San Francisco, California.  Wells Fargo Home Mortgage, Inc.

27  originates loans to California customers from its California offices and maintains a

28  systematic and continuous presence in the State.

-8-                                    Case No.
COMPLAINT

2013830.1

19.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Wells Fargo Bank, N.A. resides in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and Wells Fargo Bank, N.A.'s principal place of business is in this district.

### III.     PARTIES

20.     Plaintiff Aaron Braxton, who is Black, is a natural person and a citizen of the State of California and resides in Los Angeles, California.

21.     Defendant Wells Fargo Bank, N.A. is a publicly traded, global financial services firm and a Fortune 500 corporation incorporated in Delaware with its principal place of business in San Francisco, California.  As of December 31, 2020, Wells Fargo has assets of approximately $1.9 trillion, loans of $887.6 billion, deposits of $1.4 trillion, and stockholders' equity of $185 billion.  Wells Fargo is a mortgage lender; and also provides a wide variety of financial products and services to its global and domestic clients.

22.     Defendant Wells Fargo Home Mortgage, Inc. is a home lending company that is part of the "Wells Fargo banking family."  It operates about 725 mortgage stores nationally and originates and services one-to-four-family residential first and junior-lien mortgages and home equity loans.  On average, it originates approximately $300 billion worth of loans per year.  It is incorporated in the State of Delaware, and has its principal place of business in Des Moines, Iowa. Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California office locations.

### IV.     FACTUAL ALLEGATIONS

23.     During the last few years interest rates were near an all-time low in the United States, and homeowners who held mortgage loans at higher rates (meaning a great deal of homeowners) sought to refinance their loans at lower rates. Refinancing would allow a homeowner to significantly reduce their monthly payments and to owe less mortgage interest over the life of the loan.  Over the last

-9-
COMPLAINT                                          Case No.

2013830.1

two years, homeowners in the United States refinanced over $5 trillion worth of mortgages.

**A.      Wells Fargo's Discriminatory Refinancing Practices**

24.      Wells Fargo is a major issuer of home-based loans in the United States, holding nearly a trillion dollars in outstanding debt.

25.      Wells Fargo's discrimination began at the latest in 2018 and continues through today.

26.      In 2020, Defendant Wells Fargo approved Black homeowner refinancing applications at a rate lower than that of any other major lender in America.  It is the only lender that approved fewer such applications in 2020 than it did in 2010.[20]

27.      Bloomberg analyzed data from eight million refinancing applications from 2020, released under the Home Mortgage Disclosure Act, and found that, for Wells Fargo, "the highest-income Black applicants [had] an approval rate about the same as White borrowers in the lowest-income bracket."[21]

28.      The disparate treatment of Black applicants results at least in part from Wells Fargo's tactics that, in practice, perpetuate redlining of areas with disproportionately more Black residents and imposing in those areas hurdles and obstacles that either delay or prevent refinancing.

29.      For example, in order to minimize the likelihood and frequency of Black mortgage applications, Wells Fargo systematically and intentionally places its loan officers in areas with disproportionately low numbers of Black residents.  In many cities across the nation with large Black populations, like Atlanta, Baltimore,

---

[20] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/

[21] *Id*.

and Philadelphia, Wells Fargo's online store locator will direct individuals in predominately Black ZIP codes to areas in predominately White ZIP codes.[22] Likewise, in New Haven, Connecticut, which in 2020 was a hot spot for denials, the nearest Wells Fargo loan officer available to homeowners was 25 miles away.  Even to initiate the application process by visiting a loan officer, a Black applicant had to do more than a non-Black applicant.

30.     The effect of this is clear: while Wells Fargo's approval rates for Black refinancing applicants are much lower than the approval rates for Black applicants at other national banks, ***this gap widens in counties with more Black residents***.[23]  As noted above, nationally, Wells Fargo approved just 47% of its Black refinancing applicants.[24]  However, in Fulton County, which has more Black than white residents, Wells Fargo only approved 43% of its Black refinancing applications, nearly 10% less than its already-low national approval rate.[25]

31.     And even for those Black applicants whose loans were ultimately approved, they faced delays that White applicants living in predominately White neighborhoods did not, causing them damages through continued higher mortgage rates during the unjustified delay as they awaited loan approval.  In some cases, Wells Fargo officers simply told Black applicants living in predominately Black neighborhoods that "perhaps the area is not eligible" for quick evaluations of refinancing applications.[26]  Wells Fargo regularly approved refinancing applications

---

[22] https://www.wellsfargo.com/locator/mortgage/consultant .

[23] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/

[24] *Id*.

[25] *Id*.

[26] *Id*.

1   of non-Black homeowners in a matter of weeks, but only approved the applications

2   of Black homeowners after many months (if those Blacks applicants happened to be

3   approved).

4        32.   Wells Fargo also perpetuated its discriminatory practices using

5   algorithms.  Wells Fargo identifies neighborhoods eligible for quick evaluations of

6   refinancing applications using an internal algorithm.

7        33.   The director of the CFPB describes these types of banking algorithms

8   as "black boxes behind brick walls."[27]  "When consumers and regulators do not

9   know how decisions are made by the algorithms, consumers are unable to

10  participate in a fair and competitive market free from bias." [28]

11       34.   Wells Fargo's algorithm singled out predominately Black

12  neighborhoods and labeled those neighborhoods ineligible for rapid processing,

13  which led loan officers to inform Black applicants that they could not enjoy the

14  same rapid application processing as white applicants.

15       35.   Wells Fargo's lending standards also help to perpetuate its

16  discrimination of Black applicants.  Wells Fargo has the strictest lending policies of

17  any other major lender.[29]  And as a result, Wells Fargo has the largest disparity

18  between the approval rates of Black refinancing applicants to white refinancing

19  applicants—25% compared to 16%.[30]  A study done by the Board of Governors of

20  the Federal Reserve System analyzing federal mortgage data stated that they "do not

21  _____

22  [27] https://www.consumerfinance.gov/about-us/newsroom/remarks-of-director-rohit-
    chopra-at-a-joint-doj-cfpb-and-occ-press-conference-on-the-trustmark-national-
23  bank-enforcement-action/

24  [28] *Id.*

25  [29] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-
26  refinancing/

27  [30] *Id.*

28

1  have any evidence [ ] as to whether these tighter standards reduce loan risk to justify

2  the disparate impact on minority denials they are associated with."[31]  And after

3  controlling for relevant underwriting factors (debt-to-income ratios, loan-to-value

4  ratios, credit scores, etc.) the study found that "[l]enders who impose the strictest

5  standards on their white applicants tend to have the largest unexplained excess

6  denials of minority applicants."[32]  The study also found that, under the more

7  stringent standards, "Black applicants are 1.9 percentage points more likely…to be

8  denied than a comparable white applicant after controlling flexibly for an array of

9  important underwriting factors."[33]

10      36.    This Federal Reserve study also found that the most common reasons

11  for denials "for Black applicants [were] 'incomplete' [documents] and

12  'verification'" issues.[34]  The study found that loan officers like those of Wells Fargo

13  "may work less diligently with minority borrowers to gather all necessary

14  documents or verify aspects of their application, resulting in a denial."[35]  Excess

15  denials are also caused by "issues with the latter stages of the mortgage application

16  process that disproportionately affect minorities."[36]  Wells Fargo's loan officers'

17  lack of diligence in processing applications from Black homeowners seeking

18  refinancing caused disproportionate delays in the processing of their applications,

19

20  [31] *How Much Does Racial Bias Affect Mortgage Lending? Evidence from Human and Algorithmic Credit Decisions*, Neil Bhutta, Aurel Hizmo, and Daniel Ringo
21  (July 2021), at 12, n.20. Available at:
22  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887663

23  [32] *Id*. at 12.

24  [33] *Id*. at 9.

25  [34] *Id*. at 13.

26  [35] *Id*. at 13, n.23.

27  [36] *Id*. at 14.

28

-13-

COMPLAINT

Case No.

1  causing damage even when the loans were ultimately approved.

2      37.    The above practices are arbitrary and artificial and unnecessary to

3  achieve a valid interest or legitimate objective.  The vast difference between

4  refinancing approval rates Wells Fargo issued to Black Americans as compared to

5  any other lending institutions' approval rates negates any possible legitimate

6  objective.

7      38.    As noted, the above practices have a disproportionately adverse effect

8  on Black Americans seeking to refinance their loans.  Black Americans are

9  members of a protected class.

10      39.    Wells Fargo's practices directly harmed Black Americans by forcing

11  them to pay higher interest rates while applications were pending, by forcing them

12  to pay higher interest rates when applications were completed, and/or by denying

13  refinancing applications.  In the absence of these policies, Black Americans would

14  not have had to pay higher rates or face rejection in their refinancing applications.

15      40.    The disparity between Wells Fargo's treatment of Black American

16  applicants and non-Black American applicants is significant and shocking.  As

17  noted, a White American in the lowest income bracket was just as likely to receive

18  refinancing approval as a Black American in the highest income bracket.

19      41.    Wells Fargo's racial discrimination during the refinancing boom is

20  consistent with Wells Fargo's sordid history of racial discrimination in lending.  In

21  2012, it agreed to pay $184 million to settle claims with the Department of Justice

22  that the bank pushed Black and Hispanic homeowners to obtain subprime

23  mortgages, and then charged them higher fees and interest rates.[37]

24      42.    Several municipalities have sued Wells Fargo as well.  In 2019, it

25  settled a lawsuit with the City of Philadelphia premised on allegations that it

26  _____

27  [37] https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-
     fargo-resulting-more-175-million-relief.

28

1  purposefully made it difficult for minorities to refinance their mortgages.[38]

2      43.   Worse yet, despite harming Black homeowners by making it more

3  difficult to refinance their loans, Wells Fargo deceives the public by trumpeting its

4  supposed commitment to diversity, equity and inclusion.  In its 2020 annual report,

5  Wells Fargo expressed its supposed commitment to "the concept of equity to our

6  diversity and inclusion efforts in recognition of the systemic and structural

7  challenges in our society that have contributed to disparities that exist today." [39]

8      44.   In the same year that Wells Fargo denied a majority of Black

9  homeowners' refinancing applications, the Wells Fargo CEO claimed that "the calls

10 for racial justice in 2020 reinforced the urgency of working to create a company

11 culture with broad representation in who we are, how we think, and how we make

12 decisions."[40]  However these words ultimately ring hollow, because it denied Black

13 homeowners refinancing at much higher rates than any other major lender in that

14 same year.

15 **B.   Plaintiff Aaron Braxton is Harmed by Wells Fargo's Race-Based
        Discrimination**

16

17      45.   Plaintiff Aaron Braxton purchased his home in South Los Angeles,

18 California, near the University of Southern California, in April 2000, through a

19 Wells Fargo home loan for $139,500 ("First Loan").  This First Loan was insured

20 through the FHA. In 2005, after the price of the house appreciated, he took out a

21 second home equity line of credit loan, also from Wells Fargo ("Second Loan").  He

22 improved upon the property and built an accessory dwelling unit.  Today, the home

23

24 _____

[38] https://www.phila.gov/2019-12-16-city-of-philadelphia-and-wells-fargo-resolve-
25 litigation/.
[39] 2020 Annual Report, at 17; accessible at
26 https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-
27 reports/2020-annual-report.pdf.

[40] *Id*. at 16.
28

1  is worth approximately $800,000, as it was in 2019.  In or about August 2019, Mr.

2  Braxton began the process of applying to refinance his two Wells Fargo loans to

3  take advantage of reduced interest rates.  At the time, he owed $185,000 on both his

4  Wells Fargo loans and paid a 6% interest rate on both loans, multiple percentage

5  points higher than the average refinance rate at the time.

6        46.    When Mr. Braxton initially applied to refinance his First Loan, Wells

7  Fargo repeatedly asked him to resubmit paperwork because Wells Fargo

8  representatives claimed the paperwork was either missing or lost.  Wells Fargo

9  representatives also continually took weeks and weeks to issue or reply to

10  correspondence.  Mr. Braxton thereafter began the process of refinancing his Second

11  Loan and was confronted with the same delays.

12        47.    Frustrated by the delays and because he was continuing to pay a higher

13  mortgage rate while his applications were pending, Mr. Braxton regularly contacted

14  his loan officers and other Wells Fargo personnel to ask about the status of his

15  applications.

16        48.    After months of frustrating encounters with Wells Fargo personnel, Mr.

17  Braxton decided to call HUD.  A HUD representative informed Mr. Braxton that

18  they would be contacting Wells Fargo.  The very next day, Wells Fargo approved

19  the refinancing of Mr. Braxton's federally backed FHA home loan, approximately

20  nine months after he began the process.

21        49.    Eventually, around October 2020, Wells Fargo finally approved a

22  refinancing of his Second Loan.  However, despite the contact from HUD, which

23  presumably prompted it to act on Mr. Braxton's First Loan, Wells Fargo continued

24  its discrimination through race-based application delays.  It continued to claim that

25  paperwork needed to process the Second Loan was missing, even though Mr.

26  Braxton had already provided the paperwork.  At one point, after having sent a

27  notary to his home to finalize some paperwork, Wells Fargo informed Mr. Braxton

28  that the notary had lost the paperwork and he needed to complete some forms again.

2013830.1

50.     All told, Mr. Braxton submitted four applications because Wells Fargo kept losing them.  During the 16 months that his applications were pending, Mr. Braxton continued to pay the higher original mortgage rates instead of the lower refinanced rates he was seeking (and ultimately proven entitled to).  However, unbeknownst to Mr. Braxton, in the end the rate he received for his refinancing, while lower than his original rate, was much higher than the fair market rate received by similarly situated non-Black applicants.

## V.     CLASS ALLEGATIONS

51.     Plaintiff Aaron Braxton brings this action on behalf of himself and a potential class of similarly situated Black Americans.

52.     Each and every claim alleged in this case is also alleged on behalf of every member of the Class.

**A.     Class Definition**

53.     The Class includes all Black persons in the United States who, from January 1, 2018 through the present (the "Class Period"), submitted an application to refinance their home mortgage through Defendants that was (i) processed at a rate slower than that of the average processing time of applications made by non-Black applicants; or (ii) whose applications were denied; or (iii) whose resulting refinance loans were made at higher interest rates as compared to similarly situated non-Black applicants.  Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this complaint, and the United States government.

54.     Class certification is authorized under Federal Rule of Civil Procedure 23 and applies to claims for injunctive and equitable relief, including restitution, under Rule 23(b)(2), and for monetary damages under Rule 23(b)(3).

55.     There are at least 13,000 members of the Class.

56.     The number of persons who fall within the definitions of the Class are so numerous and geographically dispersed so as to make joinder of all members of

2013830.1

the Class or Subclass in their individual capacities impracticable, inefficient, and unmanageable, and without class-wide relief, each member of the Class would effectively be denied his, her, or their rights to prosecute and obtain legal and equitable relief based on the claims and allegations averred in the Complaint.

57.    Plaintiff, as detailed below, can fairly and adequately represent the proposed Class.  In the alternative, Plaintiff can act as the representative of the below subclasses.

**B.    Proposed Subclasses**

58.    Additionally, or in the alternative, pursuant to Federal Rule of Civil Procedure 23(c)(5), Mr. Braxton brings this action on behalf of the following subclasses:

59.    The Delayed Refinancing Subclass:  All Black persons in the United States who applied for refinancing from the Defendants during the class period and whose applications processed at a rate slower than that of the average processing time of applications made by non-Black applicants.

60.    The Higher Rate Subclass:  All Black persons in the United States who applied for refinancing from the Defendants during the class period and whose refinancing applications were eventually approved, but at a higher interest rate than prevailing market rates based on their creditworthiness.

**C.    Numerosity and Ascertainability**

61.    **Numerosity.**  While the exact numbers of the members of the Class and Subclasses are unknown to Plaintiff at this time, membership in the Class and Subclasses may be ascertained from the records maintained by Wells Fargo.  At this time, Plaintiff is informed and believes that the Class includes hundreds of thousands of members and the Subclasses includes tens of thousands of members. Therefore, the Class and Subclasses are sufficiently numerous that joinder of all members of the Class and Subclasses in a single action is impracticable under Rule 23(a)(1) of the Federal Rules of Civil Procedure, and the resolution of their claims

1 through a class action will be of benefit to the parties and the Court.

2      62. **Ascertainability.** The names and addresses of the members of the

3 Class and Subclasses are contained in Wells Fargo's records. Notice can be

4 provided to the members of the Class and Subclasses through direct mailing, email,

5 publication, or otherwise using techniques and a form of notice similar to those

6 customarily used in consumer class actions arising under State and Federal law.

7 **D.    Commonality and Predominance**

8      63. This matter involves common questions of law and fact which

9 predominate over any question solely affecting individual Class Members.

10      64. The common questions of law and fact include, but are not limited to:

11      •    Whether Defendant systematically discriminated against Class Members on account of their race;

13      •    Whether Black applicants' home mortgage and refinance applications were processed at a rate slower than that of the average processing time of applications made by non-Black applicants;

15      •    Whether Black applicants' home mortgage and refinance applications were denied when the score of a similarly situated non-Black applicant would be approved;

17      •    Whether Black applicants' resulting refinance loans were made at higher interest rates as compared to similarly situated non-Black applicants;

19      •    Whether Defendant selected disproportionately white areas for rapid refinancing evaluation and disproportionately Black areas for increased scrutiny;

21      •    Whether Defendants' underwriting algorithms and machine learning programs were racially biased and led to unfairly discriminatory credit policies that harmed Black refinancing applicants.

24      65. **Predominance.** Class action status is warranted under Rule 23(b)(3) of

25 the Federal Rules of Civil Procedure because questions of law or fact common to the

26 members of the Class and Subclasses predominate over any questions affecting only

27 individual members. The interests of the members of the Class and Subclasses in

28 individually controlling the prosecution of separate actions are theoretical and not

1  practical.  Prosecution of this action through multiple Class Representatives would

2  be superior to individual lawsuits.  Plaintiff is not aware of any difficulty which will

3  be encountered in the management of this litigation which should preclude its

4  maintenance as a class action.

5  **E.  Typicality and Adequacy**

6        66.     Plaintiff Aaron Braxton's claims are typical of the other Class

7  Members' claims because all Class Members were injured in the same manner as a

8  result of substantially similar conduct by Wells Fargo.

9        67.     Mr. Braxton is an adequate Class Representative because his interests

10  do not conflict with the interests of the other members of the Class and Subclasses

11  he seeks to represent.  Plaintiff has retained counsel competent and experienced in

12  complex class action litigation, and Plaintiff intends to prosecute this action

13  vigorously.  The Class and Subclasses' interests will be fairly and adequately

14  protected by Plaintiff and his counsel.

15  **F.  Superiority**

16        68.     A class action is the superior method for the fair and efficient

17  adjudication of this matter, because the damages and other harms suffered by

18  Plaintiff and other Class Members are small compared to the burden and expense of

19  individual litigation.  Thus, it would be impractical, if not impossible, for individual

20  plaintiffs to seek redress against Defendants for the harms suffered.

21        69.     Individual litigation of these harms would also be inefficient for the

22  court system, and would create a risk of inconsistent or contradictory rulings and

23  judgments.

24        70.     No unusual circumstances exist that would make this matter more

25  difficult to manage than a typical class action.  Individualized damages figures can

26  be mathematically computed by collecting data about the length of each Class

27  Member's delay and the differential between the interest rates they ultimately

28  received versus the prevailing market rate based on race-neutral variables such as

Case No.

debt-to-income ratio, loan-to-value ratio, and credit score.

**G.    Injunctive Relief**

71.    Plaintiff also seeks to represent a class under Rule 23(b)(2) seeking injunctive relief forcing Wells Fargo to cease and desist its current discriminatory practices.

## COUNT I

### VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT
### 15 U.S.C. § 16901, *et seq.*

72.    Plaintiff, on behalf of himself and all those similarly situated, realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

73.    The Equal Credit Opportunity Act makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

74.    The Equal Credit Opportunity Act applies to applications for refinancing, like those of the Plaintiff and others similarly situated.  Plaintiff applied for credit by seeking to refinance his home loans.

75.    Defendants are creditors because they regularly extend, renew, and continue issuances of credit.

76.    Defendants' consistent delays, roadblocks, feigned difficulties, and sometimes denials of applications for refinancing submitted by Black Americans constitute race-based discrimination forbidden by the Equal Credit Opportunity Act.

77.    Plaintiff and all those similarly situated were harmed by Defendants' conduct, including but not limited to harm in the form of higher interest rates paid while applications were pending, higher interest rates paid upon a delayed approval, or from a denied application.

78.    On behalf of himself and the Class he seeks to represent, Plaintiff requests the relief set forth below.

-21-
COMPLAINT

## COUNT II

### RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT OF 1968, 42 U.S.C. § 3601, *et seq.*

79.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

80.    The Fair Housing Act makes it unlawful, in residential real estate transactions, such as refinancing, to discriminate against designated classes of individuals.

81.    Plaintiff and others similarly situated sought to engage in residential real estate transactions with the Defendants.

82.    Plaintiff and others similarly situated are Black Americans and therefore members of a protected class under the Fair Housing Act.

83.    Defendants refused to transact business with Plaintiff and others similarly situated when they refused to approve refinancing applications on the same timeline as the applications made by other parties with similar qualifications that were not members of the protected class, by causing applicants to withdraw applications due to roadblocks and feigned difficulties, or by denying refinancing applications.  As noted, Defendants approved fewer than half of Black homeowners' refinancing applications in 2020 while approving 71% of the applications of White homeowners.

84.    Defendants refused to transact business with Plaintiff and those similarly situated during the Class Period and at the same time did transact business with non-Black homeowners with similar qualifications.

85.    Plaintiff and those similarly situated were injured by Defendants' refusal to transact business with them because they paid application fees for refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar

2013830.1

qualifications, and/or because their applications were denied.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

86.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

87.    Under 42 U.S.C. § 1981, persons of all races are guaranteed the same right to make and enforce contracts, regardless of race.  The term "make and enforce" contracts includes the making, performance, modification, and terminations of contracts, as well as all of the other aspects of a contractual relationship.

88.    By seeking to refinance their home loans and submitting an application to Defendants, Plaintiff and others similarly situated sought to "make and enforce" contracts with the Defendants.

89.    Plaintiff and those similarly situated were denied their right to make and enforce contracts when Defendants refused to provide refinancing on the same terms as they offered to members of a different race, by delaying or frustrating the applications process, and/or by denying the applications.

90.    Plaintiff and those similarly situated were harmed by Defendants' denial of their rights to make and enforce contracts.

## COUNT IV

### VIOLATION OF THE UNRUH CIVIL RIGHTS ACT,
### CALIFORNIA CIVIL CODE §51

91.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

92.    The Unruh Civil Rights Act provides that all persons within the State of California are free and equal no matter their race and are entitled to full and equal treatment in all business establishments.

93.    The Unruh Civil Rights Act thus prohibits discrimination of any kind

-23-

COMPLAINT

Case No.

2013830.1

against any person in any business establishment.

94. Defendants are business establishments under the Unruh Civil Rights Act.

95. Plaintiff and other individuals similarly situated were denied full and equal treatment under the Unruh Civil Rights Act when Defendants refused to offer them refinancing terms on the same terms as individuals who were not Black Americans.

96. Plaintiff and other individuals similarly situated were harmed by Defendants' refusal to transact business with them because they paid application fees for refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar qualifications, and/or because their applications were denied.

## COUNT V

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

97. Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

98. The California Unfair Competition Law ("UCL") forbids "unlawful, unfair or fraudulent" conduct in connection with business activity.

99. Defendants' business offering refinancing of existing loans is a business activity under the UCL.

100. Plaintiff and others similarly situated are "persons" under the UCL.

101. Defendants' conduct described herein constitutes unlawful competition, as in the course of engaging in the business acts described above, it engaged in conduct that constituted a predicate violation of the laws identified herein, namely the Equal Credit Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, and the Unruh Civil Rights Act.

102. Defendants' conduct described herein constitutes unfair competition

-24-

COMPLAINT

Case No.

1  under the UCL, as their practices are likely to deceive the public by informing the

2  public of an alleged commitment to diversity and equality, but instead using hidden

3  business practices designed to deny, delay and refuse the refinancing of loans of

4  Black Americans, and subjecting those that are approved, to unfavorable terms.  As

5  there is no legitimate justification for these practices, which have a

6  disproportionately negative impact on the public, in comparison to any fair business,

7  purpose Defendants' practices are unfair as defined under the UCL.

8       103.   Defendants' conduct described herein constitutes fraudulent

9  competition under the UCL, as they advertise and other wise state that they are

10  committed to diversity and equality, and will fairly and quickly process the

11  refinancing applications of all applicants, but instead use hidden business practices

12  designed to deny, delay and refuse the refinancing of loans of Black Americans, and

13  subjecting those that are approved, to unfavorable terms.  These business practices

14  are likely to deceive the public, and thus are fraudulent.

15       104.   Plaintiff and those similarly situated were injured by Defendants'

16  refusal to transact business with them because they paid application fees for

17  refinancing applications that were delayed or denied, because they continued to pay

18  higher interest rates while their delayed applications were pending, because they

19  were provided with higher interest rates than other homeowners with similar

20  qualifications, and/or because their applications were denied.

21                  **PRAYER FOR RELIEF**

22       WHEREFORE, Plaintiff respectfully requests that this Court provides the

23  following relief:

24       a.    Certify the 23(b)(2) and 23(b)(3) classes outlined above;

25       b.    Designate Plaintiff as a Class Representative and designate the

26             undersigned counsel as lead Class Counsel;

27       c.    Find that Defendants' acts described herein violate the Equal Credit

28             Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, the Unruh

-25-

COMPLAINT

Case No.

2013830.1

1        Civil Rights Act, and the California UCL;

2      d.    Find that Defendants have engaged in a pattern and practice of racial

3           discrimination resulting in the harm to Plaintiff and class members

4           described above;

5      e.    Award Plaintiff and all others similarly situated restitutionary relief,

6           together with compensatory and punitive damages;

7      f.    Award Plaintiff and all others similarly situated injunctive relief by

8           ordering Defendants to stop the discriminatory practices described

9           herein;

10     g.    Award Plaintiff and all others similarly situated prejudgment interest

11         and attorney's fees, costs, and disbursements; and

12     h.    Award Plaintiff and all others similarly situated such other relief as this

13         Court deems just and proper.

14                   **<u>DEMAND FOR JURY TRIAL</u>**

15   Plaintiff demands a trial by jury of all issues so triable.

16

17  DATED:  March 18, 2022       ELLIS GEORGE CIPOLLONE

                             O'BRIEN ANNAGUEY LLP

18                       Dennis S. Ellis

19                       Noah S. Helpern

20                       Ryan Q. Keech

                             Joseph Kiefer (*pro hac vice* forthcoming)

21                       Stefan Bogdanovich

22

23

                       By: _____

24                          Dennis S. Ellis

25                   Attorneys for Plaintiff Aaron Braxton and all

26                   other similarly situated Plaintiffs

27

28

DATED:  March 18, 2022          FRANK, SIMS & STOLPER LLP
                                        Jason M. Frank
                                        Scott H. Sims
                                        Andrew D. Stolper


                                By:  _____/s/ Jason Frank_____
                                        Jason Frank
                                Attorneys for Plaintiff Aaron Braxton and all
                                other similarly situated Plaintiffs

**Attestation under N.D. Cal. L.R. 5-1(h)**: the ECF filer of this document attests that all of the other signatories have concurred in the filing of the document, which shall serve in lieu of their signatures on the document.

# EXHIBIT B

1  ELLIS GEORGE CIPOLLONE
   O'BRIEN ANNAGUEY LLP
2  Dennis S. Ellis (State Bar No. 178196)
     dellis@egcfirm.com
3  Trent B. Copeland (State Bar No. 136890)
     tcopeland@egcfirm.com
4  Ryan Q. Keech (State Bar No. 280306)
     rkeech@egcfirm.com
5  2121 Avenue of the Stars, Suite 2800
   Los Angeles, California 90067
6  Telephone: (310) 274-7100
   Facsimile: (310) 275-5697
7

8  FRANK SIMS & STOLPER LLP
   Jason Frank (State Bar No. 190957)
9    jfrank@lawfss.com
   Scott H. Sims (State Bar No. 234148)
10    ssims@lawfss.com
   Andrew D. Stolper (State Bar No. 205462)
11    astolper@lawfss.com
   19800 MacArthur Blvd., Suite 855
12 Irvine, California 92612
   Telephone: (949) 210-2400
13 Facsimile: (949) 201-2405

14 (Additional Counsel on Signature Page)

15 Attorneys for Plaintiffs Aaron Braxton,
   Gia Gray, Bryan Brown, Paul Martin, on
16 behalf of themselves and all others
   similarly situated
17

18                UNITED STATES DISTRICT COURT

19              NORTHERN DISTRICT OF CALIFORNIA

20

21
   AARON BRAXTON, GIA GRAY,          Case No. 4:22-cv-01748-KAW
22 BRYAN BROWN AND PAUL
   MARTIN, on behalf of themselves and  **FIRST AMENDED CLASS ACTION**
23 all others similarly situated,        **COMPLAINT FOR:**

24          Plaintiffs,                     **1. VIOLATION OF THE EQUAL
                                            CREDIT OPPORTUNITY ACT,**
25     vs.                                  **15 U.S.C. § 1691, *ET SEQ.***
                                            **2. RACE DISCRIMINATION IN**
26 WELLS FARGO BANK, N.A., a               **VIOLATION OF THE FAIR**
   Delaware corporation; WELLS FARGO      **HOUSING ACT OF 1968, 42**
27 HOME MORTGAGE, INC., a                 **U.S.C. § 3601, *ET SEQ.***
   Delaware corporation; WELLS FARGO
28 & CO., a Delaware corporation,

2029104

|   |   |   |
|---|---|---|
| 1 | Defendants. | **3. RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981** |
| 2 | | **4. VIOLATION OF THE UNRUH CIVIL RIGHTS ACT,** |
| 3 | | **CALIFORNIA CIVIL CODE § 51** |
| 4 | | **5. VIOLATION OF THE CALIFORNIA UNFAIR** |
| 5 | | **COMPETITION LAW** |
| 6 | | **DEMAND FOR JURY TRIAL** |
| 7 | | |

8

9    Plaintiffs Aaron Braxton, Gia Gray, Bryan Brown and Paul Martin,

10  individually and as representatives of a nationwide class of Black applicants for

11  home mortgage refinancing through Wells Fargo and its related entities (collectively

12  "Plaintiffs" or the "Class"), allege as follows:

13                        **I.    NATURE OF ACTION**

14         1.    The benefits of homeownership have long been the cornerstone of the

15  American Dream—allowing citizens to accumulate wealth through access to credit,

16  generating equity, and reducing housing costs.[1]

17         2.    However, the benefits of homeownership have for far too long been

18  unattainable for a disproportionate number of Black Americans, and more difficult

19  for Black Americans to maintain once achieved.  Historically, Black Americans

20  have been repeatedly and systematically denied access to the financial benefits of

21  homeownership through the use of pernicious and pervasive race-based exclusions.

22  These denials included, for example, the Federal Housing Administration's refusal

23  to insure mortgages in and near Black neighborhoods—a practice now referred to as

24  "redlining"—at the same time that the FHA subsidized builders who mass-produced

25  entire subdivisions made for White Americans.

26

27  [1] https://www.forbes.com/sites/forbesrealestatecouncil/2021/09/28/homeownership-
    and-the-american-dream/?sh=1c78499623b5.

28

2029104

3.      The passage of civil rights legislation in the 1960s was supposed to fix that historical injustice, eliminate race-based gatekeeping practices like redlining and restrictive covenants while righting this long-standing American wrong.  For many homeowners seeking a first or refinanced mortgage with some banks, it did. For many Black Americans, however, discrimination in the realm of home ownership remains a vestige of the country's prejudice narrative.

4.      Over the past few years, historically low interest rates spawned an unprecedented opportunity for homeowners to refinance their home mortgages. Refinanced mortgages allow homeowners to reduce their monthly payments (as well as the overall interest due during the life of their loan) while still amassing equity in their homes.  Not surprisingly, millions of homeowners across the nation sought to reduce their payments through refinancing.

5.      Unfortunately, Black homeowners who sought to refinance through the Defendants in this case—Wells Fargo Bank, N.A., Wells Fargo & Co., and Wells Fargo Home Mortgage (collectively "Defendants" or "Wells Fargo")—were disproportionately denied refinance applications or, even if ultimately approved, faced unjustified delays in the processing of their applications.

6.      Wells Fargo *denied the applications of over 50%* of the Black Americans seeking to refinance in 2020, and *denied the applications of just under 50%* of the Black Americans seeking to refinance in 2021.  No other major lending institution refused to refinance the homes of Black Americans at such stunning rates.

7.      The numbers associated with Defendants' misconduct tell a shameful story, without any legitimate explanation.  Data from eight million refinancing applications from 2020 reveal that "the highest-income Black applicants [had] an approval rate about the same as White borrowers in the lowest-income bracket."[2]

_____

[2] *Id*.

2029104

White refinancing applicants earning between $0 and $63,000 a year were ***more likely*** to have their refinancing application approved by Wells Fargo than Black refinancing applicants earning between $120,000 and $168,000 a year.[3]  Overall, in 2020, Wells Fargo rejected a ***majority*** of all the completed applications submitted by Black homeowners.[4]  And because Wells Fargo designed an application process that is disproportionately difficult for Black homeowners to complete, 27% of all Black homeowners who began a refinance application with Wells Fargo withdrew it.[5]  When this group of Black homeowners who were unable to complete the refinance process due to discriminatory barriers are added to the total pool of Black homeowner refinance applicants, just one-third of the Black homeowners who applied for a refinance loan with Wells Fargo were successful.

8.     In 2020—at the height of the refinancing boom, when millions of Americans benefitted from the historically low interest rate environment—Wells Fargo approved 47% of all applications by Black homeowners (meaning that Wells Fargo rejected the majority of applications from Black homeowners), whereas all other lenders approved 71% of all applications by Black homeowners.[6]  In 2020, no other lending institution rejected a majority of Black homeowners' applications for refinancing.[7]

9.     Wells Fargo was the only major lender in the United States that approved a smaller share of refinancing applications from Black homeowners in

_____

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/.

2029104

FIRST AMENDED CLASS ACTION COMPLAINT

1  2020 than it had in 2010.[8]

2      10.    The story in 2021 was the same, with Wells Fargo approving a much

3  lower percentage of Black homeowner applicants than any other lender.[9]  Wells

4  Fargo approved only 58% of Black applicants compared to other lenders, which

5  approved 74% of Black homeowner applicants.[10]  And the disparity between Black

6  and White refinance approval rates was 21% at Wells Fargo, nearly double the

7  disparity (13%) for all other for other lenders.[11]  And while Wells Fargo's Black

8  homeowner refinancing approval rate improved slightly from 2020, the same was

9  true at all other lenders, due to broader economic conditions.[12]  By comparison,

10  other major lenders approved much higher rates of Black homeowner refinancing

11  applicants in 2021:  JP Morgan Chase & Co. approved 87% of Black homeowner

12  applicants (only 6% less than White applicants), Rocket Mortgage LLC approved

13  81% of Black homeowner applicants (only 7% less than White applicants), and

14  Bank of America Corporation approved 75% of Black homeowner applicants (only

15  11% less than White applicants).[13]

16      11.    Overall, the data released under the federal Home Mortgage Disclosure

17  Act shows unequivocally that Wells Fargo rejects a disproportionate number of

18  Black homeowners' refinancing applications.[14]  Wells Fargo also makes the

19

20  _____

   [8] *Id.*

21
   [9] https://www.bloomberg.com/news/articles/2022-03-25/wells-fargo-faces-
22  persistent-racial-gap-in-mortgage-refinancing.

23  [10] *Id.*

24  [11] *Id.*

25  [12] *Id.*

26
   [13] *Id.*
27
   [14] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-
28
2029104

1  refinancing application process more difficult for Black homeowner applicants than

2  others on a national scale.[15]  And Wells Fargo customers report loan officers stating

3  that Wells Fargo's underlying refinance calculation tools consider certain "areas"

4  with large Black populations to be ineligible for rapid valuations.[16]  Black

5  homeowner applicants are further subjected to delays, feigned mistakes, and other

6  obstacles, leading many Black Americans to withdraw their requests for refinancing

7  and leading others to wait indefinitely while Wells Fargo refuses to act upon their

8  applications.

9      12.    In light of this, Wells Fargo's stated commitment to "help[] ensure that

10  all people across our workforce, our communities, and our supply chain feel valued

11  and respected and have equal access to resources, services, products, and

12  opportunities to succeed"[17] rings hollow.  Instead, Wells Fargo pervasively denies

13  Black homeowners' refinancing applications and consistently delays the

14  applications it does not deny, in many cases ultimately forcing Black homeowners

15  into foreclosure.[18]

16      13.    Core responsibility for Wells Fargo's discriminatory treatment of Black

17  homeowner applicants lies with its decision to employ centralized, universal, race-

18  infected lending algorithms without correction to differentially assess, delay and

19  ultimately reject refinancing applications.

20      14.    Used properly, automated underwriting technology helps individual

21

22  _____

refinancing/.

23

[15] *Id.*

24

[16] *Id.*

25

26  [17] https://www.wellsfargo.com/about/diversity/diversity-and-inclusion/.

27  [18] https://www.nclc.org/images/pdf/special_projects/covid-

28  19/IB_Covid_Black_Forbearance_Foreclosure.pdf.

2029104

1    loan officers who are properly trained and familiar with the legal environment in

2    which banks operate make sound, individualized underwriting decisions that protect

3    the interests of borrowers, banks, investors, insurers and the federal government,

4    taking into account race-neutral data points and employing formulae based on those

5    data points to decide whether or not the proposed loan is in the best interest of the

6    bank and the borrower.

7         15.    But that is not how Wells Fargo utilized its automated underwriting

8    technology. Quite the contrary: confidential informants with knowledge of Wells

9    Fargo's refinance operations confirm that the onset of the COVID-19 pandemic led

10    Wells Fargo to jettison or otherwise ignore well-established internal fair lending

11    checks and balances in favor of implementing a centralized, "pioneering automated

12    underwriting" system—sometimes referred to as CORE—without sufficient, or

13    sometimes any, human supervision or involvement.

14         16.    These witnesses describe troubling facts whereby, as COVID-19 hit,

15    multiple loan processors and underwriters were terminated or otherwise left the

16    bank's residential lending operations and were not replaced, and, instead, the CORE

17    pioneering automated underwriting system was increasingly centralized to facilitate

18    at-home work by originators, processors, and underwriters. According to these

19    same witnesses, the coding and machine learning endemic to the CORE algorithmic

20    underwriting platform were—byte by byte—stuffed chock-full of numerous Wells

21    Fargo-generated geographic, demographic, race-stratified liquidity and appraisal and

22    other "overlays" that Wells Fargo knew served no legitimate underwriting basis but,

23    instead, functioned as signals for race discrimination in Wells Fargo's residential

24    refinance decisions.

25         17.    These and other "overlays" pervasively infecting Wells Fargo's CORE

26    algorithms—which become even more invidious with each successive denial that

27    taught the algorithm these denials were appropriate—ultimately serve Wells Fargo's

28    purpose of segregating the creditworthiness of prospective applicants based on their

1 race, and differentiate Wells Fargo's assessments from the other major lending

2 institutions.

3      18.    Confidential informants with knowledge of Wells Fargo's recent

4 lending operations also specify just how heavily Wells Fargo relied on its

5 systematically racist algorithmic underwriting decisions and increasing lack of an

6 individualized human element in Wells Fargo's process.  As but one example, Wells

7 Fargo loan processors supposedly responsible for shepherding applications through

8 the bank's systems—typically expected to process 30 applications per month but

9 forced by Wells Fargo's CORE platform to process more than 50 and sometimes

10 nearly 100 per month—were rendered powerless to supervise the process, override

11 the algorithm, or otherwise intervene on the side of basic compliance with the fair

12 housing laws.

13      19.    Some of these same confidential informants have further confirmed

14 that, over and over during the COVID-19 pandemic and afterwards, they referred

15 denied Black homeowner applicants to competitor financial institutions that swiftly

16 approved the applications and asked, because the applications should have resulted

17 in "easy approvals" for Wells Fargo, how Wells Fargo could have denied them.

18      20.    Wells Fargo propounds its discriminatory treatment of Black

19 homeowners by incorporating, without adjustment, appraisals that have been shaped

20 by years of race-based valuation standards or appraisals that are based on race-based

21 criteria that have markedly affected Black homeowners into its analysis.  Homes in

22 majority Black neighborhoods are worth an average of 23% less than homes in

23 neighborhoods with "very few or no Black residents" and similar home quality.[19]

24

25 _____

[19] https://www.brookings.edu/research/devaluation-of-assets-in-black-

26 neighborhoods/?utm_source=newsletter&utm_medium=email&utm_campaign=sen

27 dto_newslettertest_business&stream=top#_ga=2.213288596.1000901909.16495538

87-1080662765.1648140872.

28

1  The disparities in home appraisals leave Black homeowners at a disadvantage where

2  below market home appraisals limit refinancing options.

3      21.    In September 2021, the Federal Home Loan Mortgage Corporation

4  released the results of a five-year study based on more than 12 million appraisals.[20]

5  The study found that "Appraisers' opinions of value are more likely to fall below the

6  contract price in Black and Latino census tracts, and the extent of the gap increases

7  as the percentage of Black or Latino people in the tract increases."[21]  Wells Fargo's

8  practice of engaging in appraisal discrimination has not only led to delays in the

9  application process for Black homeowners but has forced those who received under-

10  market appraisals from Wells Fargo to abandon the process with Wells Fargo and

11  turn elsewhere.

12      22.    Plaintiffs are the unfortunate victims of Wells Fargo's pervasive

13  misconduct:  Black homeowners from across the country whose applications to

14  refinance their home loans have been systematically delayed or denied because

15  Wells Fargo's CORE algorithm operates to discriminate against them.  Tens of

16  thousands have been victimized by Wells Fargo's intentional, knowing and

17  systematic race discrimination, violating the contractual, commercial and civil rights

18  of Class members and causing millions (and perhaps even billions) of dollars in

19  damages to the Nationwide Class.  Individually and as representatives of the Class

20  (defined below), Plaintiffs bring this action to enjoin the present day redlining by

21  Wells Fargo through its discriminatory practices and to make good to the Class all

22  damages resulting from Defendants' violations of civil rights laws and to restore to

23  the Class any amounts to which they otherwise would have been entitled, together

24  with such other equitable and remedial relief as the Court may deem appropriate.

25

26  _____

27  [20] https://www.freddiemac.com/research/insight/20210920-home-appraisals.

28  [21] *Id.*

2029104

## II.   JURISDICTION AND VENUE

23.    This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1343, because the Plaintiffs assert federal causes of action, because Plaintiffs assert civil rights causes of action, because at least one member of the Class is a citizen of a different state than all Defendants, and because the amount in controversy exceeds $5,000,000.

24.    Personal jurisdiction is appropriate over Defendants because Wells Fargo Bank, N.A. transacts business in the State of California and has its principal place of business in San Francisco, California, Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California offices and maintains a systematic and continuous presence in the State, Wells Fargo & Co. has its corporate headquarters in San Francisco, California.

25.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Wells Fargo Bank, N.A. resides in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, Wells Fargo Bank, N.A.'s principal place of business is in this district, and Wells Fargo & Co. has its corporate headquarters in this district.

## III.   PARTIES

### *Aaron Braxton*

26.    Plaintiff Aaron Braxton, who is a Black homeowner, is a natural person and a citizen of the State of California and resides in Los Angeles, California.

27.    Mr. Braxton is one victim of Wells Fargo's discriminatory policies.  He is a financially successful and eminently creditworthy Black playwright, performer, and a math and science teacher with a Master's degree from the University of Southern California.[22]  He has authored several award-winning plays, including *DID*

---

[22] https://www.imdb.com/name/nm1347914/bio?ref_=nm_ov_bio_sm.

*YOU DO YOUR HOMEWORK?*, which broke the Beverly Hills Playhouse's record for longest running play (nine months).[23]  He has also written several films and television pilots, and acted in several film, television, and theatre projects.[24]

28.    In addition, for two decades, Mr. Braxton was a Wells Fargo mortgage customer.  He purchased his home in 2000, in a historically Black neighborhood located in South Los Angeles near the campus of the University of Southern California, and secured his property with a Wells Fargo home mortgage insured by the Federal Housing Administration (FHA).  Mr. Braxton always made his mortgage payments and bills on time, and he had a good credit score.

29.    Yet despite his successful career and his creditworthiness, when Mr. Braxton sought to refinance his home mortgage loans in August of 2019, Wells Fargo consistently obstructed his ability to refinance his loans.  Despite favorable loan-to-value metrics and his personal history with the institution, Wells Fargo was focused more on his race and the location of his home within a historically Black Los Angeles neighborhood, and used the fact of his race and the location of his home to delay, obstruct and deny him the full benefits of historically low home mortgage interest rates.  Wells Fargo did this even though, having paid his loans for more than 18 years, Mr. Braxton had equity in his home far greater than the amount remaining on his FHA-secured loan.

30.    Mr. Braxton was given the runaround to such an extent that it took him over nine months to refinance his federally backed mortgage loan (and 12 months to refinance his home equity loan) at an above-market interest rate of around 4%.  This was after various Wells Fargo representatives kept telling him they lost his paperwork, made incomplete inquiries and needed to request more information, delayed their responses, and even placed him into an unsolicited debt-trap deferred

---

[23] *Id.*

[24] *Id.*

2029104

1  payment program without his permission.  It was only after Mr. Braxton notified the

2  Department of Housing and Urban Development ("HUD") that Wells Fargo

3  approved the refinancing of his federally backed FHA loans (indeed, Wells Fargo

4  approved the application the very next day).  Of course, for the prolonged period

5  that Mr. Braxton was waiting for Wells Fargo to refinance his loans, he was paying

6  the higher rates associated with his original loans.

7  *Gia Gray*

8       31.    Plaintiff Gia Gray, who is a Black homeowner, is a natural person and a

9  citizen of the State of California and resides in Danville, California.

10      32.    Mrs. Gray is another victim of Wells Fargo's discriminatory policies.

11 Mrs. Gray is a physician, as is her husband.  Both are employed and both,

12 individually, are in the top quintile of income earners.  The same was true when they

13 applied to refinance their loans with Wells Fargo.  Mrs. Gray's FICO score is above

14 800.

15      33.    The Grays own three homes.  Their primary residence is in Danville,

16 California, a predominately White area.  The couple also own income properties in

17 Stockton, California and Chicago, Illinois that are more diverse areas.  The couple

18 had Wells Fargo mortgages for their three homes, and, save for a balance of

19 approximately $1,000 on a credit card, the couple has and had no other debt.  The

20 couple never missed a mortgage payment and always paid on time.  They began the

21 refinancing process for their homes in February 2020.

22      34.    The Grays were only able to refinance the Danville, California

23 property—in the predominately White area—after four months.  Their loan officer

24 was located in Walnut Creek, California, another predominately White area, and he

25 actually took time out of his day to visit their multimillion-dollar home in Danville

26 in-person to sign refinancing documentation.  Even still, Wells Fargo kept asking

27 the Grays to provide additional information, and even contacted the Human

28 Resources department at Mrs. Gray's office.

2029104

35.     The Grays were not as lucky on their two other income properties.  The loan officer would try to steer Mrs. Gray away from these properties and only expressed an interest in refinancing her Danville, California property.  Wells Fargo eventually switched the couple's Walnut Creek loan officer to a Black assistant to handle these properties.  Wells Fargo would not return their calls for inquiries on refinancing these two properties.  When the couple did manage to get a hold of the assistant or loan officer, they were told that the Stockton, California property was in a bad area, and that the Chicago, Illinois property, although in a good area, was high risk, and that Wells Fargo was not looking to refinance high-risk areas.  Frustrated by Wells Fargo's ambivalence and inaction, the couple gave up on refinancing these properties in December 2020, nearly a year after they started.

*Bryan Brown*

36.     Plaintiff Bryan Brown, who is a Black homeowner, is a natural person and a citizen of the State of Connecticut and resides in Bristol, Connecticut.

37.     Mr. Brown is another victim of Wells Fargo's discriminatory policies.  For the past two decades, Mr. Brown has been a CAD designer at a prominent engineering company in Connecticut, and has invested in residential properties in Bristol and Plymouth, Connecticut.

38.     Mr. Brown is a long-time Wells Fargo mortgage customer.  Having purchased his multi-unit home in December 2010 with a Wells Fargo home mortgage, he has always made his mortgage payments, paid his bills on time, and maintained a good credit score.

39.     In October 2020, Mr. Brown sought to refinance his loan to convert his conventional 30-year loan to a 15-year fixed mortgage and to obtain a lower interest rate.

40.     Despite his investment properties, longstanding employment, and creditworthiness, when Mr. Brown sought to refinance his home mortgage, Wells Fargo subjected him to long periods of nonresponsiveness, arbitrary requests for

additional documents, and multiple calls to his employer requesting verification of his employment. Despite favorable loan-to-value metrics and his personal history with the institution, Wells Fargo denied Mr. Brown's application to refinance after a four-month runaround. Wells Fargo did this even though, having paid his loan for more than ten years, Mr. Brown had equity in his home that was almost equal to the amount remaining on his loan.

41.     To this day, Mr. Brown's interest rate remains at 4.75%.

### Paul Martin

42.     Plaintiff Paul Martin, who is a Black homeowner, is a natural person and a citizen of the State of California and resides in Los Angeles, California.

43.     Mr. Martin has been a Hollywood entertainment executive at Sony Pictures for 14 years. In 2020, Paul Martin sought to refinance his home in the Ladera Heights neighborhood of Los Angeles, which has a higher proportion of affluent Black residents than most Los Angeles neighborhoods. His multimillion-dollar home was previously owned by WNBA superstar Lisa Leslie and NBA player Aaron Afflalo.

44.     But Wells Fargo refused to refinance Mr. Martin's loan. The bank would not refinance his home unless he could get it appraised for $2 million. Wells Fargo's appraiser refused to come inside Mr. Martin's home, and appraised it at just shy of $2 million based on comparisons with homes in less affluent Black-populated neighborhoods, apparently conflating all areas with a high concentration of Black residents. Mr. Martin went to another lender, who appraised the home at $2.4 million and promptly refinanced his loan.

### Wells Fargo Entities

45.     Defendant Wells Fargo Bank, N.A. is a nationally chartered bank with its principal place of business located in San Francisco, California, and is chartered in Wilmington, Delaware. It has 19,234 employees across all its locations, including several in the Northern District of California, and generates nearly $70

2029104

1   billion in sales annually.

2        46.    Defendant Wells Fargo Home Mortgage, Inc. is a home lending

3   company that is part of the "Wells Fargo banking family."  It operates about 725

4   mortgage stores nationally and originates and services one-to-four-family residential

5   first and junior-lien mortgages and home equity loans.  On average, it originates

6   approximately $300 billion worth of loans per year.  It is incorporated in the State of

7   Delaware, and has its principal place of business in Des Moines, Iowa.  Wells Fargo

8   Home Mortgage, Inc. originates loans to California customers from its California

9   office locations.

10       47.    Defendant Wells Fargo & Co. is a nationwide, diversified financial

11  holding company and bank holding company incorporated in the State of Delaware

12  with its principal place of business in San Francisco, California.  Wells Fargo

13  provides banking, insurance, investment, and mortgage and consumer finance

14  services through storefronts, the Internet, and other distribution channels across the

15  United States and internationally.  It is the parent company of Wells Fargo Bank,

16  N.A.

## IV.   FACTUAL ALLEGATIONS

17

18  **A.    The History of Discrimination in Housing**

19       48.    This country has an unfortunate history of discrimination, and housing

20  discrimination has always been a large part of this historical discrimination.

21       49.    In 1924, the National Association of Realtors Code of Ethics mandated

22  that a realtor should "never be instrumental in introducing into a neighborhood

23  members of any race whose presence will be clearly detrimental to any property

24  values in the neighborhood."[25]  In other words, realtors were instructed that it was

25  an ethical infraction to integrate neighborhoods.

26

27  _____
    [25] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-
28  history.

2029104

50.     Pursuant to this policy and so many others like it, realtors and developers would routinely designate specific properties to White Americans while reserving properties in other areas for minority Americans.  These designations would be found in rules, restrictions, and covenants attached to the properties.

51.     Legislation introduced during the New Deal purporting to help homeowners nationwide, in fact, codified racism into housing.  The Home Owners' Loan Corporation and the Federal Housing Administration graded residential areas from A-D, with A being the most likely to receive federal loan insurance, and D the least.  Areas with "Colored" and "Oriental" people were automatically given D ratings.[26]

52.     Federal Housing Administration underwriting manuals issued in 1938 sought to present the "infiltration of inharmonious racial groups" and directed underwriters to refuse to insure mortgages that would lead to "a change in social or racial occupancy."[27]

53.     As observed above, California has long perpetuated these discriminatory practices.  In Los Angeles, which was a leader in the nation's discriminatory segregation, a Black American in 1917 said "we were encircled by invisible walls of steel.  The whites surrounded us and made it impossible for us to go beyond these walls."[28]  In this era, Black Americans were excluded from living in 95% of the houses in Los Angeles.[29]

---

[26] *Id.*

[27] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-history.

[28] https://www.latimes.com/opinion/story/2021-09-10/racial-covenants-los-angeles-pioneered.

[29] *Id.*

2029104

54.   In Oakland, racialized zoning and restrictive covenants directed 80% of the city's Black population to West Oakland following World War II.[30]  Redlining made it impossible for these residents to obtain loans to improve their properties. Instead of helping, the city eventually, in the 1960s, razed large swaths of West Oakland, purportedly to build new homes, but the replacement projects languished and most residents were simply forced from their homes with nowhere to go.[31]

55.   Similarly, in the San Francisco area, homes from the 1930s included in title reports restrictions that "no person of any other race other than the Caucasian or white race" may own or occupy the property, except for "domestic servants of a different race domiciled with the homeowner or tenant."[32]  Similar provisions would often prohibit residents of "African, Mongolian, or Japanese" descent.[33]

56.   When a Black American would obtain one of these properties despite the clauses, White neighbors would sue, and the courts would force the Black Americans to leave their properties, cementing the discrimination.[34]  Indeed, the California Supreme Court specifically held in 1919 that Black Americans could own houses with restrictive clauses, they just could not reside there.[35]  While the states no longer enforce these covenants, they still charge a fee to homeowners wishing to

---

[30] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-history.

[31] *Id.*

[32] https://www.mercurynews.com/2019/02/26/for-whites-only-shocking-language-found-in-property-docs-throughout-bay-area/.

[33] *Id.*

[34] *Id.*

[35] https://www.latimes.com/opinion/story/2021-09-10/racial-covenants-los-angeles-pioneered.

2029104

strike them from their property records.[36]

57.   Even after the Civil Rights Act was passed, California adopted Proposition 14, allowing for continued discrimination under the guise of freedom. The proposition was ruled unconstitutional, but the state's residents had made clear their position on discrimination in housing.[37]

58.   The pervasive discrimination against Black homeowners and those wishing to become homeowners sadly persists to this day, and Wells Fargo's treatment of Black homeowners seeking refinancing during the refinance boom that took place over the last few years is just the latest attack on these long-maligned citizens of this country.

**B.   Wells Fargo Has an Established History of Discrimination**

59.   Wells Fargo's discriminatory behavior described herein is completely in line with Wells Fargo's history of discrimination in lending.  Indeed, the genesis of its latest discriminatory practices seems to have followed the end of the policies it put in place after an earlier series of lawsuits.

60.   In 2012, Wells Fargo agreed to pay $184 million to settle claims with the Department of Justice that the bank pushed Black and Hispanic homeowners to obtain subprime mortgages and then charged them higher fees and interest rates.[38]

61.   In 2015, the City of Oakland filed suit against Wells Fargo over its racially discriminatory banking practices in seeking to originate mortgage loans on predatory terms in minority neighbors and then its "subsequent [refusal] to extend credit to minority borrowers seeking to refinance previously issued unnecessarily

---

[36] https://www.mercurynews.com/2019/02/26/for-whites-only-shocking-language-found-in-property-docs-throughout-bay-area/.

[37] *Id.*

[38] https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

expensive loans."[39]  And "when a minority borrower who previously received a predatory loan sought to refinance the loan," they "discover[ed] that Wells Fargo refused to extend credit at all, or on equal terms as refinancing similar loans issued to [W]hite borrowers."[40]  Even when refinancing applications were approved, the loans turned from a "fixed-rate loan into an adjustable-rate loan that the lender knows the borrower cannot afford should interest rates rise… the likely result of such practices is to cause homeowners who are otherwise…comfortably making payments on a modest existing mortgage, to be unable to make payment on a new, unaffordable loan."[41]

62.    The City of Oakland also performed a decade-long regression analysis of Wells Fargo loans in Oakland, which controlled for objective variables like "credit history, loan to value ratio, and the ratio of loan amount to income."  The City of Oakland found that, controlling for these factors, "an African-American borrower is 2.583 times more likely to result in foreclosure than a more favorable and less expensive loan issued to a [W]hite borrower in Oakland."[42]  This corroborated other national studies which found that Black American borrowers were "124% more likely to receive a subprime refinance loan" than their White counterparts.[43]

63.    Moreover, the City of Oakland alleged that Wells Fargo employed systematic policies like "giving loan officers and others responsible for mortgage

---

[39] *City of Oakland v. Wells Fargo Bank, N.A.*, 3:15-cv-04321, Dkt. No. 1, at 2 (N.D. Cal. Sept. 21, 2015).

[40] *Id.* at 4.

[41] *Id.* at 20.

[42] *Id.* at 20-21.

[43] *Id.* at 15.

Case 4:22-cv-01748-JD   Document 63-1   Filed 04/05/22   Page 20 of 58

1  lending large financial incentives to issue loans to African-Americans and Hispanics

2  that are costlier than better loans for which they qualify" and "failing to monitor" for

3  racial disparities after "Wells Fargo had notice of widespread product placement

4  disparities based on race and national origin."[44]  Wells Fargo also systematically

5  "fail[ed] to underwrite loans based on traditional underwriting criteria such as debt-

6  to-income ratio, loan-to-value ratio, FICO score, and work history."[45]  This led

7  District Judge Edward M. Chen to conclude that "Oakland has identified specific

8  employment practices in addition to the mere delegation of discretion."[46]

9       64.    The practices leading to the 2012 and 2015 suits against Wells Fargo

10  included manual revisions to applications to reverse redline applicants who would

11  have been classified in a more risky area.  For a time, these practices receded, and

12  Wells Fargo's refinancing rates to Black homeowners were similar to those of other

13  major lenders.  But by 2020, Wells Fargo's rates plummeted in relation to the

14  approval rates at other banks.

15       65.    The City of Oakland is not the sole municipality that has sought to hold

16  Wells Fargo to account for its discriminatory conduct.  Cook County (Chicago)

17  brought suit alleging predatory lending practices to strip minority homeowners of

18  the equity from their homes.[47]  "Publicly available loan origination data indicates

19  that the percentage of high-cost and other nonprime loans issued by Wells Fargo in

20  Cook County to minority borrowers well exceeded the County's percentage of

21

22  _____

    [44] *Id*. at 33.

23

24  [45] *Id*. at 9.

25  [46] *City of Oakland v. Wells Fargo Bank, N.A.*, No. 15-CV-04321-EMC, 2018 WL
    3008538, at *15 (N.D. Cal. June 15, 2018), *aff'd in part, rev'd in part on other*

26  *grounds City of Oakland v. Wells Fargo & Co.,* 14 F.4th 1030 (9th Cir. 2021).

27  [47] *Cty. of Cook, Illinois v. Wells Fargo & Co*., 14-C-9548-GF (N.D. Ill.).

28

1  minority home owners—typically by a factor of two to three."[48]  And the

2  disproportionately White employees at Wells Fargo were given "discretion to steer

3  prime-eligible minority borrowers into nonprime loans."[49]  "Wells Fargo subjected

4  minority borrowers to equity stripping to a greater extent than it did nonminority

5  borrowers with similar credit histories."[50]  And "minority borrowers were

6  particularly susceptible to Wells Fargo's predatory practices because they were

7  more likely than nonminority borrowers to lack access to low-cost credit,

8  relationships with banks and other traditional depository institutions, and adequate

9  comparative financial information."[51]

10       66.  In 2019, Wells Fargo settled a lawsuit with the City of Philadelphia

11  premised on allegations that it purposefully made it difficult for minorities to

12  refinance their mortgages.[52]  The court in that case identified seven Wells Fargo

13  policies that contributed to the discrimination against minorities:  (1) knowing about

14  lending practices that either created high risk and higher cost loans to minorities

15  compared to comparably credit situated White borrowers or failing to adequately

16  monitor the Bank's practices regarding mortgage loans, including but not limited to

17  originations, marketing, sales, and risk management; (2) failing to underwrite loans

18  based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value

19  ratio, FICO score, and work history; (3) failing to prudently underwrite hybrid

20  adjustable-rate mortgages ("ARMs"), such as 2/28s and 3/27s; (4) failing to

21  prudently underwrite refinance loans, where borrowers substitute unaffordable

22  

23  [48] *Cty. of Cook, Illinois v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 980 (N.D. Ill. 2018).

24  [49] *Id.*

25  [50] *Id.*

26  [51] *Id.*

27  

28  [52] https://www.phila.gov/2019-12-16-city-of-philadelphia-and-wells-fargo-resolve-litigation/.

mortgage loans for existing mortgages that they are well-suited for and that allow them to build equity; (5) failing to monitor and implement necessary procedures within Wells Fargo's Internal Audit, Corporate Risk, Human Resources, Law Department, and Board of Directors throughout the Community Banking segment, which includes Wells Fargo's retail mortgage banking business responsible for the unlawful activities set forth herein, to ensure compliance with federal fair lending laws; (6) failing to abide by the terms of Wells Fargo's Vision & Values, which purportedly guides Defendants' business practices and relationships with customers; and (7) failing to ensure that Wells Fargo's decentralized organizational structure was capable of properly monitoring mortgage lending activities within Community Banking.

67.     Wells Fargo's pervasive discrimination is not limited to housing.  In August 2020, the company entered into a conciliation agreement with the U.S. Department of Labor and paid $7,800,000 over allegations of racist hiring practices. The Department of Labor under the Trump administration found that the company "discriminated against 34,193 African American applicants for banking, customer sales and service, and administrative support positions at U.S. locations nationwide."[53]

**C.     The Refinancing Boom**

68.     During the last few years, interest rates were near an all-time low in the United States, and homeowners who held mortgage loans at higher rates (meaning a great deal of homeowners) sought to refinance their loans at lower rates. Refinancing during this time allowed homeowners to significantly reduce their monthly payments and to owe less mortgage interest over the life of the loan.  Over the last two years, homeowners in the United States refinanced over $5 trillion

---

[53] https://www.dol.gov/newsroom/releases/ofccp/ofccp20200824.

2029104

worth of mortgages.

69.     In 2020, the prevailing market interest rates on mortgages "fell below 3% for the first time"[54] since it began being surveyed in 1970.[55]  And a study by the Federal Reserve Banks of Boston, Atlanta, and Philadelphia found these unprecedented low rates "spurred a boom in refinances" that was distributed unequally.[56]  Although "Black and [W]hite borrowers were about equally likely to refinance before the pandemic, [] Black borrowers were 40 less likely than [W]hite borrowers to refinance after the pandemic started and interest rates dropped."[57]  All told, only 6% of Black borrowers refinanced during the COVID-19 pandemic, compared to 12% of White borrowers.[58]  With respect to Wells Fargo, that disparity does not result from a lack of interest in refinancing by Black homeowners; it results from disparate and discriminatory treatment by Wells Fargo that blocked Black homeowners from engaging in the process.

**D.      Wells Fargo's COVID-19 Era Refinancing Application Process**

Part 1: Gathering of Key Geographic, Financial and Demographic Data and Submission of Form 1003 Through "Blend"

70.     Refinancing is necessarily a simpler process than obtaining an initial home loan.  Homeowners who have made their payments on time and who seek to refinance already own the necessary collateral and have already been approved for a

---

[54] *Racial Differences in Mortgage Refinancing, Distress, and Housing Wealth Accumulation during COVID-19*, Kristopher Gerardi, Lauren Lambie-Hanson, and Paul Willen, available at https://www.bostonfed.org/-/media/Documents/Workingpapers/PDF/2021/cpp20210622.pdf.

[55] *Id*. at 1.

[56] *Id*.

[57] *Id*. at 2.

[58] *Id*.

2029104

home loan.  In addition, if the borrower is refinancing with the same bank that holds the original mortgage, that bank has access to detailed information about a borrower's payment history and, in many cases, will be evaluating that borrower's ability to make an even *lower* monthly payment than what was already being made. Determining whether to refinance, thus, is a less involved process than determining whether to issue a mortgage, or at least it should be.

71.     On November 27, 2017, as part of its explicit policy to "leverage the ideas in Silicon Valley and beyond" in mortgage underwriting, then-Wells Fargo CEO Tim Sloan announced its partnership with San Francisco startup Blend Labs to develop a new online mortgage application and related tools.

72.     During the COVID-19 era, Wells Fargo's idea of "leverag[ing] the ideas in Silicon Valley" involved, first, obtaining a prospective refinance applicant's personal information, including name, phone number, email address, and the last four digits of the prospective applicant's Social Security number.  Applicants are, thus, required to have and utilize email to participate in the process, including checking Wells Fargo's loan tracker system for updates and requests for additional information.  When, during the pandemic, visiting loan officers in person became infeasible, applicants without technical sophistication were disadvantaged.

73.     At this preliminary stage, Wells Fargo's algorithm obtains the first data points that are subsequently utilized in its discriminatory refinance decisions: names, phone numbers (including area codes), email addresses and Social Security numbers that can then be tied to other data and used in other formulae within Wells Fargo's systems.

74.     Next, Wells Fargo sends the applicant, via electronic mail, a dedicated link through Blend, the digital banking platform developed by Wells Fargo in conjunction with Blend Labs.  That link enables the applicant to complete a Uniform Residential Loan Application (Form 1003) and submit that application to Wells Fargo.

2029104

75.     It is here that Wells Fargo collects more information for its lending algorithm to use:  the information collected on this form includes the borrower's name, alternate names, Social Security number, date of birth, citizenship status, names of borrowers, marital status, number and ages of dependents, home, mobile and work phone numbers, the subject property address, property value, status of property, intended occupancy and monthly expenses, former addresses, mailing addresses, employment information, income information, asset information, liabilities and expenses, and military service.

76.     Next, a Wells Fargo loan officer conducts a follow-up telephone or in-person interview with the refinance applicant to obtain additional information that cannot be submitted online, including the financial acknowledgment form and the Demographic Information Addendum, which specifically asks about ethnicity, race, and gender.

77.     Here, Wells Fargo's process places particular emphasis on race:  the company demands that, to the extent the interview is conducted in person, the loan officer must visually observe the applicant and consider the applicant's surname in an effort to determine the race of the prospective applicant.  Here, too, Wells Fargo's algorithm receives key demographic and financial data that it then utilizes in its lending decisions.

Part 2: Running "Blend" Data Through Automated CORE "Pioneering Underwriting System" Systematically Infected with Racially Infected Algorithms and Overlays

78.     Having obtained all of the geographic, demographic and other data necessary through Blend and the submission of the Form 1003, the Wells Fargo loan originator does the equivalent of pressing "send," submitting the 1003 for decision to Wells Fargo's CORE automated underwriting system.  Confidential informants with knowledge of the operation of these systems recount that after operating as described herein—running both Desktop Underwriter ("DU") and Loan Prospector

("LP") simultaneously—CORE's decision would come back as A1 or A2; which meant that the loan was approved; C1, which meant that the loan had to go through a manual underwriting process; or C2, which meant that the applicant was deemed "not loanable" and denied. During the COVID-19 era, Black refinance applicants were systematically slotted by CORE into C1 and C2 categories.

79. The idea of something that operates generally like CORE is, of course, nothing new or nothing unique. Used properly, automated underwriting systems can quickly use Fannie Mae and Freddie Mac underwriting criteria to evaluate the risk profile of a loan and recommend its approval or denial with respect to race-neutral criteria to human underwriters and loan processors who can, on average, comfortably handle 30 files per month, who are specially trained in the bank's fair lending compliance programs and procedures, and who can ensure that the guidelines and mechanics of the algorithm are operating in accordance with these requirements.

80. But the consequences can be immediate and pernicious when CORE-like systems are not properly used or supervised by employees with training in fair lending practices. The director of the Consumer Financial Protection Bureau ("CFPB") describes these types of banking algorithms as "black boxes behind brick walls."[59] "When consumers and regulators do not know how decisions are made by the algorithms, consumers are unable to participate in a fair and competitive market free from bias."[60]

81. Such was indeed the case at Wells Fargo. As recognized by a group of United States Senators, including the chairman of the Senate Finance Committee,

---

[59] https://www.consumerfinance.gov/about-us/newsroom/remarks-of-director-rohit-chopra-at-a-joint-doj-cfpb-and-occ-press-conference-on-the-trustmark-national-bank-enforcement-action/.

[60] Id.

2029104

1   who wanted to investigate the bank for "potentially illegal discrimination" and

2   demanded the bank produce to the Committee the data and algorithms it uses to

3   evaluate applicants,[61] the operations and impact of Wells Fargo's CORE automated

4   underwriting system are both new and unique in their treatment of Black applicants.

5       82.    More specifically, confidential informants with knowledge of Wells

6   Fargo's residential mortgage lending operations describe a situation where, around

7   the time that COVID-19 hit, understaffed Wells Fargo underwriting departments

8   made a series of deliberate and intentional choices to centralize lending decisions.

9   These decisions, ostensibly made in order to facilitate work-from-home, took human

10  supervision and fair-lending compliance out of the process.  Seemingly trumpeting

11  the effect of these decisions, Wells Fargo went so far as to make an internal

12  announcement that it would place increasing and undue reliance on machine

13  learning processes in an automated underwriting system.  But that system was

14  increasingly infected with explicit and implicit racial signals (so-called "overlays")

15  that had, as their proximate and likely result, the disparate impact reflected in the

16  statistical analyses set forth in this Amended Complaint during the time periods at

17  issue herein.

18      83.    These Wells Fargo-specific overlays represent manifestations of the

19  same continuous and unbroken practice of engaging in business policies and

20  practices that create an "artificial, arbitrary, and unnecessary" barrier to fair-housing

21  opportunities for Black home purchasers and owners.

22      84.    *Geographic Indicators*.  Among the overlays utilized by Wells Fargo's

23  COVID-19 era CORE automated underwriting processes are geographic indicators,

24  the effect of which is modern-day redlining.  Borrowers seeking to refinance

25

26  ───────────────

27  [61] *Wells Fargo Pressed by Senators on Race Disparity in Refinancing*, Yahoo!
    Finance, accessible at: https://finance.yahoo.com/news/wells-fargo-pressed-
28  senators-race-171439115.html.

2029104

property in Black-majority neighborhoods are deemed by the algorithm to be more of a lending risk than similarly situated White borrowers seeking to refinance property in non-Black-majority neighborhoods.  Wells Fargo's algorithm effectuates this racial signaling by comparing address data provided in the borrower's Form 1003 to low and moderate income census tract data within Wells Fargo's internal systems, and identifying borrowers with property in Black-majority neighborhoods as more of a lending risk than borrowers with property in White-majority neighborhoods.  None of this is required by legitimate, race-neutral underwriting criteria, let alone criteria approved by Fannie Mae and Freddie Mac.

85.    ***Post-Close Liquidity Requirements***.  Another overlay utilized by Wells Fargo's CORE underwriting system is a 50% increase in Wells Fargo's requirements for post-close liquidity and severe restrictions on the sources of that liquidity.  Before March 2020—and consistent with Fannie Mae and Freddie Mac underwriting guidelines—Wells Fargo generally required borrowers to be able to show 12 months of post-close reserves in order to close their loans.  When COVID-19 hit, however, Wells Fargo programmed its system to only approve borrowers who could show 18 months of post-close liquidity for W-2 wage earners, and 24 months for self-employed K-1 borrowers.  Wells Fargo further changed the definition of post-close liquidity to allow only 50% of the post-close liquidity to come from retirement accounts, often the greatest source of liquidity for borrowers.

86.    Not only was this huge increase not required by legitimate, race-neutral underwriting criteria, it was a change that Wells Fargo knew would effectuate a racially disparate impact.  An April 2020 JP Morgan Chase Institute report found that for every dollar in liquid assets held by White Americans, Black Americans held 32 cents.[62]  On average, while Black families have $2,000 or less in liquid

---

[62] https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/institute-race-report.pdf.

2029104

1    savings, the typical White family has more than four times that amount.[63]

2    87.    ***Demographic Indicators***.  A further criteria utilized by Wells Fargo is,

3 indeed, race itself.  For example, employees responsible for the programming of

4 Wells Fargo's automated underwriting processes describe the system's use of

5 Bayesian Improved Surname Geocoding ("BISG"),[64] a method that applies Bayes'

6 Rule to predict the race or ethnicity of an individual utilizing the individual's

7 surname and geocoded location.  This process, which necessitates an internal

8 determination by the CORE algorithm of which neighborhoods are associated with

9 which racial group, works as follows:[65]

10    (i)      first, by calculating the prior probability of an individual – $i$ –

11    being of a certain racial group $r$ given their surname:

12 $$Pr(R_i = r | S_i = s)$$

13    (ii)      next, by updating that probability with the probability of the

14    individual $i$ living in a geographic location $g$ that is associated with a

15    particular racial group $r$:

16 $$Pr(G_i = g | R_i = r)$$

17    (iii)      and finally, by using Bayes' Theorem to determine the

18    probability that a particular borrower actually belongs to a particular racial or

19    ethnic group.

20
21 $$Pr(R_i = r | S_i = s, G_i = g) = \frac{Pr(G_i = g | R_i = r) Pr(R_i = r | S_i = s)}{\sum_{i=1}^{n} Pr(G_i = g | R_i = r) Pr(R_i = r | S_i = s)}$$

22    88.    By utilizing BISG processes in its automated underwriting processes,

23 Wells Fargo's formulae utilize demographic criteria, including race, "imputed from

24 _____

25 [63] *Id.*

26 [64] https://ww2.amstat.org/meetings/sdss/2020/onlineprogram/ViewPresentation.
27 cfm?file=309619.pdf.

28 [65] https://cran.r-project.org/web/packages/eiCompare/vignettes/bisg.html.

2029104

databases of names and addresses" using processes like Bayesian Improved Surname Geocoding that associate neighborhoods with races to supplement Form 1003's race disclosures and assist in the overall racial assessment that allows the algorithm, improperly, to rely on race in the risk determination process.

89.   ***Uncorrected and Racially Biased Appraisals***.  Wells Fargo also considers uncorrected historical and current appraisal data from geographically differentiated locations in its refinance evaluation process.  Race-stratified differentials in appraisal data are well known to Wells Fargo and others in the banking industry.  Indeed, according to a March 23, 2022 report in *The Washington Post* citing Brookings Institution data, "homes in Black neighborhoods" (which, as already discussed, CORE identifies) routinely appraise at "23 percent less, on average, than those in comparable White neighborhoods – despite having similar neighborhood and property characteristics and amenities."[66]  Freddie Mac has similarly "found that 12.5 percent of appraisals for home purchases in Black neighborhoods and 15.4 percent in Latino neighborhoods came in below the contract price, compared with 7.4 percent of appraisals in White neighborhoods,"[67] due in part to the well-known and systematic failure of appraisers to choose comparisons sales in an appropriately broad geographic range for properties located in Black and Latino neighborhoods.[68]  Failure to correct for this longstanding disparity within automated underwriting systems will automatically and systematically skew the loan-to-value calculations against Black homeowners, making their loans look like riskier bets than they actually are for the banks.

90.   Wells Fargo's automated underwriting system does not correct

---

[66] https://www.washingtonpost.com/business/2022/03/23/home-appraisal-racial-bias/.

[67] *Id.*

[68] *Id.*

2029104

appropriately for these racial disparities in appraisals, instead placing undue reliance on an uncorrected data point that systematically undervalues properties in neighborhoods populated by Black homeowners.  Wells Fargo's failure to correct for this well-known disparity is not required by any legitimate underwriting criteria.

91.  ***Unjustified Increased FICO Requirements***.  A further COVID-19 era algorithmic overlay utilized by the Wells Fargo CORE system is increased credit score requirements.  According to a confidential informant, Wells Fargo imposed a higher minimum credit score than that required for an FHA loan or a Fannie Mae-backed loan.  According to the confidential informant, if Fannie Mae required a minimum credit score of 600, Wells Fargo would require a minimum score of 620, meaning CORE automatically rejected anyone with a credit score below 620.  The racial impact of this change, which was not justified by legitimate underwriting criteria, is clear:  in February 2021, it was reported that one in five Black consumers have FICO scores below 620; meanwhile one out of every 19 White consumers are in the sub-620 category.[69]

92.  A study done by the Board of Governors of the Federal Reserve System analyzing federal mortgage data identified no "evidence [a]s to whether these tighter standards reduce loan risk to justify the disparate impact on minority denials they are associated with."[70]  And after controlling for relevant underwriting factors (debt-to-income ratios, loan-to-value ratios, credit scores, etc.) the study found that "[l]enders who impose the strictest standards on their [W]hite applicants [like Wells

---

[69] https://www.forbes.com/advisor/credit-cards/from-inherent-racial-bias-to-incorrect-data-the-problems-with-current-credit-scoring-models/.

[70] *How Much Does Racial Bias Affect Mortgage Lending? Evidence from Human and Algorithmic Credit Decisions*, Neil Bhutta, Aurel Hizmo, and Daniel Ringo (July 2021), at 12, n.20, available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887663.

Fargo] tend to have the largest unexplained excess denials of minority applicants," including Black applicants.[71]

93.     In 2021, six Wells Fargo employees and officers with doctorate degrees published a study warning about the dangers of banking algorithms used by Wells Fargo and its peers.  The study was published on arXiv, an open-access archive of scholarly articles in the fields of computer science, quantitative finance, statistics, and economics, among others, which is operated by Cornell University.[72]

94.     The authors of the study noted that "despite 'years of intense scrutiny, lending discrimination still persist[s]'" and that the arrival of flexible and automated AI/ML [artificial intelligence/machine learning] algorithms and "the availability of alternative sources of data are… exacerbating" this discrimination.[73]

95.     The potential sources of bias and discrimination are multifold. According to the study, historical data can often be skewed against specific groups, particularly where there is limited information on protected groups.[74]  Moreover, biases in historical data can be exacerbated with the use of machine learning because algorithms, which automate feature engineering, can ignore the presence of surrogate variables for protected attributes.[75]

96.     Bias can also be present in alternate sources of data, which can be harvested from the worldwide web, social media, and blogs.  Often, one's digital

---

[71] *Id*. at 12.

[72] https://arxiv.org/.

[73] *Bias, Fairness, and Accountability with AI and ML Algorithms*, Nengfeng Zhou, Zach Zhang, Vijayan N. Nair, Harsh Singhal, Jie Chen, and Agus Sudjianto, Corporate Model Risk, Wells Fargo (May 6, 2021), available at: https://arxiv.org/ftp/arxiv/papers/2105/2105.06558.pdf, at page 4.

[74] *Id.* at 5.

[75] *Id.*

footprint has strong predictive performance in credit scoring, but these "predictors are highly correlated with socio-economic variables that are surrogates for protected groups."[76]  "[T]hese variables are highly related to protected classes, and the availability of such seemingly innocuous information, combined with flexible 'data snooping' ML algorithms, can easily lead to 'proxy discrimination.'"[77]

97.     "Unstructured data, ***such as texts, audio, and images***, are increasingly analyzed through AI/ML [artificial intelligence/machine learning] techniques in banking and finance."[78]  Such a "selection process can suffer from 'implicit biases'" because the use of social media data is highly correlated with individuals' race and national origin.  It is easy to envision the invidious nature of this technology.  An algorithm that reviews billions of social media posts will start to associate accounts with more posts with more Black faces as having lower creditworthiness than posts with more lighter-skinned faces.  This same algorithm also analyzes the speech patterns used in the videos, and associate's creditworthiness with "talking white" and speaking fluent English.  The same algorithm deems those who speak in an Urban vernacular, Gullah, or those who learned English as a second language as less creditworthy.  Worse yet, this algorithm learns to judge creditworthiness based on word choice and use of certain slang.  What is more, these algorithms are more prone to perpetuate guilt by association because it is well known that face recognition technologies consistently misidentify Black faces at much higher rates than White faces.[79]  Thus, "[f]airness concerns are heightened when alternative

---

[76] *Id.*

[77] *Id.*

[78] *Id.* at 6.

[79] *Racial Discrimination in Face Recognition Technology*, Alex Najibi, Harvard University Graduate School of Arts and Sciences (October 24, 2020), available at: https://sitn.hms.harvard.edu/flash/2020/racial-discrimination-in-face-recognition-

2029104

1  sources of data, such as **social-media data, information on biometrics, speech or**

2  **language**, are used because it is not easy to scrub the data of **demographic**

3  **proxies**."[80]

4        98.    In addition to data bias, the automated nature of machine learning

5  algorithms "miss[es] the potential for correlated surrogate variables causing proxy

6  discrimination."[81]  "Data bias together with poor optimization of algorithms can

7  cause severe harm to protected groups."[82]

8        99.    Notably, the study concludes that the use of "black-box algorithms that

9  are not well-understood" have "potential for serious harm" in the consumer lending

10  space, and the models "must be continually monitored for disparate impact

11  testing."[83]  A "[s]eparate fair lending group conducts periodic backtesting and trend

12  analysis to validate that credit underwriting systems do not discriminate against

13  applicants on a prohibited basis."[84]

14  **E.    Wells Fargo's COVID-19 Era Understaffing and Failure to Correct for**

15        **Discriminatory Automated Lending Decisions**

16        100.  Wells Fargo is no doubt well aware that properly functioning banks,

17  including its competitors, correct for biases within automated underwriting

18  processes by employing trained underwriters and fair lending teams that are

19  supposed to act as a backstop against the racially pernicious consequences that arise

20

21  _____

   technology/.

22  [80] *Id*. at 13.

23

24  [81] *Id*. at 6.

25  [82] *Id*. at 7.

26  [83] *Id*. at 13.

27  [84] https://ww2.amstat.org/meetings/sdss/2020/onlineprogram/ViewPresentation.
   cfm?file=309619.pdf.

28

2029104

from the unrestrained functioning of automated processes that, left unchecked, can systematically identify Black borrowers as undue credit risks.

101.   Such was not the case at Wells Fargo.  Confidential informants with knowledge of Wells Fargo's refinance practices in recent years describe a system where Wells Fargo made a business decision to centralize and emphasize automated processes at the expense of individualized lending decisions.  They explain that Wells Fargo's loan originators, processors and underwriters were overworked— sometimes handling as many as ***three times*** the normal monthly volume expected of loan processors and underwriters—and systematically disincentivized to "check the work" of the CORE system.  These witnesses also describe changes that were made, such as to remove their ability to make changes within Wells Fargo's automated system, that would result in a greater likelihood of an application being approved.

102.   Given the racially signaled functioning of Wells Fargo's COVID-19 era CORE algorithm, the effect of this was clear:  nobody was available to provide a check on the racially biased lending decisions taking place at Wells Fargo, which resulted in delays, denials and systematic application of higher interest rates to Black borrowers at a rate that far exceeded anything in the industry.

**F.     Wells Fargo's Knowledge of Disparate Impact of Overlays**

103.   Not providing a human check on Wells Fargo's discriminatory lending practices did not, however, mean that Wells Fargo was unaware of the discriminatory impact of its practices.  Quite the contrary:  throughout the relevant time period, confidential informants with knowledge of Wells Fargo's residential lending practices emphasize the extent to which senior Wells Fargo executives were fully aware of the disparate impact of these policies and practices.

104.   These witnesses emphasize that throughout the relevant time period, Wells Fargo generated a "Diversity Market Segments Report" that was distributed companywide via electronic mail distribution on a monthly basis.  Comprised of Wells Fargo's nationwide lending statistics, the report included, among other things,

the racial breakdown of Wells Fargo's lending, the percentage of loans being made in certain locations and by certain originators and offices, whether Wells Fargo met the Community Reinvestment Act[85] requirements, and the percentage of loans that were made to first-time homebuyers.  These reports were reviewed and discussed during monthly regional calls that congratulated employees on their efforts reflected therein.

105.   And yet, despite these monthly reports that provided a real-time exposé of the pernicious significant adverse effect of its overlays on Black applicants, Wells Fargo did nothing.

**G.     Wells Fargo's Algorithm Has a Disparate Impact on Black Homeowners**

106.   The above practices, policies, and procedures are arbitrary and artificial and unnecessary to achieve a valid underwriting interest or legitimate objective. The vast difference between refinancing approval rates Wells Fargo issued to Black homeowners as compared to any other lending institution's approval rates negates any possible legitimate objective.

107.   As noted, the above practices have a disproportionately adverse effect on Black Americans seeking to refinance their loans.  Black homeowners are members of a protected class.

108.   Wells Fargo's practices directly harmed Black homeowners by forcing them to pay higher interest rates while applications were pending, by forcing them to pay higher interest rates when applications were completed, and/or by denying refinancing applications.  In the absence of these policies, Black homeowners would not have had to pay higher rates or face rejection in their refinancing applications.

109.   The disparity between Wells Fargo's treatment of Black homeowner

---

[85] The Community Reinvestment Act, enacted in 1977, requires the Federal Reserve and other federal banking regulators to encourage financial institutions to help meet the credit needs of the communities in which they do business, including low- and moderate-income neighborhoods.

applicants and non-Black homeowner applicants is significant and shocking.  As noted, a White American in the lowest income bracket was just as likely to receive refinancing approval as a Black homeowner in the highest income bracket.

110.   Overall, in 2020, 8.4 million homeowners refinanced their mortgage loans to take advantage of historically low interest rates.[86]  White homeowners saved an estimated $3.8 billion in 2020.  In comparison, Black homeowners who make up 9% of all homeowners saved just $198 million, less than 4% of the total savings.[87]

111.   In 2020, using its algorithm, Defendant Wells Fargo approved Black homeowner refinancing applications at a rate lower than that of any other major lender in America.  Wells Fargo was the only major lender in the United States that approved a smaller share of refinancing applications from Black homeowners in 2020 than it had in 2010.[88]

112.   Wells Fargo **denied over 50%** of the Black homeowners seeking to refinance in 2020, and **denied just under 50%** of the Black homeowners seeking to refinance in 2021.  No other major lending institution refused to refinance the homes of Black Americans at such stunning rates.  The numbers tell a shameful story, without any legitimate explanation.  In 2020—at the height of the refinancing boom, when millions of Americans benefitted from the historically low interest rate environment—Wells Fargo approved 47% of all applications by Black homeowners

---

[86] "Data Point 2020: Mortgage Market Activity and Trends," Consumer Financial Protection Bureau, August 2021, pg. 11, available at https://files.consumerfinance.gov/f/documents/cfpb_2020-mortgage-market-activitytrends_report_2021-08.pdf.

[87] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/.

[88] *Id.*

2029104

1  (meaning that Wells Fargo rejected the majority of applications from Black
2  homeowners), whereas all other lenders approved 71% of all applications by Black
3  homeowners.[89]  In 2020, no other lending institution rejected a majority of Black
4  homeowners' applications for refinancing.[90]

5       113.   As shown in a recent Bloomberg article by Shawn Donnan, Ann Choi,
6  Hannah Levitt, and Christopher Cannon, data from eight million refinancing
7  applications from 2020 reveal that "the highest-income Black applicants [had] an
8  approval rate about the same as White borrowers in the lowest-income bracket."[91]
9  White refinancing applicants earning between $0 and $63,000 a year were ***more***
10 ***likely*** to have their refinancing application approved by Wells Fargo than Black
11 refinancing applicants earning between $120,000 and $168,000 a year.[92]

12
13
14
15
16
17
18
19
20
21
22
23

---

[89] *Id.*

[90] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/.

[91] *Id.*

[92] *Id.*

2029104



**Higher Income, Same Approval**
Wells Fargo's refinancing approval rates were higher for the lowest-income White applicants in 2020 than for all but the highest-income Black applicants.

Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

114.   Black applicants with properties in predominately Black counties fared worse.  In Fulton County, where the population was 43.6% African American in 2020,[93] Wells Fargo approved fewer than 43% of refinancing applications completed by Black homeowners, the lowest approval rate among major lenders.[94]

[93] https://data.census.gov/cedsci/table?g=0500000US13121&tid=ACSDP5Y2020 .DP05.

[94] *Id.*

2029104

115.   And even for those Black applicants whose loans were ultimately approved, they faced delays that White applicants living in predominately White neighborhoods did not, causing them damages through continued higher mortgage rates during the unjustified delay as they awaited loan approval.  In some cases, Wells Fargo officers simply told Black applicants living in predominately Black neighborhoods that "perhaps the area is not eligible" for quick evaluations of refinancing applications.[95]  Wells Fargo regularly approved refinancing applications of non-Black homeowners in a matter of weeks, but only approved the applications of Black homeowners after many months (if those Black applicants happened to be approved).

116.   And because Wells Fargo designed an application process that is disproportionately difficult for Black homeowners to complete and engages in a practice of "soft denials," where the loan officers leave applicants hanging or encourage them to look elsewhere, 27% of all Black homeowners who began a refinance application with Wells Fargo withdrew it.[96]  Thus, only one-third of the 17,702 Black homeowners who sought refinancing were successful.[97]

117.   The story in 2021 was the same, with Wells Fargo approving a much lower percentage of Black American applicants than any other lender.[98]  While the number of Black refinance applicants at Wells Fargo nearly doubled in 2021, accounting for 7% of the bank's total refinance applicants and two percent higher than industry averages, Wells Fargo's approval rates for Black borrowers continued

---

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] https://www.bloomberg.com/news/articles/2022-03-25/wells-fargo-faces-persistent-racial-gap-in-mortgage-refinancing.

2029104

1  to lag behind its major competitors.

2      118.   Wells Fargo approved only 58% of Black applicants compared to other

3  lenders, which approved 74% of Black applicants.[99]  And the disparity between

4  Black and White refinance approval rates was 21% at Wells Fargo, nearly double

5  the disparity (13%) for all other for other lenders.[100]

6

7  **Refinancing Disparities**

8  Wells Fargo approved fewer Black homeowners' applications in 2021 than other lenders.

9  

16  Source: Bloomberg analysis of Home Mortgage Disclosure Act data.

17  Note: Approval rates for completed applications for refinancing conventional, non-jumbo and first-lien mortgages in 2021.

18

19      119.   And though Wells Fargo's Black refinancing approval rate improved

20  slightly from 2020, the same was true at all other lenders, due to broader economic

21  conditions.[101]  By comparison, other major lenders approved much higher rates of

22  Black refinancing applicants in 2021: JP Morgan Chase & Co. approved 87% of

23  Black applicants (only 6% less than White applicants), Rocket Mortgage LLC

24  _____

25  [99] *Id.*

26  [100] *Id.*

27  [101] *Id.*

28

2029104

approved 81% of Black applicants (only 7% less than White applicants), and Bank of America Corporation approved 75% of Black applicants (only 11% less than White applicants).[102]

**H.     Plaintiffs and the Class are Harmed by Wells Fargo's Race-Based Discrimination**

120.    The stories of Black Americans whose applications were delayed or denied are legion.

121.    One Black American applicant sought to refinance an $890,000 mortgage in February 2020.  The applicant worked as a dentist and earned approximately $250,000 a year.  The applicant had never missed a mortgage payment and had minimal credit card debt.  The applicant had over $1 million in a Wells Fargo account, and also owned several rental properties with paying tenants.  Nevertheless, over a six-month period, Wells Fargo asked and re-asked for documents.  After the lengthy delay, Wells Fargo denied the application.  The applicant subsequently sought refinancing from a different institution that granted the refinancing over the phone.

122.    Another applicant sought to refinance a loan already held by Wells Fargo, which it had issued two years prior.  The applicant had never missed a payment and had never even been late on a payment.  They held the same job they held when they obtained the mortgage, and their credit score was over 780.  For at least two months, Wells Fargo demanded more and more documents, leading the applicant to complain to his broker's superior.  The applicant had to fax the same documents four or five times, which Wells Fargo claimed to have lost.  Before Wells Fargo decided to deny the loan, the applicant went to another lender, who refinanced the loan in only three or four days.

123.    Yet another applicant waited four months for Wells Fargo to approve

---

[102] *Id*.

2029104

their refinancing applications.  This applicant is a practicing doctor who owns multiple investment properties attempting to refinance their primary residence. During the application process, Wells Fargo repeatedly asked for documents and repeatedly went silent, refusing to return the applicant's calls.

124.   Plaintiff Aaron Braxton purchased his home in South Los Angeles, California, near the University of Southern California, in April 2000, through a Wells Fargo home loan for $139,500 ("First Loan").  This First Loan was insured through the FHA.  In 2005, after the price of the house appreciated, he took out a second home equity line of credit loan, also from Wells Fargo ("Second Loan").  He improved upon the property and built an accessory dwelling unit.  Today, the home is worth approximately $800,000, as it was in 2019.  In or about August 2019, Mr. Braxton began the process of applying to refinance his two Wells Fargo loans to take advantage of reduced interest rates.  At the time, he owed $185,000 on both his Wells Fargo loans and paid a 6% interest rate on both loans, multiple percentage points higher than the average refinance rate at the time.

125.   When Mr. Braxton initially applied to refinance his First Loan, Wells Fargo repeatedly asked him to resubmit paperwork because Wells Fargo representatives claimed the paperwork was either missing or lost.  Wells Fargo representatives also continually took weeks and weeks to issue or reply to correspondence.  Mr. Braxton thereafter began the process of refinancing his Second Loan and was confronted with the same delays.

126.   Frustrated by the delays and because he was continuing to pay a higher mortgage rate while his applications were pending, Mr. Braxton regularly contacted his loan officers and other Wells Fargo personnel to ask about the status of his applications.

127.   After months of frustrating encounters with Wells Fargo personnel, Mr. Braxton decided to call HUD.  A HUD representative informed Mr. Braxton that they would be contacting Wells Fargo.  The very next day, Wells Fargo approved

the refinancing of Mr. Braxton's federally backed FHA home loan, approximately nine months after he began the process.

128.   Eventually, around October 2020, Wells Fargo finally approved a refinancing of his Second Loan.  However, despite the contact from HUD, which presumably prompted it to act on Mr. Braxton's First Loan, Wells Fargo continued its discrimination through race-based application delays.  It continued to claim that paperwork needed to process the Second Loan was missing, even though Mr. Braxton had already provided the paperwork.  At one point, after having sent a notary to his home to finalize some paperwork, Wells Fargo informed Mr. Braxton that the notary had lost the paperwork, and he needed to complete some forms again.

129.   All told, Mr. Braxton submitted four applications because Wells Fargo kept losing them.  During the 16 months that his applications were pending, Mr. Braxton continued to pay the higher original mortgage rates instead of the lower refinanced rates he was seeking (and ultimately proven entitled to).  However, unbeknownst to Mr. Braxton, in the end the rate he received for his refinancing, while lower than his original rate, was much higher than the fair market rate received by similarly situated non-Black applicants.

130.   Plaintiff Gia Gray is a Black homeowner who resides in Danville, California.

131.   Mrs. Gray is another victim of Wells Fargo's discriminatory policies. Both Mrs. Gray and her husband are physicians.  Both are employed and both, individually, are in the top quintile of income earners.  The same was true when they applied to refinance their loans with Wells Fargo.  Mrs. Gray's FICO score is above 800.

132.   The couple owns three homes.  Their primary residence is in Danville, California—a predominately White area.  The couple also own income properties in Stockton, California, and Chicago, Illinois—more diverse areas.  The couple had Wells Fargo mortgages for all these homes, and, save for a balance of approximately

$1,000 on their credit card, the couple has and had no other debt.  The couple never missed a mortgage payment, and they always paid on time.  They began the refinancing process for their homes in February 2020.

133.   The couple was only able to finance the Danville, California property—in the predominately White area—after four months.  Their loan officer was located in Walnut Creek, California, another predominately White area, who actually took time out of his day to visit their multimillion-dollar home in Danville in-person to sign refinancing documentation.  Even still, Wells Fargo kept asking them to provide additional information, and even contacted the Human Resources department at Mrs. Gray's office.

134.   The couple was not as lucky on their two other income properties.  The loan officer would try to steer Mrs. Gray away from these properties and only expressed an interest in refinancing her Danville, California property.  Wells Fargo eventually switched the couple's Walnut Creek loan officer to a Black assistant to handle these properties.  Wells Fargo would not return their calls for inquiries on refinancing these two properties.  When the couple did manage to get a hold of the assistant or loan officer, they were told that Stockton, California property was in a bad area, and that the Chicago, Illinois property, although in a good area, was high risk, and that Wells Fargo was not looking to refinance high-risk areas.  Frustrated by Wells Fargo's ambivalence and inaction, the couple gave up on refinancing these properties in December 2020, nearly a year after they started.

135.   Plaintiff Bryan Brown is a Black homeowner who resides at 18 Elm Street, 3rd Floor, Bristol, Connecticut 06010.

136.   Mr. Brown purchased a three-unit, multifamily property in Bristol, Connecticut in December 2010, through a Wells Fargo home loan for approximately $204,000.  Mr. Brown and his family reside in one of the units, and he receives rental income from the other two units.  Today, the property is worth approximately $250,000.

137.   In October 2020, Mr. Brown began the process of applying to refinance his loan to take advantage of reduced interest rates and to convert his conventional 30-year loan to a 15-year fixed mortgage.  At the time, Mr. Brown owed approximately $150,000 and paid a 4.75% interest rate.

138.   When Mr. Brown initially applied to refinance his loan, he submitted financial statements, including but not limited to those relating to his three investment properties.  Frustrated by the delays and because he was continuing to pay a higher mortgage rate while his application was pending, Mr. Brown regularly contacted Wells Fargo personnel to ask about the status of his application.  Rather than provide Mr. Brown an explanation as to the delay, Wells Fargo repeatedly requested that Mr. Brown *resubmit* financial documents and/or provide additional documentation to demonstrate *how* he paid his credit card statements.  Wells Fargo also contacted Mr. Brown's employer on multiple occasions requesting that they verify his employment.

139.   Four months after Mr. Brown submitted his application, in or around January/February 2021, Mr. Brown's application was denied.

140.   Plaintiff Paul Martin is a Black homeowner and resides in Los Angeles, California.

141.   Paul Martin is a 14-year Hollywood entertainment executive at Sony Pictures.  In 2020, Paul Martin sought to refinance his home in the Ladera Heights neighborhood of Los Angeles, California, which has a higher proportion of affluent Blacks.  His multimillion-dollar home was previously owned by WNBA superstar Lisa Leslie and NBA player Aaron Afflalo.

142.   But even Mr. Martin's shot was blocked by Wells Fargo.  The bank would not refinance his home unless he could get it appraised for $2.0 million.  Wells Fargo's appraiser refused to come into Mr. Martin's home, and appraised it at just shy of $2.0 million based on comparisons in the neighborhood.  Mr. Martin went to another lender, who appraised the home at $2.4 million and promptly

1  refinanced his loan.

2      143.   Plaintiffs' experiences are emblematic of the experiences of Black

3  Americans all over the country.

4                    **V.      CLASS ALLEGATIONS**

5      144.   Plaintiffs bring this action on behalf of themselves and a potential class

6  of similarly situated Black homeowners.

7      145.   Each and every claim alleged in this case is also alleged on behalf of

8  every member of the Class.

9  **A.      Class Definition**

10      146.   The Class includes all Black homeowners in the United States who,

11  from January 1, 2018 through the present (the "Class Period"), submitted an

12  application to refinance their home mortgage through Defendants that was (i)

13  processed at a rate slower than that of the average processing time of applications

14  made by non-Black applicants; or (ii) whose applications were denied; or (iii) whose

15  resulting refinance loans were made at higher interest rates as compared to similarly

16  situated non-Black applicants.  Excluded from the Class are Defendants and their

17  employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not

18  named in this Complaint, and the United States government.

19      147.   Class certification is authorized under Federal Rule of Civil Procedure

20  23 and applies to claims for injunctive and equitable relief, including restitution,

21  under Rule 23(b)(2), and for monetary damages under Rule 23(b)(3).

22      148.   There are at least 13,000 members of the Class.

23      149.   The number of persons who fall within the definitions of the Class are

24  so numerous and geographically dispersed so as to make joinder of all members of

25  the Class or Subclass in their individual capacities impracticable, inefficient, and

26  unmanageable, and without class-wide relief, each member of the Class would

27  effectively be denied his, her, or their rights to prosecute and obtain legal and

28  equitable relief based on the claims and allegations averred in the Complaint.

2029104

150.   Plaintiffs, as detailed below, can fairly and adequately represent the proposed Class.  In the alternative, Plaintiffs can act as the representatives of the below subclasses.

**B.    Proposed Subclasses**

151.   Additionally, or in the alternative, pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiffs bring this action on behalf of the following subclasses:

152.   **The Delayed Refinancing Subclass**:  All Black persons in the United States who applied for refinancing from the Defendants during the class period and whose applications processed at a rate slower than that of the average processing time of applications made by non-Black applicants.

153.   **The Higher Rate Subclass**:  All Black persons in the United States who applied for refinancing from the Defendants during the class period and whose refinancing applications were eventually approved, but at a higher interest rate than prevailing market rates based on their creditworthiness.

154.   **The Denied Refinancing Subclass**:  All Black persons in the United States who applied for refinancing from the Defendants during the class period and whose applications were denied but should have been approved based on objective, race-neutral factors, including but not limited to:  loan-to-value ratio, debt-to-income ratio, and credit score.

**C.    Numerosity and Ascertainability**

155.   **Numerosity**.  While the exact numbers of the members of the Class and Subclasses are unknown to Plaintiffs at this time, membership in the Class and Subclasses may be ascertained from the records maintained by Defendants.  At this time, Plaintiffs are informed and believe that the Class includes at least 13,000 and the Subclasses include tens of thousands of members.  Therefore, the Class and Subclasses are sufficiently numerous that joinder of all members of the Class and Subclasses in a single action is impracticable under Rule 23(a)(1) of the Federal Rules of Civil Procedure, and the resolution of their claims through a class action

2029104

will be of benefit to the parties and the Court.

156.   **Ascertainability**.  The names and addresses of the members of the Class and Subclasses are contained in Defendants' records.  Notice can be provided to the members of the Class and Subclasses through direct mailing, email, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under State and Federal law.

**D.     Commonality and Predominance**

157.   This matter involves common questions of law and fact which predominate over any question solely affecting individual Class Members.

158.   The common questions of law and fact include, but are not limited to:

- Whether Defendants systematically discriminated against Class Members on account of their race;

- Whether Black applicants' refinance applications were processed at a rate slower than that of the average processing time of applications made by non-Black applicants;

- Whether Black applicants' refinance applications were denied when the score of a similarly situated non-Black applicant would be approved;

- Whether Black applicants' resulting refinance loans were made at higher interest rates as compared to similarly situated non-Black applicants;

- Whether Defendants selected disproportionately White areas for rapid refinancing evaluation and disproportionately Black areas for increased scrutiny;

- Whether Defendants' underwriting algorithms and machine learning programs were racially biased and led to unfairly discriminatory credit policies that harmed Black refinancing applicants;

- Defendants' knowledge;

- Defendants' consumer disclosures;

- Defendants' internal approval process; and

- Defendants' use of appraisals.

159.   **Predominance**.  Class action status is warranted under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law or fact common to the

2029104

members of the Class and Subclasses predominate over any questions affecting only individual members. The interests of the members of the Class and Subclasses in individually controlling the prosecution of separate actions are theoretical and not practical. Prosecution of this action through multiple Class Representatives would be superior to individual lawsuits. Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

**E.     Typicality and Adequacy**

160.   Plaintiffs' claims are typical of the other Class Members' claims because all Class Members were injured in the same manner as a result of substantially similar conduct by Defendants.

161.   Plaintiffs are adequate Class Representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. The Class and Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

**F.     Superiority**

162.   A class action is the superior method for the fair and efficient adjudication of this matter because the damages and other harms suffered by Plaintiffs and other Class Members are small compared to the burden and expense of individual litigation. Thus, it would be impractical, if not impossible, for individual plaintiffs to seek redress against Defendants for the harms suffered.

163.   Individual litigation of these harms would also be inefficient for the court system, and would create a risk of inconsistent or contradictory rulings and judgments.

164.   No unusual circumstances exist that would make this matter more difficult to manage than a typical class action. Individualized damages figures can

2029104

FIRST AMENDED CLASS ACTION COMPLAINT

Case 4:22-cv-01748-KAW Document 63-1   Filed 04/15/22   Page 51 of 58

1    be mathematically computed by collecting data about the length of each Class

2    Member's delay and the differential between the interest rates they ultimately

3    received versus the prevailing market rate based on race-neutral variables such as

4    debt-to-income ratio, loan-to-value ratio, and credit score.

5    **G.    Injunctive Relief**

6         165.    Plaintiffs also seek to represent a class under Rule 23(b)(2) seeking

7    injunctive relief forcing Wells Fargo to cease and desist its current discriminatory

8    practices.

9    <u>**COUNT I**</u>

10   **VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT**

11   **15 U.S.C. § 16901, *et seq.***

12        166.    Plaintiffs, on behalf of themselves and all those similarly situated,

13   reallege each and every paragraph above and incorporate them by reference as

14   though fully stated herein.

15        167.    The Equal Credit Opportunity Act makes it unlawful for a creditor to

16   discriminate against any applicant with respect to any aspect of a credit transaction

17   on the basis of race.

18        168.    The Equal Credit Opportunity Act applies to applications for

19   refinancing, like those of the Plaintiffs and others similarly situated.  Plaintiffs

20   applied for credit by seeking to refinance their home loans.

21        169.    Defendants are creditors because they regularly extend, renew, and

22   continue issuances of credit.

23        170.    Defendants' consistent delays, roadblocks, feigned difficulties, and

24   sometimes denials of applications for refinancing submitted by Black Americans

25   constitute race-based discrimination forbidden by the Equal Credit Opportunity Act.

26        171.    Plaintiffs and all those similarly situated were harmed by Defendants'

27   conduct, including but not limited to harm in the form of higher interest rates paid

28   while applications were pending, higher interest rates paid upon a delayed approval,

2029104

1  or from a denied application.

2      172.   On behalf of themselves and the Class they seek to represent, Plaintiffs

3  request the relief set forth below.

4  ### COUNT II

5  **RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT**

6  **OF 1968, 42 U.S.C. § 3601, *et seq.***

7      173.   Plaintiffs reallege each and every paragraph above and incorporate

8  them by reference as though fully stated herein.

9      174.   The Fair Housing Act makes it unlawful, in residential real estate

10  transactions, such as refinancing, to discriminate against designated classes of

11  individuals.

12      175.   Plaintiffs and others similarly situated sought to engage in residential

13  real estate transactions with the Defendants.

14      176.   Plaintiffs and others similarly situated are Black Americans and

15  therefore members of a protected class under the Fair Housing Act.

16      177.   Defendants refused to transact business with Plaintiffs and others

17  similarly situated when they refused to approve refinancing applications on the same

18  timeline as the applications made by other parties with similar qualifications that

19  were not members of the protected class, by causing applicants to withdraw

20  applications due to roadblocks and feigned difficulties, or by denying refinancing

21  applications.  As noted, Defendants approved fewer than half of Black homeowners'

22  refinancing applications in 2020 while approving 71% of the applications of White

23  homeowners.

24      178.   Defendants refused to transact business with Plaintiffs and those

25  similarly situated during the Class Period and at the same time did transact business

26  with non-Black homeowners with similar qualifications.

27      179.   Plaintiffs and those similarly situated were injured by Defendants'

28  refusal to transact business with them because they paid application fees for

2029104

1  refinancing applications that were delayed or denied, because they continued to pay

2  higher interest rates while their delayed applications were pending, because they

3  were provided with higher interest rates than other homeowners with similar

4  qualifications, and/or because their applications were denied.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

7       180.   Plaintiffs reallege each and every paragraph above and incorporate

8  them by reference as though fully stated herein.

9       181.   Under 42 U.S.C. § 1981, persons of all races are guaranteed the same

10 right to make and enforce contracts, regardless of race.  The term "make and

11 enforce" contracts includes the making, performance, modification, and

12 terminations of contracts, as well as all of the other aspects of a contractual

13 relationship.

14      182.   By seeking to refinance their home loans and submitting an application

15 to Defendants, Plaintiffs and others similarly situated sought to "make and enforce"

16 contracts with the Defendants.

17      183.   Plaintiffs and those similarly situated were denied their right to make

18 and enforce contracts when Defendants refused to provide refinancing on the same

19 terms as they offered to members of a different race, by delaying or frustrating the

20 applications process, and/or by denying the applications.

21      184.   Plaintiffs and those similarly situated were harmed by Defendants'

22 denial of their rights to make and enforce contracts.

## COUNT IV

### VIOLATION OF THE UNRUH CIVIL RIGHTS ACT,

### CALIFORNIA CIVIL CODE §51

26      185.   Plaintiffs reallege each and every paragraph above and incorporate

27 them by reference as though fully stated herein.

28      186.   The Unruh Civil Rights Act provides that all persons within the State of

1  California are free and equal no matter their race and are entitled to full and equal

2  treatment in all business establishments.

3      187.   The Unruh Civil Rights Act thus prohibits discrimination of any kind

4  against any person in any business establishment.

5      188.   Defendants are business establishments under the Unruh Civil Rights

6  Act.

7      189.   Plaintiffs and other individuals similarly situated were denied full and

8  equal treatment under the Unruh Civil Rights Act when Defendants refused to offer

9  them refinancing terms on the same terms as individuals who were not Black

10  Americans.

11      190.   Plaintiffs and other individuals similarly situated were harmed by

12  Defendants' refusal to transact business with them because they paid application

13  fees for refinancing applications that were delayed or denied, because they

14  continued to pay higher interest rates while their delayed applications were pending,

15  because they were provided with higher interest rates than other homeowners with

16  similar qualifications, and/or because their applications were denied.

17                          **<u>COUNT V</u>**

18  **VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**

19      191.   Plaintiffs reallege each and every paragraph above and incorporate

20  them by reference as though fully stated herein.

21      192.   The California Unfair Competition Law ("UCL") forbids "unlawful,

22  unfair or fraudulent" conduct in connection with business activity.

23      193.   Defendants' business offering refinancing of existing loans is a

24  business activity under the UCL.

25      194.   Plaintiffs and others similarly situated are "persons" under the UCL.

26      195.   Defendants' conduct described herein constitutes unlawful competition,

27  as in the course of engaging in the business acts described above, it engaged in

28  conduct that constituted a predicate violation of the laws identified herein, namely

2029104

the Equal Credit Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, and the Unruh Civil Rights Act.

196.   Defendants' conduct described herein constitutes unfair competition under the UCL, as their practices are likely to deceive the public by informing the public of an alleged commitment to diversity and equality, but instead using hidden business practices designed to deny, delay and refuse the refinancing of loans of Black Americans, and subjecting those that are approved, to unfavorable terms.  As there is no legitimate justification for these practices, which have a disproportionately negative impact on the public, in comparison to any fair business purpose, Defendants' practices are unfair as defined under the UCL.

197.   Defendants' conduct described herein constitutes fraudulent competition under the UCL, as they advertise and otherwise state that they are committed to diversity and equality, and will fairly and quickly process the refinancing applications of all applicants, but instead use hidden business practices designed to deny, delay and refuse the refinancing of loans of Black Americans, and subjecting those that are approved, to unfavorable terms.  These business practices are likely to deceive the public, and thus are fraudulent.

198.   Plaintiffs and those similarly situated were injured by Defendants' refusal to transact business with them because they paid application fees for refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar qualifications, and/or because their applications were denied.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court provides the following relief:

a.   Certify the 23(b)(2) and 23(b)(3) classes outlined above;

b.   Designate Plaintiffs as Class Representatives and designate the

1    undersigned counsel as lead Class Counsel;

2    c.    Find that Defendants' acts described herein violate the Equal Credit

3          Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, the Unruh

4          Civil Rights Act, and the California UCL;

5    d.    Find that Defendants have engaged in a pattern and practice of racial

6          discrimination resulting in the harm to Plaintiffs and class members

7          described above;

8    e.    Award Plaintiffs and all others similarly situated restitutionary relief,

9          together with compensatory and punitive damages;

10   f.    Award Plaintiffs and all others similarly situated injunctive relief by

11         ordering Defendants to stop the discriminatory practices described

12         herein;

13   g.    Award Plaintiffs and all others similarly situated prejudgment interest

14         and attorney's fees, costs, and disbursements; and

15   h.    Award Plaintiffs and all others similarly situated such other relief as

16         this Court deems just and proper.

17                          **DEMAND FOR JURY TRIAL**

18   Plaintiffs demand a trial by jury of all issues so triable.

19

20

21

22

23

24

25

26

27

28

2029104

1   DATED:  April 12, 2022                    ELLIS GEORGE CIPOLLONE
2                                             O'BRIEN ANNAGUEY LLP

3                                             By:     */s/ Dennis S. Ellis*
4                                                  Dennis S. Ellis (SBN 178196)
5                                                  Trent B. Copeland (SBN 136890)
                                                   Ryan Q. Keech (SBN 280306)
6                                                  Stefan Bogdanovich (SBN 324525)
                                                   2121 Avenue of the Stars, Suite 2800
7                                                  Los Angeles, California 90067
8                                                  Telephone: (310) 274-7100
                                                   Facsimile: (310) 275-5697
9                                                  Email:  dellis@egcfirm.com
10                                                         tcopeland@egcfirm.com
                                                           rkeech@egcfirm.com
11                                                         sbogdanovich@egcfirm.com

12                                            ELLIS GEORGE CIPOLLONE
13                                            O'BRIEN ANNAGUEY LLP
14                                                 Noah S. Helpern (SBN 254023)
                                                   Milin Chun (SBN 262674)
15                                                 801 South Figueroa Street, Suite 2000
16                                                 Los Angeles, California 90017
                                                   Telephone: (213) 725-9800
17                                                 Facsimile: (213) 725-9808
18                                                 Email:  nhelpern@egcfirm.com
                                                           mchun@egcfirm.com
19
20                                            ELLIS GEORGE CIPOLLONE
21                                            O'BRIEN ANNAGUEY LLP
                                                   Joseph N. Kiefer (*pro hac vice forthcoming*)
22                                                 (NY Bar No. 5345657)
                                                   157 West 57th Street, Suite 28 S
23                                                 New York, New York 10019
24                                                 Telephone: (212) 413-2600
                                                   Facsimile: (212) 413-2629
25                                                 Email:  jkiefer@egcfirm.com

26
27                                            Attorneys for Plaintiffs Aaron Braxton, Gia
                                              Gray, Bryan Brown, Paul Martin and all others
28                                            similarly situated

2029104

DATED:  April 12, 2022                    FRANK, SIMS & STOLPER LLP
                                          Jason M. Frank (SBN 190957)
                                          Scott H. Sims (SBN 234148)
                                          Andrew D. Stolper (SBN 205462)


                                          By:        /s/ Jason Frank
                                                     Jason Frank
                                          Attorneys for Plaintiffs Aaron Braxton, Gia
                                          Gray, Bryan Brown, Paul Martin and all others
                                          similarly situated

**Attestation under N.D. Cal. L.R. 5-1(h)**: the ECF filer of this document attests that all of the other signatories have concurred in the filing of the document, which shall serve in lieu of their signatures on the document.

2029104

# EXHIBIT C

1    Alisa Adams (SBN 277697)
     Adams Law Practice, LLC
2    P.O. Box 1834
     Cleveland, OH 44103
3    (216) 926-0065 telephone
     Email: aadams@advocateattorneys.com
4

5    *Attorneys for Plaintiff and Putative Class*
     *Additional Counsel on Signature Page*
6

7

8                 **UNITED STATES DISTRICT COURT**
            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
9                   **SAN FRANCISCO DIVISION**

10    **IFEOMA EBO**,                     Case No.
     individually, and on behalf of all others
11    similarly situated,

12                        **CLASS ACTION COMPLAINT FOR:**
                  Plaintiff,
13                          1.   **VIOLATIONS OF THE EQUAL**
                            **CREDIT OPPORTUNITY ACT, 15**
14    v.                           **U.S.C. §§ 1691, *ET SEQ.*;**
                        2.   **VIOLATIONS OF THE FAIR**
15    **WELLS FARGO BANK, N.A.**           **HOUSING ACT, 42 U.S.C. §§ 3601,**
                           ***ET SEQ.*; and**
16                  Defendant.     3.   **VIOLATIONS OF SECTION 1981,**
                            **42 U.S.C. § 1981.**
17

18                        **DEMAND FOR JURY TRIAL**

19        NOW COMES Plaintiff IFEOMA EBO ("Plaintiff"), individually and on behalf of all others

20    similarly situated, by and through counsel, and for her Class Action Complaint against Defendant WELLS

21    FARGO BANK, N.A. ("Wells Fargo" or "Defendant"), states as follows:

22                            <u>**INTRODUCTION**</u>

23        **1.**     This case concerns Wells Fargo's pervasive pattern and practice of placing Black

24
   Americans at a disadvantage in comparison to White Americans with respect to their applications for
25

26    mortgage loans.

27

28

                 *Ebo, et al. v. Wells Fargo Bank, N.A., Class Action Complaint, p.1*

**2.**     In fact, Wells Fargo's discriminatory practices were already the subject of a lawsuit brought by the United States Department of Justice ("DOJ") in 2012, which was resolved through a Consent Order (the "Consent Order").[1]  Pursuant to the terms of that Consent Order, Wells Fargo was required to "provide[] $184.3 million in compensation" to borrowers—which was "the second largest fair lending settlement in the [DOJ]'s history" to that point—and was required to institute procedures to ensure compliance with federal housing law.[2]

**3.**     Unfortunately for Black Americans, as soon as the terms of that Consent Order expired, Wells Fargo reverted back to its discriminatory practices.

**4.**     For example, according to a recent report from Bloomberg, "Wells Fargo approved fewer than half of Black homeowners' refinancing applications in 2020," which is a significantly lower rate than all other lenders.[3]  In fact, "Wells Fargo…was alone in rejecting more Black homeowners than it accepted."[4]

**5.**     Moreover, based on a review of publicly available data from the Consumer Financial Protection Bureau ("CFPB")—collected under the Home Mortgage Disclosure Act ("HMDA"), which is codified as 12 U.S.C. §§ 2801, *et seq.*—Wells Fargo still lags behind its industry counterparts with respect to approving Black Americans' loan applications, and, even when Wells Fargo does approve Black Americans' loan applications, Wells Fargo offers them significantly less favorable interest rates.

---

[1] *See, e.g.*, DOJ Complaint, available at: https://www.justice.gov/iso/opa/resources/951201271211371999513 6.pdf; Consent Order, available at: https://www.justice.gov/iso/opa/resources/14201271211384881962.pdf.

[2] *See*, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

[3] *See*, https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/.

[4] *Id.*

**6.**     As explained below, Wells Fargo's discriminatory practices violate, *inter alia*, the Equal Credit Opportunity Act ("ECOA")—codified as 15 U.S.C. §§ 1691, *et seq.*—the Fair Housing Act ("FHA")—codified as 42 U.S.C. §§ 3601, *et seq.*—and 42 U.S.C. § 1981 ("Section 1981"). Accordingly, Plaintiff, individually, and on behalf of all others similarly situated (the "Class"), seeks redress in connection with the harm she and other Class members incurred as a result of Wells Fargo's discriminatory practices and violations of federal law.

## PARTIES, JURISDICTION, AND VENUE

**7.**     Plaintiff is a citizen of the United States and an adult resident of the City of New York, New York.

**8.**     Defendant Wells Fargo Bank, N.A. is a business incorporated under the laws of the State of Delaware.  Defendant maintains its principal place of business at 420 Montgomery Street, San Francisco, California 94104.  Defendant does business in the state of New York and nationwide.

**9.**     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as several of Plaintiff's causes of action arise under federal law.

**10.**     Personal jurisdiction is appropriate over Wells Fargo Bank, N.A. as it transacts business in the State of California and has its principal place of business in San Francisco, California.

**11.**     Venue lies in this District pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## INTRADISTRICT ASSIGNMENT

**12.**     This action is properly assigned to the San Francisco Division of this District pursuant to N.D. Cal. L.R. 3-2, because Defendant Wells Fargo Bank, N.A. is headquartered in San Francisco, California, which is served by the San Francisco Division.

**FACTUAL ALLEGATIONS**

**13.**    Plaintiff and Class members are all Black Americans, and thus are members of a protected class.

**14.**    Plaintiff and Class members each submitted an application for a mortgage loan from Defendant in connection with the purchase or refinancing of residential real estate ("Application").

**15.**    Plaintiff and Class members were qualified to receive mortgage loans from Wells Fargo, and complied with all reasonable requirements imposed by Wells Fargo as necessary to substantiate their qualifications to receive mortgage loans.

**16.**    Nevertheless, Plaintiff's and Class members' Applications were either (1) denied by Wells Fargo, (2) never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (3) granted by Wells Fargo, but on significantly less favorable terms than a similarly situated White borrower would have received.

**17.**    Plaintiff's and Class members' experiences with Wells Fargo were part of a larger pattern and practice of racial discrimination against Black Americans.

**18.**    As noted above, Wells Fargo was already subjected to a DOJ lawsuit in 2012 alleging similar misconduct.  That lawsuit was ultimately resolved through a Consent Order which provided for "the second largest fair lending settlement in the [DOJ]'s history" to that point.[5]  Nevertheless, Wells Fargo's discriminatory practices continued.

**19.**    For example, according to Bloomberg, in 2020, Wells Fargo approved Black Americans' loan refinancing applications at a rate of 47%, in comparison to a rate of 72% for White Americans—a

_____

[5] *See*, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

25% difference.[6]  Other similarly-sized lenders had only a modest disparity between Black and White applicants, ranging from 7% to 12%.[7]  For instance, Chase, "the largest U.S. bank by assets, accepted 81% of refinancing applications from Black homeowners in 2020 compared with 90% from White ones"—which only amounts to a 9% difference.[8]

20.     Notably, Wells Fargo's 47% approval rate does not even account for the "27% of Black borrowers who began an application with Wells Fargo in 2020 [and then] withdrew it."[9]  When those applicants are factored in, it means that "only one-third of the 17,702 Black homeowners who sought refinancing [from Wells Fargo] were successful."[10]

21.     The Bloomberg report also notes that "Wells Fargo approved a greater share of applications from low-income White homeowners than all but the highest-income Black applicants, who had an approval rate about the same as White borrowers in the lowest-income bracket."[11]  Clearly, the disparity between Black and White applicants seeking refinancing from Wells Fargo has little do with creditworthiness.

22.     Wells Fargo's discriminatory practices are also pervasive with respect to applicants for new mortgage loans.

23.     Based on a review of publicly available data collected by the CFPB in accordance with the HMDA, in 2019, Wells Fargo approved Black Americans' loan applications at a rate that was approximately 21% lower than White Americans' loan applications.  In comparison, three of the other

---

[6] *See*, https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*

largest lenders in the country—*i.e.*, Chase, Quicken Loans, and United Wholesale Mortgage—approved Black Americans' loan applications at a rate that was "only" approximately 10% lower than White Americans' loan applications.

24.     Moreover, even when common indicia of creditworthiness are controlled for—*e.g.*, debt to income ratio, loan to value ratio, etc.—Wells Fargo approved Black Americans' loan applications at a rate that was, on average, approximately 9% lower than similarly situated White Americans' loan applications. In contrast, Chase—one of the largest mortgage loan lenders in the country—approved Black Americans' loan applications at a rate that was, on average, approximately 3% *higher* than similarly situated White Americans' loan applications.  Chase is not an outlier.  When that same analysis is applied to data from three of the other largest lenders in the county—*i.e.*, Chase, Quicken Loans, and United Wholesale Mortgage—it reveals that Black Americans' loan applications were approved at a rate that was, on average, approximately 2% *higher* than similarly situated White Americans' loan applications.

25.     Even when Wells Fargo does approve Black Americans' loan applications, it offers them significantly less favorable terms than similarly situated White Americans.

26.     According to the same dataset referenced above, the interest rates on loans offered by Wells Fargo to Black Americans were, on average, half a percentage point *higher* than the interest rates on the loans it offered to similarly situated White Americans, even when common indicia of creditworthiness are controlled for.

27.     In comparison, there was no appreciable difference between the interest rates offered to Black Americans and similarly situated White Americans by three of the other largest lenders in the county—*i.e.*, Chase, Quicken Loans, and United Wholesale Mortgage.  For these lenders, the difference between the interest rates offered to Black Americans and similarly situated White Americans was, on average, only five hundredths of a percentage point—i.e., *ten times less* than Wells Fargo's disparity.

**28.**     Wells Fargo's discriminatory practices are also evidenced by the fact that Wells Fargo artificially makes it more difficult for Black Americans to complete their applications for mortgage loans. For example, Wells Fargo has a pattern and practice of requiring Black Americans to repeatedly submit documentation that they have already submitted, or to submit additional documentation beyond what is necessary to determine their eligibility status.

**29.**     Again, according to publicly available data collected by the CFPB in accordance with the HMDA, in 2019, new mortgage loan applications submitted by Black Americans to Wells Fargo were either withdrawn or never completed approximately 17% of the time, in comparison to only 14% for White Americans.  But, there was no difference between Black Americans and White Americans with respect to applications submitted to three of the other largest lenders in the county—*i.e.*, Chase, Quicken Loans, and United Wholesale Mortgage.   For these lenders, *both* Black Americans and White Americans either withdrew or never completed their mortgage loan applications 8% of the time.

**30.**     The processing delays experienced by Black Americans who seek mortgage loans from Wells Fargo can prevent them from purchasing real property altogether because, in real estate transactions, time is frequently of the essence.  In other words, sellers of real property are simply unwilling to wait for Wells Fargo's unnecessarily lengthy loan approval process to be completed, and sellers move on to other potential buyers with whom they will not experience this problem.

**31.**     Those processing delays also made it more difficult for existing Black property owners to refinance their mortgage loans and take advantage of historically lower interest rates, which have since begun to rise.

**32.**     In light of the foregoing, Plaintiff and Class members were harmed by Wells Fargo's discriminatory practices in one or more of the following ways: (1) they were unable to obtain or refinance mortgage loans to which they were qualified; (2) they were unable to obtain or refinance mortgage loans

on the same (more favorable) terms as White Americans; (3) they were unable to purchase real property that similarly situated White Americans would have been able to purchase; and (4) they spent time and money pursuing mortgage loans that similarly situated White Americans would not have been required to expend.

**FACTS RELEVANT TO PLAINTIFF**

33.     Plaintiff is a Black American, and thus is a member of a protected class.

34.     In late 2021, Plaintiff began the process of searching for a new home to purchase.  That search ended in October 2021, when Plaintiff found a property (the "Property") located in Kings County, New York—and more specifically, the East Flatbush neighborhood of Brooklyn—and entered into a contract (the "Contract") to purchase it for the price of $900,000.

35.     Thereafter, Plaintiff submitted an application for a mortgage loan to Defendant in connection with the purchase of the Property ("Plaintiff's Application").

36.     At the time Plaintiff applied for the Loan (defined below), Plaintiff had a credit score of approximately 800, an annual income of approximately $178,000, and no significant debt.

37.     On November 1, 2021, Plaintiff received preapproval from Wells Fargo for a mortgage loan in the amount of $883,698 (the "Loan"), which would be used to purchase the Property.  According to Wells Fargo, Plaintiff's preapproval was to expire on February 24, 2022.

38.     After Plaintiff's Application was preapproved, Plaintiff began working with Wells Fargo to receive final approval for the Loan.

39.     Per Wells Fargo's requests, Plaintiff submitted all necessary documentation to verify her qualifications for the Loan.  Plaintiff timely provided Wells Fargo with documentation such as W-2 forms, paystubs, bank account statements, etc.

**40.**     On December 29, 2021, Plaintiff received a "Commitment Letter" from Wells Fargo. According to the Commitment Letter, Plaintiff's Application was approved, and she only needed to submit some additional documentation "in order to complete the final underwriting and funding of" her Loan.

**41.**     In January and February 2022, Wells Fargo informed Plaintiff that it required additional documentation to complete the underwriting process relative to Plaintiff's Application.

**42.**     Notably, some of the additional documentation that Wells Fargo requested in January and February 2022 had *already* been submitted by Plaintiff (*e.g.*, recent paystubs from Plaintiff's employers).

**43.**     Other documentation requested by Wells Fargo in January and February 2022 was unnecessary, unduly burdensome, and irrelevant to Plaintiff's qualifications for the Loan.  For example, in one instance, Wells Fargo requested a written explanation as to why Plaintiff made a monthly credit card payment in the amount of $290 on her own credit card.  In another instance, Wells Fargo requested a bank statement for a bank account that did not even exist.

**44.**     As Wells Fargo's duplicative and unnecessary requests for documentation continued into February 2022, Plaintiff expressed her concern to Wells Fargo that she would not be able to complete the Loan application process by the time that her preapproval expired on February 24, 2022. Nevertheless, as of February 24, 2022, Plaintiff's Loan still had yet to receive final approval.

**45.**     In March 2022, Wells Fargo continued to request additional documentation, much of which was duplicative of documentation that Plaintiff had already provided to Wells Fargo several times previously.

**46.**     In sum, Plaintiff was highly qualified to receive a mortgage loan from Wells Fargo, and complied with all of Wells Fargo's reasonable requests for documentation to substantiate her qualifications.  Yet, as of March 22, 2022—nearly a month after the Loan approval process should have concluded—Plaintiff still had not received final approval for her Loan.

**47.** On or about March 22, 2022, the seller of the Property canceled the Contract due to the fact that Wells Fargo had still not approved Plaintiff's Loan, and it was unclear when (or if) that approval would ever come.  That same day, Plaintiff informed Wells Fargo of the seller's decision. Accordingly, Plaintiff did not, and will never, receive the Loan.

**48.** As explained above, Plaintiff's experience with Wells Fargo was part of a larger pattern and practice of racial discrimination against Black Americans.  Like the Applications of many other Black Americans who sought mortgage loans from Wells Fargo, Plaintiff's Application was never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant.

**49.** Plaintiff was harmed by Wells Fargo's discriminatory practices because she was unable to obtain the Loan—to which she was qualified—and was thus unable to purchase the Property, even though a similarly situated White American would have been able to do so.  Plaintiff was also harmed by Wells Fargo's discriminatory practices because she spent time and money pursuing her Application that similarly situated White Americans would not have been required to expend.

## CLASS ACTION ALLEGATIONS

**50.** **Class Definition**: Plaintiff brings this action pursuant to Fed R. Civ. P. 23 on behalf of a Class of similarly situated individuals and entities, defined as follows:

> All Black Americans (1) who submitted applications to obtain or refinance a mortgage loan with respect to residential real property, (2) who were qualified to receive mortgage loans from Wells Fargo, and (3) whose applications were either (a) denied by Wells Fargo, (b) never completed, due to Wells Fargo's demands for documentation or information that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (c) granted by Wells Fargo, but on less favorable terms than a similarly situated White borrower would have received.

*Ebo, et al. v. Wells Fargo Bank, N.A., Class Action Complaint, p.10*

Excluded from the Class are: (1) the Judge to whom this case is assigned and the Judge's immediate family members; (2) Defendant, Defendant's agents, Defendant's employees, and other affiliates of Defendant; (4) any person(s) who executes and files a timely request for exclusion from the Class; (5) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (6) the legal representatives, successors and assigns of any such excluded person.

**51.**     **Numerosity and Ascertainability**: Upon information and belief, the Class is comprised of more than 40 members.  This conclusion is reasonable because Wells Fargo is one of the largest mortgage providers in the country, and, based on publicly available data collected by the CFPB in accordance with the HMDA, received over 7,000 Applications for mortgage loans from Black Americans in 2019.  The Class is so numerous that joinder of all members is impractical.  The exact number of members in the Class is presently unknown, can only be ascertained through discovery, and can easily be identified through Defendant's records or by other means.

**52.**     **Commonality and Predominance**: All members of the Class have been subject to and affected by a uniform course of conduct: specifically, Wells Fargo's pattern and practice of racial discrimination against Black Americans.  Accordingly, there are questions of law and fact common to the proposed Class that predominate over any individual questions.

**53.**     **Typicality**: Plaintiff's claims are typical of the claims of the Class. As previously explained, Plaintiff, like all Class members, was subject to Wells Fargo's pattern and practice of racial discrimination against Black Americans, and did not receive a mortgage loan from Wells Fargo on terms that would have been the same as a similarly situated White Americans.  Therefore, Plaintiff and Class members were all harmed in the same way, and incurred damages as a result.

**54.**     **Adequacy**: Plaintiff will adequately represent the interests of the Class and does not have adverse interests to the Class. If individual Class members prosecuted separate actions it may create a risk

of inconsistent or varying judgments that would establish incompatible standards of conduct. A class action is the superior method for the quick and efficient adjudication of this controversy. Plaintiff's counsel has extensive experience litigating consumer class actions.

**COUNT I**
**Violations of the Equal Credit Opportunity Act**
**15 U.S.C. §§ 1691, *et seq*.**
**On Behalf of Plaintiff and the Class**

55.     Plaintiff repeats and realleges paragraphs 1-54 with the same force and effect as though fully set forth herein.

56.     The ECOA makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction…on the basis of race [or] color." 15 U.S.C. § 1691(a)(1).

57.     As one of the largest mortgage lenders in the country, Defendant "regularly extends, renews, or continues credit" and/or "regularly arranges for the extension, renewal, or continuation of credit." 15 U.S.C. § 1691a(e).  Therefore, Defendant is a "creditor," as that term is defined by the ECOA.

58.     Plaintiff and Class members each applied "for an extension, renewal, or continuation of credit" from Wells Fargo.  15 U.S.C. § 1691a(b).  Therefore, Plaintiff and Class members are each an "applicant," as that term is defined by the ECOA.

59.     Pursuant to 15 U.S.C. § 1691e, any creditor who violates the ECOA "shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class."  15 U.S.C. § 1691e(a).   The ECOA further provides for recovery of attorneys' fees incurred in connection with such a claim.  15 U.S.C. § 1691e(d).

60.     In general, to state a claim under the ECOA, a plaintiff must allege that: "(1) [she] was a member of a protected class, (2) [she] applied for credit from the defendant, (3) [she] was qualified for credit but the defendant denied [her] credit application, and (4) the defendant continued to engage in the

type of transaction in question with other parties with similar qualifications." *E.g.*, *Germain v. M & T Bank Corp.*, 111 F.Supp.3d 506, 526 (S.D.N.Y. 2015) (internal alterations and quotations omitted).

**61.**     Importantly, however, ECOA "protection is not limited to those applicants who were rejected." *E.g.*, *Wilson v. Toussie*, 260 F.Supp.2d 530, 541 (E.D.N.Y. 2003) (quoting *Hargraves v. Capital City Mortg. Corp.*, 140 F.Supp.2d 7, 23 (D.D.C. 2000)). Accordingly, a plaintiff can also state a claim under the ECOA where, as a result of racial discrimination, a creditor's "investigation procedures" are more onerous, or a borrower receives approval for a loan, but on less favorable terms.  *E.g.*, *Hargraves*, 140 F.Supp.2d at 23; *Phillips v. Better Homes Depot, Inc.*, 2003 WL 25867736, at *22 (E.D.N.Y. 2003).

**62.**     Plaintiff and Class members are all Black Americans who submitted Applications for credit from Defendant to obtain or refinance mortgage loans secured by residential real property.

**63.**     As a direct and proximate result of Wells Fargo's pattern and practice of racial discrimination against Black Americans, Plaintiff's and Class members' Applications were either (1) denied by Wells Fargo, despite the fact that a similarly situated White applicant would have been approved, (2) never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (3) granted by Wells Fargo, but on significantly less favorable terms than a similarly situated White borrower would have received.

**64.**     Plaintiff and Class members were harmed by Defendant's violations of the ECOA in one or more of the following ways: (1) they were unable to obtain or refinance mortgage loans to which they were qualified; (2) they were unable to obtain or refinance mortgage loans on the same (more favorable) terms as White Americans; (3) they were unable to purchase real property that similarly situated White

Americans would have been able to purchase; and (4) they spent time and money pursuing mortgage loans that similarly situated White Americans would not have been required to expend.

**65.**     Plaintiff, individually, and on behalf of the Class, seeks recovery of actual damages, punitive damages, and attorneys' fees and costs incurred connection with Defendant's violations of the ECOA.

## COUNT II
### Violations of the Fair Housing Act
### 42 U.S.C. §§ 3601, *et seq.*
### On Behalf of Plaintiff and the Class

**66.**     Plaintiff repeats and realleges paragraphs 1-54 with the same force and effect as though fully set forth herein.

**67.**     The FHA makes it "unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color…or national origin." 42 U.S.C. § 3605(a).

**68.**     As one of the largest mortgage lenders in the country, Defendant's business includes engaging in residential real estate-related transactions because it regularly makes loans and provides financial assistance in connection with "purchasing, constructing, improving, repairing, or maintaining a dwelling," and those loans are "secured by residential real estate."   42 U.S.C. § 3605(b).   Therefore, Defendant is subject to the FHA's anti-discrimination provisions.

**69.**     42 U.S.C. § 3613 provides for a private right of action against any person who violates the FHA. The FHA further provides for recovery of attorneys' fees incurred in connection with such a claim. 42 U.S.C. § 3613(c)(2).

*Ebo, et al. v. Wells Fargo Bank, N.A., Class Action Complaint, p.14*

**70.**     In general, to state a claim under the FHA, "plaintiffs who allege disparate treatment must show: (1) that they are members of a protected class; (2) that they sought and were qualified to rent or purchase the housing; (3) that they were rejected; and (4) that the housing opportunity remained available to other renters or purchasers." *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 574 (E.D.N.Y. 2010) (internal quotations omitted).

**71.**     However, like claims under the ECOA, racial discrimination need not result in an outright denial of an application for credit for purposes of stating a claim under the FHA; any less favorable outcome is sufficient. *E.g.*, *Hargraves*, 140 F.Supp.2d at 20-22.

**72.**     Plaintiff and Class members are all Black Americans who submitted Applications for credit from Defendant to obtain or refinance mortgage loans secured by residential real property.

**73.**     As a direct and proximate result of Wells Fargo's pattern and practice of racial discrimination against Black Americans, Plaintiff's and Class members' Applications were either (1) denied by Wells Fargo, despite the fact that a similarly situated White applicant would have been approved, (2) never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (3) granted by Wells Fargo, but on significantly less favorable terms than a similarly situated White borrower would have received.

**74.**     Plaintiff and Class members were harmed by Defendant's violations of the FHA in one or more of the following ways: (1) they were unable to obtain or refinance mortgage loans to which they were qualified; (2) they were unable to obtain or refinance mortgage loans on the same (more favorable) terms as White Americans; (3) they were unable to purchase real property that similarly situated White Americans would have been able to purchase; and (4) they spent time and money pursuing mortgage loans that similarly situated White Americans would not have been required to expend.

**75.**     Plaintiff, individually, and on behalf of the Class, seeks recovery of actual damages, punitive damages, and attorneys' fees and costs incurred connection with Defendant's violations of the FHA.

**COUNT III**
**Violations of Section 1981**
**42 U.S.C. § 1981**
**On Behalf of Plaintiff and the Class**

**76.**     Plaintiff repeats and realleges paragraphs 1-54 with the same force and effect as though fully set forth herein.

**77.**     Under Section 1981, "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts," which "includes the making, performance, modification, and termination of contracts." 42 U.S.C. § 1981(a)-(b).  The rights guaranteed by Section 1981 "are protected against impairment by nongovernmental discrimination" (42 U.S.C. § 1981(c)), and are enforceable through 42 U.S.C. § 1988, which provides for the recovery of attorney fees' and costs incurred in connection with a successful action under Section 1981 (42 U.S.C. § 1988(b)).

**78.**     "To establish a claim under [Section] 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (*i.e.*, make and enforce contracts, sue and be sued, give evidence, etc.)."  *E.g.*, *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2nd Cir. 1993).

**79.**     Plaintiff and Class members are all Black Americans who submitted Applications for credit from Defendant to obtain or refinance mortgage loans secured by residential real property.  In other words, Plaintiff and Class members are each a member of a racial minority who sought to engage in the making of a contract.

**80.** As a direct and proximate result of Wells Fargo's pattern and practice of racial discrimination against Black Americans, Plaintiff's and Class members' Applications were either (1) denied by Wells Fargo, despite the fact that a similarly situated White applicant would have been approved, (2) never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (3) granted by Wells Fargo, but on significantly less favorable terms than a similarly situated White borrower would have received.

**81.** Accordingly, Defendant denied Plaintiff and Class members the same ability to make and enter into contracts "as is enjoyed by White citizens" of the United States.  42 U.S.C. § 1981(a).

**82.** As evidenced by the pervasiveness of Defendant's racial discrimination in its lending practices, Defendant intended to discriminate against Plaintiff and Class members on the basis of race.

**83.** Plaintiff and Class members were harmed by Defendant's violations of Section 1981 in one or more of the following ways: (1) they were unable to obtain or refinance mortgage loans to which they were qualified; (2) they were unable to obtain or refinance mortgage loans on the same (more favorable) terms as White Americans; (3) they were unable to purchase real property that similarly situated White Americans would have been able to purchase; and (4) they spent time and money pursuing mortgage loans that similarly situated White Americans would not have been required to expend.

**84.** Plaintiff, individually, and on behalf of the Class, seeks recovery of actual damages, punitive damages, and attorneys' fees and costs incurred connection with Defendant's violations of Section 1981.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff IFEOMA EBO, individually, and on behalf of the Class, prays for an Order as follows:

A.     Finding that this action satisfies the prerequisites for maintenance as a class action and certifying the Class defined herein;

B.     Designating Plaintiff as representative of the Class and her undersigned counsel as Class Counsel;

C.     Entering judgment in favor of Plaintiff and the Class and against Defendant as to each and every Count, as applicable;

D.     Awarding Plaintiff and the Class actual damages, statutory damages, and punitive in an amount to be determined at trial as to each and every Count, as applicable;

E.     Awarding Plaintiff and the Class attorneys' fees and costs, including interest thereon, as allowed or required by law, as to each and every Count, as applicable; and

F.     Granting all such further and other relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts so triable.

DATED: April 26, 2022

*/s/ Alisa Adams*
Alisa Adams (SBN 277697)
Adams Law Practice, LLC
P.O. Box 1834
Cleveland, OH 44103
(216) 926-0065 telephone
Email: aadams@advocateattorneys.com

Marc E. Dann (*pro hac vice* anticipated)
Brian D. Flick (*pro hac vice* anticipated)
DANNLAW
15000 Madison Avenue
Lakewood, OH 44107
(216) 373-0539 telephone
(216) 373-0536 facsimile
*notices@dannlaw.com*

Javier L. Merino (*pro hac vice* anticipated)
DANNLAW
1520 U.S. Highway 130, Suite 101
North Brunswick, NJ 08902
(201) 355-3440 telephone
(216) 373-0536 e-facsimile
notices@dannlaw.com

Thomas A. Zimmerman, Jr. (*pro hac vice* anticipated)
*tom@attorneyzim.com*
Matthew C. De Re (*pro hac vice* anticipated)
*matt@attorneyzim.com*
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
(312) 440-4180 facsimile

*Attorneys for Plaintiff and the Putative Class*

# EXHIBIT D

1  Dennis J. Stewart, CA Bar No. 99152
2  **GUSTAFSON GLUEK PLLC**
   600 B Street, Suite 1700
3  San Diego, CA 92024QW
   Tel.: (612) 333-8844
4  Fax: (612) 339-6622
5  dstewart@gustafsongluek.com
   [Additional Counsel on Signature Page]
6  Attorneys for Plaintiffs and Others Similarly Situated

7

8                    **UNITED STATES DISTRICT COURT**

9                  **NORTHERN DISTRICT OF CALIFORNIA**

10                       **SAN FRANCISCO DIVISION**

11

| | |
|---|---|
| **ELRETHA PERKINS and LARONICA JOHNSON**, individually and on behalf of all others similarly situated, | Case No. 3:22-cv-3455 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| vs. | **(1) Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq.** |
| **WELLS FARGO, N.A.**, a Delaware Corporation; **WELLS FARGO HOME MORTGAGE, INC.**, a Delaware Corporation, | **(2) Violation of the Fair Housing Act, 42 U.S.C. § 3601, et seq.**<br>**(3) Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, et seq.** |
| Defendants. | **(4) Violation of the California Unfair Competition Law, Cal. Bus. & Pro. Code §17200, et seq.** |
| | **JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT - 1

Plaintiffs Elretha Perkins and Laronica Johnson, on behalf of themselves and all others similarly situated, bring this action against Defendants Wells Fargo, N.A. and Wells Fargo Home Mortgage (The "Defendants" or "Wells Fargo") to address the substantial injuries they and all others similarly situated sustained arising from Wells Fargo's illegal discrimination, in violation of the Equal Credit Opportunity Act, the Fair Housing Act, the Civil Rights Act of 1866, and the California Unfair Competition Law.

## I. NATURE OF THE ACTION

1.      Homeownership in the United States of America is a central tenet of the American Dream.  For millions of Americans, homeownership is the foundation of family, community, and human dignity.

2.      By design, however, federal agencies and financial institutions in charge of making homeownership a reality have long placed African Americans and other racial minorities at a structural disadvantage.

3.      Soon after Congress passed the National Housing Act of 1934 (NHA) into law, federal agencies, and financial institutions responsible for fulfilling the NHA's promise drew maps across the United States, placing "greenlines" around neighborhoods that were predominantly white Anglo-Saxon and Northern European, and "redlines" around neighborhoods that were predominantly African American and other racial minority populations.

4.      This discriminatory practice of "redlining" caused African American home loan applicants to be denied more often than their similarly situated white counterparts, to receive less favorable terms than their similarly situated white counterparts, and to receive inferior treatment as part of the home loan application process than their similarly situated white counterparts.

5.      In 1968, Congress enacted the Fair Housing Act, seeking to, among other things, end the discriminatory practice of redlining.

6.      Despite decades of efforts since the Fair Housing Act, recent data from federal housing agencies indicate that African Americans and other racial minorities, of worthy credit, continue to face discrimination in access to, and quality of, home loans when compared to their similarly situated white counterparts.  Among those who continue to contribute to this injustice is Wells Fargo.

7.      Indeed, data reviewed reveals that in 2020, Wells Fargo rejected a majority of completed home loan applications submitted by African American homeowners as compared to similarly situated white applicants.[1] Moreover, the application process designed by Wells Fargo is more difficult for African American applicants to complete, resulting in 27% of all African American applicants to withdraw their application before completing it.[2]

8.      Wells Fargo has a long history of discrimination against African Americans and other racial minorities in the home loan arena.  For example, in 2011, a jury found Wells Fargo guilty of systematically discriminating against minority home buyers by using a computer software in part to identify minority homeowners which resulted in them paying more for their home loans than white borrowers.  *See Opal Jones, et. al v. Wells Fargo Bank, N.A., et al.*, Case No. BC337821 (Los Angeles Superior Court. 2011), *rev'd on other grounds*, Case No. B243333, 2015 WL 662081.  The following year, a United States Department of Justice (DOJ) Civil Rights Division investigation found that in more than 34,000 cases, Wells Fargo charged Black and Hispanic customers higher fees and interest rates than white customers with similar credit profiles.[3]  Despite

---

[1]  https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing
[2] *Id.*
[3]  *See Justice Department Reaches Settlement with Wells Fargo Resulting in More Than $175 Million in Relief for Homeowners to Resolve Fair Lending Claims* (DOJ Release) July 12, 2012, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief (accessed April 10, 2022).

CLASS ACTION COMPLAINT - 3

having to be held accountable for its discriminatory conduct many times before, Wells Fargo continues its pattern and practice of discrimination against non-white borrowers.

9.     Starting in at least 2018, and continuing to the present, Wells Fargo has discriminated against African Americans, and other racial minorities, by deploying a modern home loan scheme that is tantamount to 21st century redlining.

10.     Wells Fargo deploys this discriminatory scheme in two critical ways.  First, Wells Fargo uses a computer system which deploys automated algorithms and artificial intelligence-like machine learning as part of its home loan decisions.  These algorithms and artificial intelligence machine learning technologies—like the redlining maps of the 1930's—select geographic areas that are predominantly African American (and other racial minorities) and subject those geographies and persons within those geographies to adverse treatment as part of home loan decisions.

11.     For example, Wells Fargo's algorithm labels certain neighborhoods that are predominantly Black as neighborhoods ineligible for rapid loan processing, a service provided to similarly situated white applicants.  As a result, Wells Fargo loan personnel have told African American loan applicants who live in predominantly Black neighborhoods that they would not receive the same rapid application process as their white counterparts.[4]

12.     Second, Wells Fargo applies several pretextual actions in the home loan application process which are specifically targeted at non-white borrowers.  These actions include, but are not limited to, (i) providing African American applicants with an inferior and slower valuation process for homes in predominantly Black neighborhoods, (ii) placing loan officers who were able to process applications significantly farther away from Black applicants than their white

---

[4]   *See Wells Fargo Rejected Half Its Black Applicants in Mortgage Refinancing Boom (bloomberg.com)*, www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/, (accessed March 28, 2022).

counterparts, and (iii) delaying processing of applications from African Americans, when compared to their similarly situated white counterparts.

13.     Based on the data, the disparate impact of Wells Fargo's discriminatory scheme is quite clear.  A white applicant seeking to refinance their home loan, who earned between $0 and $63,000 per year were more likely to have their home loan financing application approved by Wells Fargo than a Black applicant seeking to refinance their home loan, who earned between $120,000 and $168,000 per year.[5]  As a result of Wells Fargo's barrage of pretextual actions aimed at deterring Black applicants, more than one-quarter of all Black homeowners who began an application to finance their home loan through Wells Fargo did not finish their application.[6]

14.     Wells Fargo was the only major lender in the United States of America that approved a smaller share of refinancing applications from Black Americans in 2020 than it had in 2010.[7]

15.     Notably, Wells Fargo was the *only* major lending institution in the United States to reject the majority of Black applicants seeking to refinance their homes.  Wells Fargo's conduct is especially pernicious with regards to refinancing—as opposed to a new loan application—because with a refinance, the applicant has already established an ability to pay a mortgage with a *higher* interest rate than would be secured with a refinanced loan.

16.     Wells Fargo's discrimination is even more stark when its treatment of Black home loan applicants is compared to other financial institutions.

17.     By way of example, during the same time period, JP Morgan Chase & Co. approved 81% of Black applicants seeking to refinance their home loan.  Bank of America Corp. approved

---

[5]     *Id.*
[6]     *Id.*
[7]     *Id.*

CLASS ACTION COMPLAINT - 5

over two-thirds of Black applicants; and Rocket Mortgage approved nearly 8-in-10 Black applicants.[8] Overall, other comparable lenders approved 71% of Black applicants seeking to refinance their home loans.[9] Meanwhile, Wells Fargo approved only 47% of Black applicants.

18.     One of those many Americans impacted by Wells Fargo's discriminatory scheme is Plaintiff Elretha Perkins. Ms. Perkins is a successful small business owner with a 40+ year career in North Carolina's childcare and transportation industries. Ms. Perkins is a business leader, a graduate of North Carolina A&T State University, a prominent Historically Black College and University ("HBCU"), and leader within her local African American community. In addition to her personal successes, she has raised extremely successful children who are active in Georgia's film and entertainment industry.

19.     Ms. Perkins has consistently made payments on her home loan, originally financed by Wells Fargo. Ms. Perkins' creditworthiness is evidenced by her 720-credit score. Yet, despite her successful 40+ career and clear creditworthiness, when Ms. Perkins sought to refinance an equity line of credit, Wells Fargo subjected her to delay tactics and overt acts of discrimination.

20.     Ms. Perkins faced a multitude of pretextual obstacles and actions by Wells Fargo, including mandating that in order for her to refinance her equity line of credit she would have to apply for a modification under a "hardship" program, as if the loan was in distress, despite Ms. Perkins not facing any financial hardship or need to modify the loan under a loss mitigation program. Wells Fargo also required her to speak with third-party entities to simply make payments on her equity line of credit. Ms. Perkins was given the runaround to such an extent that she has

---

[8]   *See Wells Fargo refinancing loan approvals lower for Blacks (Philadelphia Tribune),* www.phillytrib.com/news/business/wells-fargo-refinancing-loan-approvals-lower-for-blacks/article_379b95bd-d8a7-5402-abb9-d569c68bbbc6.html, (accessed March 26, 2022).
[9]   *See Wells Fargo Rejected Half Its Black Applicants in Mortgage Refinancing Boom (bloomberg.com),* *www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/, (accessed March 28, 2022)*

had to submit the same tax and income documents multiple times only to face more delays from Wells Fargo in processing her refinancing request.

21. Another American impacted by Wells Fargo's discriminatory scheme is Plaintiff Laronica Johnson. Ms. Johnson is a caring and committed educator. Ms. Johnson received her bachelor's degree from Texas Southern University and her master's degree from Prairie View A&M University, both HBCU's. Today, Ms. Johnson works to ensure that all children receive equal treatment and access to education as a special education teacher.

22. Ms. Johnson has consistently made payments on her home loan. Ms. Johnson has never been late on her current home mortgage payment. Her creditworthiness is evidenced by her 680-credit score.

23. Despite her creditworthiness, Wells Fargo provided a series of pretextual reasons in discriminating against Ms. Johnson. For example, contrary to the purpose of borrowers refinancing their home mortgage loans, Wells Fargo personnel told Ms. Johnson that refinancing did not make sense in her case and would result in her mortgage and/or interest rate increasing. In addition, despite approving many other similarly situated white applicants, Wells Fargo personnel told Ms. Johnson that refinancing was "just not worth it." Between 2019 and 2022, Ms. Johnson has applied three times to refinance her home mortgage loan with Wells Fargo. Wells Fargo denied Ms. Johnson each time.

24. The experiences of Ms. Perkins and Ms. Johnson mirror the experiences of so many Black and Brown Americans who have been damaged by Wells Fargo's systemic discrimination. Wells Fargo's discriminatory conduct violates the commercial and civil rights of Class members and has caused hundreds of millions of dollars in damages to the Class. Individually, and as Class Representatives, Ms. Perkins and Ms. Johnson bring this action against Wells Fargo to restore the

Class any amounts which they otherwise would have been entitled to under law, together with any other equitable and remedial relief as the Court may deem appropriate.

## II.  JURISDICTION AND VENUE

25.      Plaintiffs bring this action under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*, the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981, to secure declaratory and  injunctive relief, statutory damages, costs of suit, and reasonable attorneys' fees for the injuries that Plaintiffs and members of the Class sustained as a result of Defendants' violations.

26.      This Court has federal question jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1343, regarding Plaintiffs' claims arising under the Equal Credit Opportunity Act, 15 U.S.C. §  1691 *et seq*, the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

27.      This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a), regarding Plaintiffs' claims arising under California's Unfair Competition Law, Cal. Bus. And Pro. Code § 17200 *et seq.*, because this claim is so related to the federal Equal Credit Opportunity Act, the Fair Housing Act of 1968, and the Civil Rights Act of 1866 claims that they form part of the same case or controversy under Article III of the United States Constitution.

28.      This Court has personal jurisdiction over Defendants because, among other things, they: (a) transacted business throughout the United States, including in this District; (b) the illegal discrimination alleged took place in this District; (c) had maintained substantial aggregate contacts with the United States as a whole, including in this District; (d) had substantial contact in various states in the United States, including in this District; and (e) directed its illegal discrimination and had direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons

CLASS ACTION COMPLAINT - 8

residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

29.     This District is the appropriate venue under 28 U.S.C. §1391(c), because during the Class Period, Defendants transacted business in this District, and a substantial part of the events giving rise to the Plaintiffs' claims took place in this District.

### III.  PARTIES

**A.  Plaintiffs**

*Elretha Perkins*

30.     Plaintiff Elretha Perkins is a Black female homeowner with a 720-credit score, and is a natural person and citizen of Eden, North Carolina.  Ms. Perkins owns homes in both Eden, North Carolina and Dacula, Georgia.  Ms. Perkins' Dacula, Georgia home was financed through Wells Fargo.  Ms. Perkins has been a Wells Fargo customer for nearly 20 years.

*Laronica Johnson*

31.     Plaintiff Laronica Johnson is a Black female homeowner with a 680-credit score, and is a natural person and citizen of Houston, Texas.  Ms. Johnson owns a home in Houston, Texas.  Ms. Johnson unsuccessfully sought to refinance her home mortgage loan through Wells Fargo on three separate occasions between 2019 and 2022.

**B.  Defendants**

*Wells Fargo, N.A.*

32.     Defendant Wells Fargo, N.A. a publicly traded, global financial services firm and a Fortune 500 corporation incorporated in the State of Delaware, with its principal place of

business in the State of California.   As of 2020, Defendant Wells Fargo N.A. has assets of approximately $1.9 trillion.   Among other things, Wells Fargo, N.A. is a mortgage lender.

*Wells Fargo Home Mortgage*

33.   Defendant Wells Fargo Home Mortgage is a home lending company that is one of Wells Fargo's various corporate entities.   Defendant Wells Fargo Home Mortgage originates and services approximately $300 billion worth of loans per year.   Wells Fargo Home Mortgage is incorporated in the State of Delaware and has its principal place of business in the State of Iowa.

## IV.  FACTUAL ALLEGATIONS

### A.     Access to Home Loan Refinancing Hits Record Highs

34.   Refinancing a home loan provides homeowners the ability to reduce the interest on their home loan payments, to "cash out" and capture the additional equity their homes have gained since the previous financing and may permit home loan borrowers to save money on the principal of their loan.

35.   Because of historically low interest rates, millions of Americans have applied to refinance their homes over the last few years.   These homeowners have refinanced over $5 trillion in mortgage value.

### B.     Wells Fargo's Discriminatory Scheme

36.   Wells Fargo executes its discriminatory scheme in two key ways.   First, Wells Fargo utilizes a computer system with a discriminatory automated algorithm and artificial intelligence machine learning program to make home loan decisions.   These discriminatory algorithms and artificial intelligence machine learning technologies—like the redlining maps of the 1930's—select geographic areas that are predominantly Black, and then either deny home loan

opportunities to Black applicants or provide inferior terms and processing than the terms and processing received by similarly situated white applicants.  For example, Wells Fargo's algorithms and artificial intelligence machine identified geographic neighborhoods eligible for quick evaluations of refinancing applicants.  This algorithm consistently labeled predominantly Black neighborhoods *ineligible* for rapid processing.

37.     Second, Wells Fargo employed a series of pretextual actions that are instrumental to further its discriminatory scheme.

38.     One pretextual action was that Wells Fargo placed its loan officers significantly farther away from Black applicants to reduce the amount and frequency of home loan applications from Black applicants.

39.     Another pretextual action was Wells Fargo delaying the home loan valuation process for Black applicants as well as delaying the valuation process of homes located in predominantly Black neighborhoods.   The valuation process is critical to any home loan and home sale transaction.   By deploying this pretextual action, Wells Fargo treated Black applicants differently than their similarly situated white counterparts.

40.     A third pretextual action was the intentional delay in the processing of applications from African Americans, when compared to their similarly situated white counterparts.  Wells Fargo regularly approved refinancing applications of non-Black homeowners in just weeks but took significantly longer to approve the applications of Black homeowners, sometimes taking months.

C.     **Data Shows Wells Fargo Disparately Treated Its Black Home Loan Applicants.**

41.     The impact of Wells Fargo's discriminatory scheme is also evident from the data.

42.     In 2020, Wells Fargo approved Black homeowner refinancing applications at a rate far lower than that of *any* other major lender in the United States of America.

43.     For instance, JP Morgan Chase & Co. approved 81% of Black applicants seeking to refinance their home loans.  Bank of America Corp. approved over two-thirds of Black applicants; and Rocket Mortgage approved nearly 8-in-10 Black applicants.

44.     Overall, other comparable lenders approved 71% of Black applicants seeking to refinance their home loans, whereas Wells Fargo approved only 47%.

**D.     Plaintiffs Elretha Perkins and Laronica Johnson Were Harmed by Wells Fargo's Race-Based Discrimination.**

45.     Plaintiff Elretha Perkins purchased her home in Dacula, Georgia in 2006, through a Wells Fargo home loan for $470,000 ("Home Loan").  Today, Ms. Perkin's Dacula home is worth approximately $630,000.  As part of this home loan approval, but without Ms. Perkins knowledge, Wells Fargo added a second home equity loan ("Home Equity Loan") to Ms. Perkins lending package.  Ms. Perkins consistently made payments to Wells Fargo from 2006 through 2018.

46.     In 2018, Ms. Perkins' Home Loan contract was moved to a third-party mortgage servicer, Specialized Loan Services.  Ms. Perkins' Home Equity Loan, however, continued to be serviced by Wells Fargo.  Ms. Perkins began making home loan payments to Specialized Loan Services, and Home Equity Loan payments to Wells Fargo.

47.     In 2021, Ms. Perkins sought to refinance her Home Equity Loan through Wells Fargo.  Because of her high credit score and history with Wells Fargo, Ms. Perkins believed refinancing her Home Equity Loan would be easy.  She was sadly mistaken.

48.     For example, upon initially seeking to refinance her Home Equity Loan, Wells Fargo repeatedly asked Ms. Perkins to resubmit paperwork because Wells Fargo personnel claimed that the information she had submitted was either not received, missing, or somehow lost.  Wells Fargo personnel also took weeks or months to respond to Ms. Perkins' inquiries about the status of her Home Equity Loan refinance request.

49.     During this time, Wells Fargo mandated that for Ms. Perkins to refinance her Home Equity Loan she would have to apply for a loan modification classifying the loan with "Hardship" status, despite Ms. Perkins facing no financial hardship or requesting any hardship status.  Wells Fargo then advised Ms. Perkins that the only way for her to be considered for a Home Equity Loan refinance would be for her to fill out paperwork seeking mortgage assistance through loss mitigation.

50.     Although Ms. Perkins was not under any financial hardship, she very much desired to refinance her Home Equity Loan so she acquiesced to Wells Fargo's request and filled out hardship paperwork.  Despite following Wells Fargo's directions for nearly 12 months, including submitting paperwork for mortgage assistance and "hardship" status that Ms. Perkins did not need, Wells Fargo has constructively denied her home loan refinance request.

51.     Plaintiff Laronica Johnson purchased her home in Houston, Texas in 2016, for approximately $163,000.  Her home is currently worth approximately $261,000.  In 2018, Wells Fargo notified Ms. Johnson that it would take over servicing her mortgage, which was originated with a third-party, TexMex Mortgage Company.

52.     In July 2019, Ms. Johnson first applied to refinance her home mortgage loan through Wells Fargo.  Contrary to the entire purpose of refinancing a home mortgage, Wells Fargo personnel told Ms. Johnson that refinance would cost her *more* money than her initial mortgage

CLASS ACTION COMPLAINT - 13

agreement.  Following this illogical explanation, Wells Fargo personnel told Ms. Johnson that it "just did not make sense" for Ms. Johnson to obtain a home loan refinance at this time.

53.     In October 2020, Ms. Johnson again applied to refinance her home mortgage loan through Wells Fargo.  This time, Wells Fargo gave Ms. Johnson the runaround, farcically explaining that it just would not be "worth it" for her to refinance her home mortgage loan and that based upon the application she submitted, it did not look like refinancing would result in a lower interest rate.  When Ms. Johnson inquired into why, especially in light of her 680-credit score, Wells Fargo personnel relied on a nonsensical excuse that refinancing was simply not in Ms. Johnson's best interest.

54.     In February 2022, Ms. Johnson applied to refinance her home mortgage loan through Wells Fargo for a third time.  During this attempt, Wells Fargo personnel told Ms. Johnson that refinancing her home mortgage loan, which is typically sought for the purpose of reducing monthly payments for a borrower, would result in Ms. Johnson paying an additional $10,000 on her mortgage.  When Ms. Johnson explained to Wells Fargo that such an increase does not make sense in light of her knowing others who had been approved for refinancing, Wells Fargo continued the denial.

55.     In causing injury to the Plaintiffs and the members of the Class, Defendants have acted intentionally, maliciously, and with willful, callous, wanton, and reckless disregard for the Plaintiffs' and Class members' rights.

## V.  CLASS ACTION ALLEGATIONS

56.     Plaintiffs Elretha Perkins and Laronica Johnson bring this action on behalf of themselves and all others similarly situated as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Class:

All Black persons, as well as other racial minorities, in the United States of America, who from January 1, 2018 through the Present (the "Class Period"), submitted, or attempted to submit, an application to finance or refinance their home mortgage through the Defendants that was (i) processed at a rate slower than that of the average processing time of applications made by non-Black or other non-racial minority applicants; or (ii) whose application was denied; or (iii) whose resulting refinanced loans were made at higher interest rates as compared to similarly situated non-Black applicants.

57.     Plaintiffs and Class members reserve the right to amend the Class definitions as discovery proceeds and to conform to the evidence.  Excluded from the Class are Defendants and their employees, affiliates, parent entities, subsidiaries, and co-conspirators, whether or not named in this complaint, and the United States Government.

58.     The exact size of the Class is unknown at this time because the information is in the exclusive control of Defendants.  However, upon information and belief and due to the nature of commerce involved, there are thousands of Class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

59.     The Class is readily ascertainable by business records and other data from Defendants.

60.     Plaintiffs' claim is typical of the claims of the members of the Plaintiff Class because Plaintiffs and members of the Class all submitted applications for home loan refinancing to Defendants, and therefore Plaintiffs' claim arises from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

61.     Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs' interests are aligned with, and not antagonistic to, the Class.

62.     Plaintiffs has retained counsel competent and experienced in class action litigation.

63.     Numerous questions of law and fact common to each Class member exist that predominate over questions affecting only individual members, including, but not limited to:

CLASS ACTION COMPLAINT - 15

**A.** Whether Defendants discriminated against Plaintiffs and the Class;

**B.** Whether such discrimination is a violation of the Equal Credit Opportunity Act; the Fair Housing Act; the Civil Rights Act of 1866; and California's Unfair Competition Law;

**C.** Whether Defendants' acts, policies, and practices have a disparate impact on the basis of race, color, and/or national origin with respect to credit transactions, as described herein, on the basis of race;

**D.** Whether Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges on the basis of race, color, and/or national origin in connection with the making of residential real estate-related transactions;

**E.** The natural persons involved in the alleged discrimination, and their acts in furtherance of the illegal practice;

**F.** The period of time the alleged discrimination existed;

**G.** Whether and the extent to which Defendants' discrimination resulted in increased interest and/or principal amounts incurred by Plaintiffs and Class Members above natural market levels;

**H.** The nature and scope of the injunctive relief required to remedy continuous illegal discrimination;

**I.** The measure of damages suffered by Plaintiffs and the Class Members.

64.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical.  Prosecution as a class action will eliminate the possibility of repetitious litigation.

CLASS ACTION COMPLAINT - 16

The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation.  Absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system.  Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.  The Class is readily definable and is one for which records likely exist in the files of Defendants.

65.     Defendants' actions are ongoing and without Court intervention, will continue unabated.  Accordingly, Plaintiffs seek to represent the Class under Rule 23(b)(2) for an award of declaratory and injunctive relief finding the Defendants' discriminatory actions improper and enjoining the Defendants from continuing their acts of discrimination as described herein.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT
### 15 U.S.C. § 1691, *et seq.*

66.     Plaintiffs incorporate by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

67.     The Equal Credit Opportunity Act makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

68.     The Equal Credit Opportunity Act applies to all applications for financing, including applications for refinancing like those the Plaintiffs, and all others similarly situated, sought.  Plaintiffs applied for credit by seeking to refinance their home loans.

CLASS ACTION COMPLAINT - 17

69.     Defendants are creditors because they regularly extend, renew, and continue the issuance of credit.

70.     Defendants' denial of home loan refinance applications based on race, and Defendants' perpetual delays, roadblocks, and other pretextual actions, constitute race-based discrimination and are unlawful under the Equal Credit Opportunity Act.

71.     Defendants' acts, policies, and practices are intentionally discriminatory on the basis of race, color, and/or national origin with respect to aspects of credit transactions, constitute redlining, and violate 15 U.S.C. § 1691(a)(1).

72.     Defendants' acts, policies, and practices have a disparate impact on the basis of race, color, and/or national origin with respect to aspects of credit transactions in violation of 15 U.S.C. § 1691(a)(1).

73.     Defendants have maintained these acts, policies, and practices continuously and without material change since at least 2018, and they constitute a continuing violation of the Equal Credit Opportunity Act.

74.     Plaintiffs and all other similarly situated were harmed by Defendants' conduct, including, but not limited to, harm in the form of higher interest rates paid while applications were pending, higher interest rates paid upon a delayed approval, an inability to secure a "cash out" refinance loan, an inability to reduce the principal on a home loan payment, or from a denied application.

75.     On behalf of themselves, and all others similar situated, Plaintiffs requests the relief set forth below.

CLASS ACTION COMPLAINT - 18

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE FAIR HOUSING ACT OF 1968**
**42 U.S.C. § 3601, *et seq.***

76.     Plaintiffs incorporate by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

77.     The Fair Housing Act makes it illegal to discriminate against any designated class of individuals in a residential real estate transaction.

78.     Plaintiffs and all others similarly situated sought to engage in a residential real estate transaction with the Defendants.

79.     Plaintiffs and all others similarly situated are African Americans, or other racial minorities, and therefore members of a protected class under the Fair Housing Act.

80.     Defendants refused to transact business with Plaintiffs and all others similarly situated by (i) denying Black (or other racial minority) home loan applicants, of worthy credit, while approving home loan applications from their similarly situated white counterparts; (ii) approving Black (or other racial minority) home loan applicants, but with inferior terms than terms offered to similarly situated white home loan applicants; (iii) refusing to approve refinancing applications on the same window of time as applications made by other parties with similar qualifications that were not members of the protected class, or by (iv) constructively causing applicants to withdraw applications due to roadblocks and pretextual actions.

81.     Defendants refused to transact business with Plaintiffs and all others similarly situated during the Class Period and at the same time transacted business with non-Black homeowners with similar qualifications.

82.     Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges on the basis of race, color, and/or national origin in

connection with the making of residential real estate-related transactions, in violation of 42 U.S.C. § 3605

83.     Plaintiffs and all others similarly situated were disparately impacted by Defendants' refusal to transact business with them on equal terms because, among other things, they: (i) paid application fees for refinancing applications that were delayed or denied;  (ii) continued to pay higher interest rates while their delayed applications were pending; (iii)  were provided with higher interest rates than other similarly situated Non-Black applicants; or (iv) were unable to "cash out" of their mortgage and capture increased home value since a previous financing.

84.     Defendants have maintained these acts, policies, and practices continuously and without material change since at least 2018, and they constitute a continuing violation of the Fair Housing Act.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF THE CIVIL RIGHTS ACT OF 1866
### 42 U.S.C. § 1981, *et seq.*

85.     Plaintiffs incorporate by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

86.     Racial discrimination in contracting is prohibited by 42 U.S.C. § 1981, which ensures that all people have the same right to make and enforce contracts "as is enjoyed by white citizens." Section 1981 was enacted to eradicate racial discrimination in contracting as is derived from the Civil Rights Act of 1866 and applies with full force and effect today.

87.     Defendants have engaged in, and is engaging in, pernicious, intentional racial discrimination in contracting, which is illegal under § 1981.  Section 1981 is broad, covering "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

CLASS ACTION COMPLAINT - 20

88.     African Americans and other racial minorities are a protected class under § 1981. Plaintiffs and the Class Members are members of that class as they are African American or other racial minorities.

89.     As alleged herein, Plaintiffs and the Class Members attempted to contract with the Defendants for home loans and loan refinancing, but the Defendants refused, engaging in a series of pretextual acts meant to discriminate, including but not limited to, (i) denying Black (or other racial minority) home loan applicants, of worthy credit; (ii) approving Black (or other racial minority) home loan applicants, but with inferior terms than terms offered to similarly situated white home loan applicants; (iii) refusing to approve refinancing applications on the same window of time as applications made by other parties with similar qualifications that were not members of the protected class, or by (iv) constructively causing applicants to withdraw applications due to roadblocks and pretextual actions.  Yet, Defendants have continued to contract with and make themselves available to contract with similarly situated white home loan applicants.

90.     Defendants have refused to contract with Plaintiffs and the Class Members for home loan financing.  Defendants have a pattern and practice of refusing to do business, or offering unequal contracting terms to, African Americans and other racial minorities.

91.     Plaintiffs and all other similarly situated were harmed by Defendants' conduct, including, but not limited to, harm in the form of higher interest rates paid while applications were pending, higher interest rates paid upon a delayed approval, an inability to secure a "cash out" refinance loan, an inability to reduce the principal on a home loan payment, or from a denied application.

92.     Accordingly, Defendants' unlawful discrimination has caused Plaintiffs and those similarly situated harm for Defendants' refusal to contract with Plaintiffs.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Pro. Code §17200,** *et seq.*

93.    Plaintiffs incorporates by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

94.    The California Unfair Competition Law ("UCL") forbids "unlawful, unfair or fraudulent" conduct in connection with business activity.

95.    Defendants' business offering of financing loans and refinancing of existing loans is a business activity under the UCL.

96.    Plaintiffs and others similarly situated are "persons" under the UCL.

97.    Defendants' conduct described herein constitutes unlawful competition, as in the course of engaging in the business acts described above, it engaged in conduct that constituted a predicate violation of the laws identified herein, namely the Equal Credit Opportunity Act and the Fair Housing Act, 42 U.S.C. § 1981.

98.    Defendants' conduct described herein constitutes unfair competition under the UCL, as Defendants deploy hidden business practices designed to deny, delay and refuse the financing and/or refinancing of loans of Black Americans, and subjecting those that are approved, to less favorable terms than white borrowers.  Defendants' acts and practices offended an established public policy, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers. As there is no legitimate justification for these practices, which have a disproportionately negative impact on the public, in comparison to any fair business, purpose Defendants' practices are unfair as defined under the UCL.

99.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

CLASS ACTION COMPLAINT - 22

100.    Defendants' acts and practices alleged above constitute unlawful business acts or practices as they have violated federal law as described herein.

101.    Defendants' conduct described herein constitutes fraudulent competition under the UCL, as they claim they will fairly and quickly process the financing and refinancing applications of all applicants, but instead use hidden business practices designed to deny, delay and refuse the refinancing of loans of Black Americans, and subjecting those that are approved to less favorable terms.  These business practices are likely to deceive the public, and thus are fraudulent.

102.    Plaintiffs and those similarly situated were injured by Defendants' refusal to transact business with them because they paid application fees for financing and refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar qualifications, because they were offered less favorable terms than white borrowers, and/or because their applications were denied.

## VII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class of similarly situated persons, respectfully seek the following relief:

**A.**    An order certifying this action as a class action under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), defining the Class as requested herein, finding that Plaintiffs are proper representatives of the Class requested herein, and appointing Plaintiffs' counsel as Class Counsel;

**B.**    Designate Plaintiffs as Class Representatives and designate the undersigned counsel as lead Class Counsel;

**C.**  Find that Defendants' acts described herein violate the Equal Credit Opportunity Act, the Fair Housing Act, the Civil Rights Act of 1866, and the California Unfair Competition Law;

**D.**  Enter a declaratory judgment that the forgoing acts, policies, and practices of Defendants violate 15 U.S.C. § 1691; and 42 U.S.C. § 3605;

**E.**  Enter a permanent injunction enjoining Defendants from continuing to implement and enforce the illegal conduct described herein and directing Defendants to take all affirmative steps necessary to remedy the effects of that conduct and to prevent additional instances of such conduct or similar conduct from occurring in the future;

**F.**  Find that Defendants have engaged in a pattern and practice of racial discrimination resulting in the harm to Plaintiffs and class members described above;

**G.**  Award Plaintiffs and the members of the Class damages in an amount to be determined by the Court;

**H.**  Award Plaintiffs and the members of the Class pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

**I.**  Award Plaintiffs and the members of the Class the costs of suit, including reasonable attorneys' fees, as provided by law; and

**J.**  Award Plaintiffs and the members of the Class any other and further relief as the case may require and the Court may deem just and proper.

## VIII.    JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

CLASS ACTION COMPLAINT - 24

1   Dated:       June 10, 2022         Respectfully submitted,

2                                    **GUSTAFSON GLUEK, PLLC**

3                                    By: */s/ Dennis J. Stewart*

4                                    Dennis J. Stewart, CA Bar No. 99152

                                      600 B Street, Suite 1700

5                                    San Diego, CA 92024

                                      Tel.: (612) 333-8844

6                                    Fax: (612) 339-6622

7                                    dstewart@gustafsongluek.com

8                                    Daniel E. Gustafson (Pro Hac Vice to be filed)

                                      David A. Goodwin (Pro Hac Vice to be filed)

9                                    Amanda M. Williams (Pro Hac Vice to be filed)

                                      Abou B. Amara, Jr. (Pro Hac Vice to be filed)

10                                   **GUSTAFSON GLUEK PLLC**

11                                   Canadian Pacific Plaza

                                    120 South Sixth Street, Suite 2600

12                                   Minneapolis, MN 55402

13                                   Telephone: (612) 333-8844

                                    dgustafson@gustafsongluek.com

14                                   dgoodwin@gustafsongluek.com

15                                   awilliams@gustafsongluek.com

                                    aamara@gustafsongluek.com

16                                   Scott D. Hirsch (*Pro Hac Vice to be filed*)

17                                   **SCOTT HIRSCH LAW GROUP, PLLC**

18                                   6810 N. State Road 7

                                    Coconut Creek, FL 33073

19                                   Tel.: (561) 569-7062

20                                   scott@scotthirschlawgroup.com

21                                   Vildan A. Teske (*Pro Hac Vice to be filed*)

                                  Marisa C. Katz (*Pro Hac Vice to be filed*)

22                                   **TESKE KATZ PLLP**

23                                   222 South Ninth Street, Suite 1600

                                  Minneapolis, MN 55402

24                                   Telephone: (612) 746-1558

25                                   teske@teskekatz.com

26                                   *Attorneys for Plaintiffs and Others Similarly Situated*

27

28

CLASS ACTION COMPLAINT - 25

1

2 **UNITED STATES DISTRICT COURT**

3 **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

4

5 CHRISTOPHER WILLIAMS, SAM          Case No. 3:22-cv-00990-JD
   ALBURY, and SHAIA BECKWITH
6 SIMMONS, individually and on behalf of
   all others similarly situated,
7                                     **[PROPOSED] ORDER GRANTING
                                       DEFENDANTS' MOTION TO
8            Plaintiffs,              CONSOLIDATE**

9       v.

10 WELLS FARGO BANK, N.A.; WELLS
   FARGO & CO.
11
            Defendants.

12

13        Having considered Defendants Wells Fargo Bank, N.A. and Wells Fargo & Company's

14 Motion to Consolidate, the Court hereby rules as follows:

15        The following cases are consolidated for all purposes:

16   • *Williams v. Wells Fargo Bank, N.A., et al*., Case No. 3:22-cv-00990-JD

17   • *Braxton v. Wells Fargo Bank, N.A., et al*., Case No. 3:22-cv-01748-JD

18   • *Ebo v. Wells Fargo Bank, N.A*., No. 3:22-cv-2535-JD

19   • *Perkins v. Wells Fargo Bank, N.A., et al*., Case No. 3:22-cv-3455-JD

20        Plaintiffs shall file a single, consolidated amended complaint within __ days of this order.

21 IT IS SO ORDERED.

22

23 Dated: _____          _____

24                                 HON. JAMES DONATO
                                   UNITED STATES DISTRICT COURT JUDGE

25

26

27

28